# EXHIBIT D

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Blockquarry Corp. f/k/a ISW Holdings, Inc., <br><br>     Plaintiff, <br><br> v. <br><br> Litchain Corp. and Gaffney Board of Public Works, <br><br>     Defendants. | Civil Action Number: <br><br><br> **COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTION, AND DAMAGES** <br><br> *(Jury Trial Demanded)* |

Plaintiff Blockquarry Corp. f/k/a ISW Holdings, Inc. requests declaratory and injunctive relief relative to matters effecting Defendants Litchain, Inc. and Gaffney Board of Public Works and sues Defendants Litchain, Inc. for damages and alleges as follows.

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Blockquarry Corp. f/k/a ISW Holdings, Inc. ("Blockquarry") is a corporation organized under the laws of Nevada.  The company is authorized to transact business in the state of South Carolina and maintains a principal place of business  in Texas.[1]

2.    Defendant Litchain Corp. ("Defendant") is a corporation organized under the laws of Florida.  The company is authorized to transaction business in the state of South Carolina and maintains a principal place of business in Florida.

3.    Defendant Gaffney Board of Public Works (the "Utility") is a municipal corporation organized under the laws of South Carolina.  The Utility maintains a principal place

---

[1] During 2021, Blockquarry caused a name change to occur with the Nevada Secretary of State, changing the corporation's name from ISW Holdings, Inc. to Blockquarry Corp.

of business in South Carolina and was founded to provide electric, water, and sewer public utility services to customers within its retail service territory.

4.     This Court has subject matter jurisdiction over the instant case because all parties are diverse, including each plaintiff as to each defendant, and the amount in controversy exceeds $75,000.00.  *See* 28 U.S.C.A. § 1332.

5.     The Court has personal jurisdiction over the Utility because it is a municipal corporation organized under the laws of South Carolina and because it maintains a principal place of business in South Carolina.

6.     The Court has personal jurisdiction over Defendant because Defendant regularly conducts business in South Carolina by, among other ways, contracting with the Utility and, purportedly, Blockquarry for various performances due in the state of South Carolina.

7.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the instant claim occurred in Cherokee County, South Carolina and a substantial part of property that is the subject of the action is situated in Cherokee County, South Carolina.  *See* 28 U.S.C.A. § 1391(b)(2).

## **FACTUAL ALLEGATIONS**

### A.   **Bitcoin Mining, Generally**

8.     The acts and omissions involved in the instant case relate to Bitcoin mining.

9.     Bitcoin is a digital currency that uses blockchain technology to support peer-to-peer transactions between users on a decentralized network.  Bitcoin is money—that can (and does) thrive without the guarantees of a national central bank.

10.    Bitcoin is relatively risk free because ownership of the currency is verified and recorded by a public digital ledger.  The ledger perpetually grows as new transactions and exchanges take place.

**EXHIBIT D
PAGE 132**

11.     Bitcoin "miners" maintain and verify the ledger for a fee that is paid in Bitcoin.

12.     The ledger is maintained and verified, digitally, by mining servers owned or operated by miners.  The servers are continually running complex mathematical equations required to solve for and publish new blocks of Bitcoin transactions on the ledger.

13.     Operating the server equipment for Bitcoin mining requires an immense amount of electrical power.  *See, generally, infra* ¶ 33.  Consequently, power supply contracts are paramount considerations for Bitcoin miners.

14.     It is common for development companies to prepare sites for cryptocurrency mining operations, in the same way a real estate development company may prepare unimproved land for subdivision and sale.

15.     A development company may contract for the real estate, utility services (primarily electrical power), and housing for cryptocurrency mining servers, even though the mining servers may be owned by third parties.  Housing in this context often refers to providing mining "pods." *Pods* are, typically, converted shipping containers equipped with cooling, server racking, and coupling points for utility services.  The mining *servers* are installed in the pods when development is complete.  In this relationship, the owners of the mining servers are the miners that earn a fee for maintaining and verifying the Bitcoin ledger (not the development company).

**B.     Blockquarry pays Defendant $300,000 for identifying and delivering premises for cryptocurrency mining operations on the Utility's real property.**

16.     Blockquarry is a cryptocurrency mining development company, as described in ¶ 15 above.  Its primary business purpose is to provide its clients with cryptocurrency mining development services in the United States.

**EXHIBIT D
PAGE 133**

17.    During early October 2021, Blockquarry's business associates approached the company with a potential site for new cryptocurrency mining operations.  The proposed site was being offered by Defendant.

18.    Defendant represented it was offering to lease real property suited for cryptocurrency mining, as the site was located adjacent to a distribution-level electrical substation.

19.    The site's proximity to a substation made it highly attractive to Blockquarry, given the likelihood that the substation could serve high-demand electrical processes with little need for additional or supplemental power systems upgrades.

20.    On or about October 18, 2021, Blockquarry executed a written document, whereby Defendant purported to sublease real property owned by the Utility to Blockquarry, located at 154 Hyatt Street in Gaffney, Cherokee County, South Carolina (the "Premises"), for the purpose of a Bitcoin mining operation.  The purported sublease is discussed in greater detail *infra* at § H.

21.    The Utility owns and operates a distribution-level electrical substation on or adjacent to the Premises, called the 'Suez Station.'

22.    On or about October 18, 2021, Blockquarry executed a written document, whereby Defendant purported to license to Blockquarry an attractive rate offered by the Utility for electrical usage and demand consumed on the Premises.[2]  The purported license agreement is discussed in greater detail *infra* at § I.

23.    Unknown to Blockquarry—at that time—Defendant had secured the following agreements relative to the Premises.

---

[2] The rate is called an 'economic development incentive rate' and is a tool for participating municipal utilities to offer incentives for new customers with high-demand profiles to enter their retail service territories.

4

**EXHIBIT D**
**PAGE 134**

- On or about September 8, 2021, the Utility and Defendant entered an electric service agreement for electrical service for the Premises.  The electric service agreement is discussed in greater detail *infra* at § J and provides for the same attractive rate provided for in the purported license agreement.

- On or about September 28, 2021, the Utility and Defendant entered a ground lease for the Premises.

24.     Blockquarry funded a $300,000 fee paid to Defendant for identifying the Premises as a Bitcoin mining site.  The fee was *not* paid part and parcel to or as a requirement of the purported sublease or purported license agreement.

**C.     Blockquarry expends nearly $7.4 million for Bitcoin mining on the Premises.**

25.     Blockquarry funded $1,387,895.20 as a deposit on the Premises' utility bill (the "Deposit").  Approximately $1,000,000 this amount was paid by Blockquarry, directly, to the Utility.  The remainder was paid by Blockquarry's contractor, directly, to the Utility.

26.     The deposit was required under the electric service agreement between BPW and Defendant.  *See infra* ¶ 94.

27.     The Utility remains in possession of the Deposit.

28.     In addition to the Deposit, Blockquarry paid approximately $6 million to a third party contractor for:

- various improvements to the Premises, including for site clearing and build out of the Premises;

- the purchase, delivery, and installation of distribution transformers required to condition and deliver usable electrical power for Bitcoin mining, and

- for the purchase, delivery, and installation of mining pods.

**EXHIBIT D**
**PAGE 135**

29.    Blockquarry owns personal property kept on the Premises, including at least five distribution transformers, ten mining pods, and Bitcoin mining servers.  Blockquarry's Bitcoin mining servers are kept in a storage facility on the Premises.

30.    Additionally, Blockquarry's clients own personal property kept on the Premises, including over 5,000 Bitcoin mining servers installed in Blockquarry's mining pods.  Blockquarry is the bailee of its client's personal property kept on the Premises.

**D.    Blockquarry mines for Bitcoin on the Premises and pays rent and utility bills directly to the Utility.**

31.    Blockquarry (and/or its client(s)) began Bitcoin mining on the Premises during March 2022.

32.    Defendant gave Blockquarry's contractor access to an online portal for reconciliation and payment of the invoices and bills from the Utility relative to the Premises.

33.    Blockquarry paid the Utility, directly, over $2.2 million in fees for utility services, exclusive of the Deposit.

34.    Blockquarry also paid the Utility, directly, $3,000 in monthly rent payments.  *See infra* ¶ 73.

35.    Blockquarry paid the fees for utility services and monthly rent payments by using the Utility's website and by making check payments that were overnighted to the Utility.

36.    Blockquarry understood—and had justifiable reason to believe, given the purported license agreement—that *all* money paid by Blockquarry to the Utility was paid for Blockquarry's benefit.

37.    Moreover, the Utility *knew* Blockquarry was making payments, directly, to the Utility for utility services and monthly rent.

**EXHIBIT D
PAGE 136**

38.     Blockquarry has *not* paid Defendant *any* money under the purported sublease or purported license agreement.  All payments have been made by Blockquarry directly to the Utility or by Blockquarry's contractor directly to the Utility.

39.     On information and belief, Defendant has not paid the Utility any money relative to the Premises.

40.     On or about April 11, 2022, Blockquarry contracted with a management company to maintain the Premises and to maintain the Bitcoin mining operations located on the Premises for a fee of $65,000 per month.[3]  Blockquarry paid the management company accordingly.

41.     Blockquarry also reimbursed the management company for various costs associated with maintenance.

**E.     Defendant attempts to extort money from Blockquarry.**

42.     Sometime around December 2022, Defendant's principal, Tony Tate ("Tate"), determined, apparently, that he was dissatisfied with Defendant's position relative to Blockquarry and the Utility.

43.     Tate changed the administrative credentials to the online payment portal, blocking Blockquarry and its management company's access to the Utility's billing.   Thereafter, Blockquarry and its management company would have no information relative to the Utility's charges for services.

44.     At the same time, Tate begins delivering Blockquarry erratic, threatening messages demanding large amounts of money.

---

[3] The management company and the contractor discussed in ¶ 28 *supra* are the same entity.

**EXHIBIT D
PAGE 137**

45.     On December 21, 2022, Tate sent Blockquarry an email stating "we revoked" the purported sublease and license agreements, and that Defendant and/or Tate would "lock down" the Premises and inform the Utility to stop delivering electrical power to the Premises.

46.     On December 27, 2022, Tate delivered Blockquarry an email stating "we have revoked the agreements" and that the purported license agreement is revoked, and demanding payment of nearly $100,000—an amount which is, purportedly, a "10% Good Faith Deposit."

47.     On January 5, 2023, Tate sent Blockquarry an email:

•       stating "I will be initiating . . . eviction" for, allegedly, not curing alleged defaults that Defendant purportedly noticed on December 7, 2022, December 16, 2022, and December 27, 2022;

•       stating Defendant is assessing over $1.4 million against Blockquarry, exclusive of administrative fee and penalties, on ground of alleged breaches of the purported sublease and purported license agreement;

•       stating "we will be locking down the site and advising [the Utility] to keep the power shut off . . . [;]" and

•       demanding information from Blockquarry relative to the company's plan to vacate the Premises.

48.     On January 9, 2023, Tate delivered Blockquarry and email claiming that over $157,000.00 is past due and owing for utility services and $2,899 is past due and owing for rent payments under the purported sublease.  The email provided *the Utility's* ACH payment information and demanded that Blockquarry make payment to the Utility.

**EXHIBIT D
PAGE 138**

49.     On January 10, 2023, Tate delivered Blockquarry an email stating, among other things, he considers the Premises abandoned—due, apparently, to "nonpayment of bills"—and that "we're moving forward with eviction."

50.     On January 19, 2023, Tate delivered Blockquarry an email accusing Blockquarry of a material breach; claiming that the "total amount of indebtedness accrued by [Blockquarry] for non-payment and failing to perform as agreed is $1,879,304.61[;]" and demanding a half payment on a total amount of $995,767.20 to avoid eviction.

51.     The same email claims $883,537.41 is due and payable to the Utility, despite that Tate claimed days earlier that a mere $157,000.00 was past due and owning for utility services.

52.     Defendant has refused and continues to refuse to substantiate claims levied in its correspondence (with documents or otherwise), notwithstanding requests from Blockquarry.

53.     Defendant's conduct—*e.g.*, demanding the payment of nearly two million dollars in exchange for Defendant's avoidance of legal process it has no entitlement to pursue—is extortion.

54.     Blockquarry is not indebted to Defendant and owes no duty of performance to Defendant.

**F.     The Utility stops electrical service to the Premises; refuses to return the Deposit to Blockquarry; and locks Blockquarry out of the Premises.**

55.     During January 2023, the Utility stopped electrical service to the Premises.

56.     On January 9, 2023, the Utility delivered a letter to Defendant advising it cutoff the Premises' electricity for nonpayment; identifying Defendant's defaults under the September 23 ground lease and stating "[the Utility] did *not* approve of or consent to sublease" to Blockquarry.

57.     Sometime after February 16, 2023, the Utility padlocked the Premises, blocking any physical access to the Premises for Blockquarry (and, presumably, any other third party).

9

**EXHIBIT D
PAGE 139**

58.     The Utility has refused and continues to refuse to return the Deposit to Blockquarry, despite demand from .

59.     The Utility informed Blockquarry it will return the Deposit paid by Blockquarry to its customer—*i.e.*, Defendant—*not* to Blockquarry.

60.     The Utility further informed Blockquarry it will return the Deposit paid by Blockquarry to Litchain *before* April 14, 2023.

61.     Since the Utility has discontinued electrical and other utility services on the Premises and has never turned the power back on, the Utility has no need, requirement, or right to retain the Deposit paid by Blockquarry.

**G.     Litchain attempts to evict Blockquarry and dupe the Utility into returning the Deposit to Litchain.**

62.     On or about February 3, 2023, Litchain caused an eviction action to be filed against Blockquarry relative to the Premises in the Magistrate Court of Cherokee County, South Carolina (bearing case number 2023CV1110100285) (the "Eviction Action").  The rule to vacate filed in the Eviction Action is attached hereto as *Exhibit A* and sworn to by Defendant's counsel.

63.     Blockquarry opposed the eviction and demanded a jury trial.

64.     On or about March 13, 2023, the Utility delivered a letter to Defendant stating, "Effective immediately, the Lease is terminated[]" (emphasis in original), and stating that future access of the Premises by Litchain will be treated as a trespass.

65.     On March 14, 2023, Litchain delivered an email to the Utility's counsel requesting that the Utility cut a check for the Deposit to Litchain and provided the company's address for delivery of the same.

66.     Litchain's March 14, 2023 was an unlawful attempt to convert the Deposit for Litchain's improper use.

**EXHIBIT D**
**PAGE 140**

**H.     Terms of the Purported Sublease between Blockquarry and Defendant**

67.     A true and correct copy of the written agreement purporting to convey a sublease for the Premises is attached hereto as *Exhibit B*.  The agreement is hereinafter cited as "Ex. B."

68.     The agreement references a 'master lease' between the Utility and Defendant—dated September 23, 2021—for the Premises and represents and warrants Defendant was able to convey a leasehold interest in the Premises.  (Ex. B §§ A., 2.13, and 15.8.)

69.     The agreement is subordinate to the purported 'master lease' and incorporates its terms and conditions.  (Ex. B §§ 2.1. and 2.2.)

70.     The agreement is "conditioned upon the consent . . . by [the Utility,] which consent shall evidenced by [the Utility's] signature appended hereto or a separate consent . . . ."  (Ex. B § 1.4.)  The agreement further provides Blockquarry and/or Defendant may cancel the agreement upon written notice, in the event Defendant does not receive the Utility's consent.  (*Id.*)

71.     The purported sublease is terminated in the event the 'master lease' is terminated. (Ex. B §§ 2.3.)

72.     The term of the purported sublease is approximately eight years, commencing upon the later of October 1, 2021 and the Utility's consent, and expiring on September 30, 2029.  (Ex. B § 1.4.)

73.     The agreement requires Blockquarry to pay rent in the amount of $3,000 per month. (Ex. B § 1.1.(b).)

74.     The agreement requires Defendant to produce to Blockquarry notices provided to Defendant from the Utility.  (Ex. B § 2.11.)

75.     The agreement provides that South Carolina law controls.  (Ex. B § 15.7.)

76.     The agreement was drafted by Defendant.

77.     Except for the terms provided above, the agreement is ambiguous and unclear.  It is unusually verbose and difficult to decipher and appears to contain elements of a pro forma document that were not edited or removed for purposes of the instant transaction.  (*See, e.g.,* Ex. B § 2.7.)

78.     Adding to the confusion, the purported sublease devotes pages of terms that were waived by Defendant.  (*See, e.g.,* Ex. B at Article VIII [Security].)

**I.    Terms of the Purported License Agreement between Blockquarry and Defendant**

79.     A true and correct copy of the written agreement purporting to convey a license for the use of an 'economic development incentive rate' is attached hereto as *Exhibit C*.  The agreement is hereinafter cited as "Ex. C."

80.     This is the same rate referred to in ¶ 22 above.

81.     The agreement references a "special agreement with Gaffney Board of Public Works' (the Utility)" along with the applicable rate schedule and purports to convey "a revocable license for the use of the benefits of the [agreement with the Utility]." (Ex. C § 2.) This references the electrical service agreement between the Utility and Defendant, which is discussed further *infra* § J.

82.     The term of the agreement is five years or until the purported license is revoked by Defendant.  (*Id.*)  Revocation by Defendant requires sixty-days' notice.  (*Id.*)

83.     The agreement purports to eliminate a claim for damages arising from termination of the purported license.  (*Id.*)

84.     The agreement does not require or otherwise demand the exchange of any payment. (Ex. C § 3.)

**EXHIBIT D
PAGE 142**

85.    The agreement requires Blockquarry to remit special benefit payments received to the Utility.  (Ex. C § 5.)

86.    Curiously, the agreement also purports to convey an interest in real estate—presumably, the Premises.  (Ex. C § 6.)

87.    The agreement provides for attorneys' fees to the prevailing party while enforcing the agreement.  (Ex. C § 10.)

88.    The agreement provides that South Carolina law controls.  (Ex. C § 12.)

89.    The agreement was drafted by Defendant and thereafter provided to Blockquarry.

90.    Except for the terms provided above, the agreement is ambiguous and unclear.  It contains, among other things, several incomplete sentences.  (*See, e.g.,* Ex. C § 6.)

**J.    Terms of the Electrical Service Agreement between Defendant and the Utility**

91.    A true and correct copy of the written agreement for electrical service by the Utility to serve the Premises is attached hereto as _Exhibit D_.  The agreement is hereinafter cited as "Ex. D."

92.    According to the electrical service agreement the Premises are to take electrical service under the Utility's 'economic development incentive rate' and 'credit for new loads,' provided that the Premises' peak demand exceeds 750 kilowatts.  (Ex. D p. 12, § 2.1.)

93.    The term of the agreement is for eight years.  (Ex. D § 4.1.)

94.    The agreement requires a deposit equal to the Premises "two highest month utility bill average."  (Ex. D § 7.1.)

95.    The agreement states, "[Defendant] is choosing to provide it own distribution transformers (2500 KVA/416 v)."  (Ex. D § 6.3.)

**EXHIBIT D
PAGE 143**

96.    These are the distribution transformers purchased, delivered, and installed by Blockquarry on the Premises.  *See supra* ¶ 28.

## COUNT 1

**REQUEST FOR DECLARATORY JUDGMENT RELATIVE TO THE DEPOSIT, THE PERSONAL PROPERTY ON THE PREMISES, AND ALLEGED INDEBTEDNESS TO DEFENDANT AND THE UTILITY**

*(As to Defendant and the Utility)*

97.    Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

98.    This is an action under 28 U.S.C.A. §§ 2201 and 2202 to resolve a case and controversy by and between Blockquarry, Defendant, and the Utility (collectively, the "Parties").

99.    There is a case of actual, justiciable controversy between the Parties—that is substantial, definite, and concrete—relative to: (i) the Deposit paid by Blockquarry, (ii) Blockquarry's personal property on the Premises, and (iii) real improvements made by Blockquarry to the Premises (to the extent they are not fixtures).  Blockquarry enjoys a legally protected interest with respect to these matters.

100.    The threat of an injury in fact to Blockquarry—if these issues are not resolved by the Court issued declaratory relief—is actual and imminent, not conjectural or hypothetical.

101.    A declaratory judgment in the instant case will be useful; there is a sufficient practical need for it; and the judgment will finally determine the rights of the Parties.

102.    The Deposit belongs to Blockquarry and should be returned immediately to Blockquarry.

103.    Defendant's attempted extortion of Blockquarry and conversion of the Deposit, among other conduct, demonstrates that—if the Deposit is returned to Defendant—Defendant will either abscond with the cash or use it to continue exploiting Blockquarry.

14

**EXHIBIT D
PAGE 144**

104.    Blockquarry maintains the personal property on the Premises valued at well over $1 million. *See supra* ¶¶ 28-29.

105.    Blockquarry improved the Premises by *inter alia* installing distribution transformers required to condition electrical power for Bitcoin mining.

106.    Blockquarry does not have an adequate remedy at law with respect to the Deposit paid by Blockquarry, the maintenance and protection of Blockquarry's personal property, including the distribution transformers.

WHEREFORE Blockquarry requests this Court enter judgment:

A.    declaring Blockquarry is the rightful owner of the Deposit paid by Blockquarry;

B.    declaring Blockquarry is the rightful owner of its personal property on the Premises, including the Bitcoin mining pods, the distribution transformers, and other personal property not affixed to the Premises;

C.    declaring Blockquarry caused and paid for real improvements to be affixed to the Premises;

D.    declaring Blockquarry is not indebted to Litchain for any amount of money or other obligation;

E.    declaring Blockquarry is not indebted to the Utility for any amount of money or other obligation;

F.    taxing against Defendant Blockquarry's attorneys' fees and costs under 28 U.S.C.A. § 2202 and S.C. CODE ANN. § 15-53-100; and

G.    awarding any other relief the Court deems appropriate.

**EXHIBIT D**
**PAGE 145**

## COUNT 2

### DECLARATORY JUDGMENT RELATIVE TO THE PURPORTED SUBLEASE

#### *(As to Defendant)*

107.    Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

108.    This is an action under 28 U.S.C.A. §§ 2201 and 2202 to resolve a case and controversy by and between Blockquarry and Defendant.

109.    There is a case of actual, justiciable controversy between Blockquarry and Defendant—that is substantial, definite, and concrete—with respect to the rights and obligations flowing from the purported sublease.  Blockquarry enjoys a legally protected interest relative to the money paid and other obligations it incurred by way of the purported sublease.

110.    The threat of an injury in fact to Blockquarry—if these issues are not resolved by the Court issued declaratory relief—is actual and imminent, not conjectural or hypothetical.

111.    A declaratory judgment in the instant case will be useful; there is a sufficient practical need for it; and the judgment will finally determine the rights between Blockquarry and Defendant, generally, and with respect to money paid and other obligations it incurred by way of the purported sublease.

112.    The purported sublease is void, voidable, and further unenforceable because, among other reasons, Defendant cancelled, terminated, and revoked the purported sublease; Defendant never had the Utility's consent for the purported sublease, despite Defendant's representations otherwise; and the Utility cancelled, terminated, and revoked the master lease with Defendant.

**EXHIBIT D**
**PAGE 146**

WHEREFORE Blockquarry requests this Court enter judgment:

1.     declaring that purported sublease is void, voidable, and further unenforceable;

2.     taxing against Defendant Blockquarry's attorneys' fees and costs under 28 U.S.C.A. § 2202 and S.C. CODE ANN. § 15-53-100; and

3.     awarding any other relief the Court deems appropriate.

## COUNT 3

## DECLARATORY JUDGMENT RELATIVE TO THE PURPORTED LICENSE AGREEMENT

### *(As to Defendant)*

113.     Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

114.     This is an action under 28 U.S.C.A. §§ 2201 and 2202 to resolve a case and controversy by and between Blockquarry and Defendant.

115.     There is a case of actual, justiciable controversy between the Parties—that is substantial, definite, and concrete—with respect to the rights and obligations flowing from purported license agreement.  Blockquarry enjoys a legally protected interest relative to the money paid and other obligations it incurred by way of the purported license agreement.

116.     The threat of an injury in fact to Blockquarry—if these issues are not resolved by the Court issued declaratory relief—is actual and imminent, not conjectural or hypothetical.

117.     A declaratory judgment in the instant case will be useful; there is a sufficient practical need for it; and the judgment will finally determine the rights of the Parties, generally, and with respect to money paid and other obligations incurred by way of the purported license agreement.

17

**EXHIBIT D
PAGE 147**

118.    The purported license is void, voidable, and further unenforceable because, among other reasons, it is not supported by consideration and the purported license agreement precludes a claim for damages.  Moreover, Defendant cancelled, terminated, and revoked the purported license agreement; Defendant never had the Utility's consent for the purported license agreement; and the Utility cancelled, terminated, and revoked the electrical service agreement between the Utility and Defendant.

WHEREFORE Blockquarry requests this Court enter judgment:

A.      declaring the purported license agreement is void, voidable, and further unenforceable;

B.      taxing against Defendant Blockquarry's attorneys' fees and costs under 28 U.S.C.A. § 2202 and S.C. CODE ANN. § 15-53-100; and

C.      awarding any other relief the Court deems appropriate.

## REQUEST FOR INJUNCTIVE RELIEF

### *(As to Defendant and the Utility)*

119.    Blockquarry incorporates by this reference all the other allegations contained in this Complaint.

120.    Blockquarry seeks injunctive relief from the Court requiring the Utility and/or Defendant to return—to Blockquarry—the Deposit and personal property on the Premises.

121.    Blockquarry demonstrated a likelihood of success on the merits as to the foregoing claims for relief, based on the allegations set forth in this pleading.

122.    Blockquarry is without an adequate remedy at law relative to the return of the Deposit and personal property on the Premises for and among other reasons it is the bailiff of some of the personal property on the Premises

**EXHIBIT D
PAGE 148**

123.    Blockquarry will suffer immediate and irreparable harm if the Deposit is not returned, if the Deposit is returned to Litchain, and if the personal property on the Premises is not returned to Blockquarry.   This is evidence by, among other reasons, the Eviction Action and attempt to convert Blockquarry's Deposit.

124.    No harm will be suffered from the issuance of an injunction, as requested herein.

125.    Greater harm will be suffered by Blockquarry if injunctive relief is not granted. The balance of equities tip in Blockquarry's favor.

126.    Granting the injunctive relief is in the public interest.

WHEREFORE Blockquarry requests this Court enter judgment:

     A.    requiring the Utility and/or Defendant to immediately return to Blockquarry the Deposit;

     B.    enjoining the Utility from returning the Deposit to Litchain;

     C.    requiring the Utility and/or Defendant to immediately return to Blockquarry the personal property on the Premises, including the Bitcoin mining pods, the distribution transformers, and other personal property not affixed to the Premises

     D.    enjoining the Utility from returning the personal property on the Premises to Litchain;

     E.    taxing against Defendant Blockquarry's attorneys' fees and costs; and

     F.    awarding any other relief the Court deems appropriate.

## COUNT 4
### WRONGFUL EVICTION
*(As to Defendant)*

127.    Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

19

**EXHIBIT D**
**PAGE 149**

128.    The Eviction Action is wrongful and unlawful on the following grounds:

- by causing a breach of the purported master lease;

- by not providing requisite notice, including notices produced by the Utility;

- by refusing to provide information relative to the master lease;

- by interfering with Blockquarry's quiet enjoyment of the Premises;

- by failing to achieve and not achieving the Utility's consent with the sublease;

- by representing and warranting Defendant could lawfully enter the sublease, while not enjoying the Utility's consent to the sublease; and

- by blocking Blockquarry's access to the online portal for payment of rent and utility fees; and

- by instructing the Utility to cut off the power; and

- by instructing the Utility not to communicate with Blockquarry.

129.    The Eviction Action caused Blockquarry damages.

WHEREFORE Blockquarry requests this Court enter judgment against the Defendant for damages or, alternatively, damages, costs, and any other relief the Court deems appropriate.

## COUNT 5

### ABUSE OF PROCESS

### *(As to Defendant)*

130.    Blockquarry alleges and incorporates herein by this reference the allegations contained in paragraphs 1 through 96 above.

131.    Defendant's filing of the eviction action (*see supra* ¶ 62) relative to Blockquarry's use of the Premises is a misuse of the legal system for an ulterior purpose that is not proper in the regular conduct of the proceeding.

**EXHIBIT D
PAGE 150**

132.    Defendant had no legal or equitable right to attempt to evict Blockquarry from the Premises.  Defendant knew at the time it filed the eviction action, among other things: (i) that the Utility had never consented to the purported sublease; (ii) that Defendant had never once paid for rent under the master lease; (iii) that Defendant had never once paid for electrical service under the electric service agreement; (iv) that Blockquarry paid the Deposit; (v) that the Utility had delivered Defendant notice that it would terminate the master lease; and (vi) that Defendant had purportedly terminated the purported sublease.

133.    Defendant has further maintained the eviction action notwithstanding that the Utility terminated the master lease.  *See supra* ¶ 64.

134.    Defendant filed the eviction action and has maintained the same action primarily to accomplish a purpose for which it is not designed, namely, to coerce the achievement of a collateral advantage—*i.e.*, to continue to unlawfully attempt to extort money from Blockquarry and to convert the Deposit to its own improper use, among other things.

135.    Defendant's abuse of process caused Blockquarry damages.

136.    Blockquarry anticipates amended the instant complaint to allege a cause of action for malicious prosecution if and when the eviction action is dismissed in Blockquarry's favor.

WHEREFORE Blockquarry requests this Court enter judgment against the Defendant for damages or, alternatively, damages, costs, and any other relief the Court deems appropriate.

## JURY DEMAND

Blockquarry requests a jury trial on all issues so triable.

**EXHIBIT D
PAGE 151**

Respectfully submitted,

April 7, 2023

FOX ROTHSCHILD LLP

2 W. Washington Street
Suite 1100
Greenville, SC 29601
Tel:   864.751.7600

Greenville, South Carolina

*/s/ R. Taylor Speer*

R. Taylor Speer
Federal ID# 12267
tspeer@foxrothschild.com

William A. Neinast
Federal ID# 13172
wneinast@foxrothschild.com

*Attorneys for Blockquarry Corp. f/k/a ISW Holdings, Inc.*

144394496

**EXHIBIT D
PAGE 152**

|  |  |  |
|---|---|---|
| OF SOUTH CAROLINA | ) | **2023CV1110100285** |
|  | ) | CIVIL CASE NUMBER |
| COUNTY OF CHEROKEE | ) | MAGISTRATE'S COURT |
|  | ) | **RULE TO VACATE OR SHOW CAUSE (EVICTION)** |

**Litchain Corporation**
**145 N. Church Street**
**Spartanburg, SC 29306**                            Phone:

**PLAINTIFF(S)**

**Vs**
**Blockquarry F/K/A Isw Holdings Inc**
**RA - Paracorp In**
**150 Hyatt Street**
**Gaffney, SC 29340**                                Phone:

**DEFENDANT(S)**

**TO Blockquarry F/K/A Isw Holdings Inc RA - Paracorp Inc:** Litchain Corporation is asking this Court to evict you from the property located at because they claim that:

☒ You have failed to pay rent when due or demanded in the amount of $5,874.00.
☐ The terms of your tenancy or occupancy have ended.
☒ You have violated the terms or conditions of your lease by:  see attached

You the defendant(s) and lessee(s) of the premises listed at the address listed above, **and all others are** ordered to vacate the premises immediately pursuant to S.C. Code Ann. §27-37-10 **OR** contact the:

        **Cherokee County Magistrate**
        **312 East Frederick Street**
        **Gaffney, SC 29340**
        **(864) 487-2533**

within ten (10) days of receiving this notice, for the purpose of scheduling a hearing to show why you should not be evicted from these premises.

**FAILURE TO VACATE THE PREMISES OR RESPOND WITHIN TEN (10) DAYS MAY RESULT IN THE ISSUANCE OF A WRIT OF EJECTMENT.**

**02/03/2023**                          **Judge, Cherokee County Magistrate**

---

Personally appeared before me, the undersigned deponent, being duly sworn, , says s/he is a person over 18 years of age, not a party or attorney in this action and s/he to serve the Rule to Vacate or Show Cause on Blockquarry F/K/A Isw Holdings Inc RA - Paracorp In        on the following dates/times:

| DATE | TIME | INITIALS | DATE OF SERVICE 2-6-23 | TIME OF SERVICE 09:20 |
|---|---|---|---|---|
| 1. 2-6-23 | 09:20 | JDB | SETTLED/DATE _____ | VACANT/DATE _____ |
| 2. ___ | ___ | ___ | PERSON SERVED & RELATIONSHIP IF NOT DEFENDANT |  |
| 3. ___ | ___ | ___ | _____ |  |

Sworn to and subscribed before me
This _____ day of _____, 20___.

_____                    _____
**NOTARY PUBLIC OR JUDGE**                    **SIGNATURE OF SERVER**

ON_____ I DEPOSITED IN THE UNITED STATES MAIL IN AN ENVELOPE ADDRESSED TO THE DEFENDANT(S) ABOVE WITH FIRST CLASS POSTAGE AFFIXED THERETO, A COPY OF THIS DOCUMENT.

_____    **MAGISTRATE'S CLERK**

MV220
SCCA/733A (Amended 11/2019)

EXHIBIT A to Blockquarry Compl.
**EXHIBIT D**
**PAGE 153**

2023CV1110100285

CIVIL CASE NUMBER

IN THE MAGISTRATE'S COURT

STATE OF SOUTH CAROLINA

COUNTY OF __Cherokee__

__Litchain Corporation__
PLAINTIFF(S)

VS.

__Blockquarry f/k/a ISW Holdings, Inc__
DEFENDANT(S)

APPLICATION FOR
EJECTMENT
(Eviction)

I, __Litchain Corporation__, plaintiff in this action, state that I am the landlord-lessor of premises within the jurisdiction of Magistrate __Howell__ which is described as: (address and description of premises – apartment, house, etc.)

__150 Hyatt Street__   (physical address of business)
__Gaffney, SC 29340__

I further state that, with regard to the above-described premises, a landlord-tenant relationship exists between myself and the defendant, __Blockquarry f/k/a ISW Holdings Inc__, the tenant-lessee, as evidenced by the following: (Attach lease papers or other written proof.)
__2 Office Park Court #103__   (Registered agent)
__Columbia, SC 29223__   (Paracorp Incorporated)

Grounds for this ejectment are one or more of the following:
[✓] The tenant fails or refuses to pay the rent when due or when demanded in the amount of $ __5,874.00__ ; or
[ ] The term of tenancy or occupancy has ended; or
[ ] The terms or conditions of the lease have been violated as follows: __associated past due delinquent energy charges, additional required deposit due to material breach of lease agreement__

Sworn to before me
this __3rd__ day of __February__, __2023__

__Elizabeth McDaniel__
Magistrate or Notary Public for South Carolina

My Commission expires __5/2030__

__Michael Brown__
PLAINTIFF (or his attorney/agent)
__145 N. Church Street__
Address
__Spartanburg, SC 29306__
City/State/Zip
__(864) 494-0003__
Phone Number

EXHIBIT A to Blockquarry Compl.

SCCA/732 (Amended 11/2019)

**EXHIBIT D
PAGE 154**

**SUBLEASE BETWEEN LITCHAIN CORP.,**

**AS SUBLANDLORD AND** <u>ISW Holdings Inc</u> **AS SUBTENANT SUBLEASE**

SUBLEASE made as of the <u>18th</u> day of <u>October</u>, 2021 (this "**Sublease**"), by and between LITCHAIN CORP., a Florida corporation having an address at 3415 W Lake Mary Blvd, Suite 950702, Lake Mary Florida 32795 ("**Sublandlord**"), and <u>ISW Holdings Inc</u>, a <u>a Nevada corporation</u> having an office at <u>700 Louisiana St, Suite 3950, Houston Texas 77002</u> ("**Subtenant**").

**W I T N E S S E T H :**

**WHEREAS:**

    **A.** By lease dated 23rd Of September 2021 (the "**Master Lease**"), Gaffney Board Of Public Works (the "**Master Landlord**") leased to Sublandlord certain space (the "**Premises**") in the property known as the Suez Station aka 154 Hyatt Street Gaffney SC29340 as more particularly described in the Master Lease. A true copy of the Master Lease has been delivered to Subtenant, from which certain economic terms which do not relate to Subtenant's obligations hereunder have been deleted.

    **B.** Sublandlord and Subtenant desire to consummate a subleasing of a portion consisting of 2.93 acres of the Premises (the "**Subleased Premises**"), shown cross hatched on <u>Exhibit A</u> attached hereto, on the terms and conditions contained in this Sublease.

    **C.** Capitalized terms used herein without definition which are defined in the Master Lease shall have the same meaning herein as given to such terms in the Master Lease.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter contained, it is hereby agreed as follows:

**ARTICLE I. SUBLEASED PREMISES, TERM AND FIXED RENT.**

**1.1.**

    (a) Sublandlord hereby leases to Subtenant and Subtenant hereby hires from Sublandlord the Subleased Premises, for a term (the "Sublease Term") to commence upon the later of (i) October 1, 2021, and (ii) Sublandlord's receipt of Master Landlord's written consent to the Sublease (the "Sublease Commencement Date"), and to end on September 30, 2029 or on such earlier date on which this Sublease may be cancelled or terminated pursuant to any of the provisions of this Sublease or the Master Lease or pursuant to law (the "Sublease Expiration Date"). At Sublandlord's request, Subtenant shall execute and deliver to Sublandlord a letter setting forth the Sublease Commencement Date. Any failure of the parties to execute such letter agreement shall not affect the validity of the Sublease Commencement Date as fixed in accordance with the applicable provisions of this Sublease.

    (b) Subtenant shall pay on behalf of Sublandlord the fixed rent (the "Fixed Rent") as set forth on Exhibit B attached hereto and made a part hereof to Sublandlord:

    if by mail at:

1

Litchain Corp

3415 W Lake Mary Blvd

Suite 950702

Lake Mary, FL 32795

in advance in equal monthly installments as set forth on <u>Exhibit B</u>, without prior demand, offset, abatement or deduction, on or before the first day of each month during the Sublease Term, commencing on the Sublease Commencement Date (the "**Rent Commencement Date**").  Notwithstanding the foregoing, one (1) calendar month's Fixed Rent shall be paid by Subtenant to Sublandlord upon Subtenant's execution hereof, and be applied to the first Fixed Rent payable hereunder for the first full calendar month after the month in which the Rent Commencement Date occurs.

(c)  If the Rent Commencement Date occurs on a day other than the first day of a month, Fixed Rent from such day through the last day of the then calendar month shall be prorated on a per diem basis and shall be payable, in advance, on or before the Rent Commencement Date.

1.2.

(a)  Subtenant shall also pay to Sublandlord, as Additional Rent (as hereinafter defined) under this Sublease, effective as of the Sublease Commencement Date, all other additional rent and other charges payable by Sublandlord to Master Landlord pursuant to the Master Lease, including, without limitation, (i) for work, utilities, services and/or labor provided to the Subleased Premises by Master Landlord during any time that is not normal business hours, or (ii) in excess of work, services, utilities and/or labor provided for in the Master Lease to be without charge or fee to the Subleased Premises, or (iii) at the request of Subtenant or otherwise pertaining solely to the Subleased Premises, or (iv) with respect to alterations to the Subleased Premises by or for the account of Subtenant, or (v) charges for utilities provided to the Subleased Premises, but excluding from the provisions of this sentence Escalation Rent (as defined in Article IV hereof) payable pursuant to the Master Lease.

(b)  The cost of electric energy is not included in the Fixed Rent payable hereunder. Commencing on the Sublease Commencement Date, Subtenant shall pay for electricity, by payment directly to the local utility service providing such energy as provided in the Master Lease.

(c)  All rent (other than Fixed Rent) and other sums payable by Subtenant pursuant to this Sublease, including, without limitation, Electric Charges and Sublease Escalation Rent (as hereinafter defined) (collectively, "**Additional Rent**") shall be paid within five (5) days after Subtenant's receipt of the bill therefor, without offset, abatement or deduction.

1.3.  If Subtenant shall default in the payment of any sums due under Section 1.2 hereof or of any Sublease Escalation Rent or any other Additional Rent, Sublandlord, in addition to any other right or remedy, shall have the same rights and remedies as in the case of a default by Subtenant in the payment of Fixed Rent.

EXHIBIT B to Blockquarry Compl.
**EXHIBIT D**
**PAGE 156**

1.4.   This Sublease is conditioned upon the consent thereto by Master Landlord, which consent shall be evidenced by Master Landlord's signature appended hereto or a separate consent in the standard form utilized by Master Landlord for such purposes. Sublandlord agrees promptly to request such consent, but Sublandlord shall have no responsibility or liability whatsoever if such consent is refused or not obtained for any reason whatsoever or for no reason, including Master Landlord exercising its right of recapture, and Sublandlord shall have no obligation to initiate any litigation or other proceeding or pay any sums to Master Landlord to obtain such consent (other than such sums, if any, which Sublandlord is required to pay pursuant to the express provisions of the Master Lease). Subtenant agrees to cooperate with Sublandlord with respect thereto and to furnish all financial statements, references and other data with respect to Subtenant as Master Landlord may request in accordance with the provisions of the Master Lease and execute and deliver such consent form provided by Master Landlord. In the event that Master Landlord notifies Sublandlord that Master Landlord will not give such consent, Sublandlord will so notify Subtenant and this Sublease shall be deemed to be canceled and without force or effect. In the event that the previous sentence does not apply but Sublandlord does not receive such consent of Master Landlord by a date which is sixty (60) days after the date of this Sublease, then, upon written notice to the other, Sublandlord or Subtenant may cancel this Sublease, and upon the giving of such notice, this Sublease shall be deemed canceled and of no further force or effect. If either of the two (2) previous sentences shall be applicable, Sublandlord shall promptly return to Subtenant any pre-paid rent and security deposit heretofore paid hereunder and thereafter Sublandlord and Subtenant shall have no further obligations or liabilities to the other with respect to this Sublease.

## ARTICLE II. PROVISIONS OF MASTER LEASE, ETC.

2.1.   All of the terms, covenants, conditions and provisions in the Master Lease, including specifically the provisions regarding Tenant's default and Landlord's remedies with respect thereto, are hereby incorporated in, and made a part of this Sublease, except (i) as herein otherwise expressly provided; (ii) which by their nature or purport are inapplicable to the subleasing of the Subleased Premises pursuant to this Sublease; (iii) are inconsistent with or modified by any of the terms, covenants or conditions of this Sublease; (iv) the obligation to pay rent and additional charges under the Master Lease; and such rights and obligations are hereby imposed upon the respective parties hereto with the same force and effect as if (A) references in the Master Lease to the "Lease" and to the "Premises" were references, respectively, to this Sublease and the Subleased Premises, and (B) references in the Master Lease to "Landlord" and "Tenant" were references, respectively, to Sublandlord and Subtenant and (C) references in the Master Lease to "Rent" and "Additional Rent" (D) references in the Master Lease to "Term" and "Commencement Date" were references to Sublease Term and Sublease Commencement Date herein; provided, however, with reference to this Sublease:

(a)   Subtenant's covenant to pay Fixed Rent and Additional Rent (collectively, the "Sublease Rent") shall be independent of every other covenant in this Sublease. Sublandlord's failure to prepare and deliver any statements or notice set forth in Article IV hereof or elsewhere in this Sublease, or Sublandlord's failure to make a

demand, shall not in any way cause Sublandlord to forfeit or surrender its rights to collect any items of Sublease Rent which may have become due during the Sublease Term. Subtenant's liability for such amounts shall survive the expiration of the Sublease Term.

(b) Subtenant agrees that the Subleased Premises shall be occupied only as executive, administrative and general offices for Subtenant's business as a Crypto Hosting & Mining Facility.

(c) References in the Master Lease to work, repairs or restorations to be performed or services or maintenance to be supplied by "Landlord" in respect of the Subleased Premises shall continue to mean and provide that such work, repairs or restorations shall be performed and services or maintenance provided by Master Landlord (and not by Sublandlord) pursuant to the terms, covenants and conditions of the Master Lease, applicable to the Subleased Premises.

(d) Except as otherwise expressly set forth herein, all notice or cure periods of Subtenant provided for herein or other time limits for Subtenant to give notice or perform any act, condition or covenant, or exercise any right or remedy, shall be the same as those provided for in the Master Lease, but reduced by the greater of 25% (rounded to the greatest reduction) or three (3) days and, if notice is required, measured from the earlier of the date on which notice is given to Subtenant by either Master Landlord or Sublandlord.

(e) Supplementing the Master Lease, if a separate consent by Master Landlord to this Sublease is signed by Subtenant, the term "Master Lease" and "Sublease" as used herein shall each be deemed to include such consent, and it shall be a default under this Sublease if Subtenant shall default in the full and timely performance of any of its covenants and other agreements set forth in such consent.

2.2.

(a) This Sublease and all rights of Subtenant hereunder are and shall be subject and subordinate in all respects to the Master Lease and all of the terms, covenants, agreements, provisions and conditions of the Master Lease, and to all modifications, amendments and extensions of the Master Lease and to all of Sublandlord's obligations under the Master Lease. Sublandlord agrees with Subtenant that so long as Subtenant is not in default hereunder, Sublandlord shall not enter into any modification or amendment to the Master Lease not expressly provided for or contemplated by the Master Lease, which will prevent or materially adversely affect the use by Subtenant of the Subleased Premises in accordance with the terms of this Sublease, or increase the obligations of Subtenant or decrease its rights under the Sublease in any other way materially adversely affecting Subtenant.

(b) Subtenant shall duly and fully keep, observe and perform each and every term, covenant, provision and condition on Sublandlord's part to be kept, observed and performed pursuant to the Master Lease as incorporated herein, including, without limitation, the rules and regulations adopted by Master Landlord pursuant thereto, except as may otherwise be specifically provided in this Sublease. In furtherance of the foregoing and notwithstanding anything herein to the contrary, Subtenant shall

not (i) take or permit any action inconsistent with the terms of the Master Lease or, (ii) do or permit to be done anything which Sublandlord is prohibited from doing or permitting under the Master Lease, or otherwise do or suffer to permit anything to be done which would result in a default under the Master Lease or cause the Master Lease to be terminated or forfeited, or (iii) take any action or do or permit anything to be done which could result in any additional cost or other liability to Sublandlord under or pursuant to the Master Lease.

2.3.    If, for any reason whatsoever, the Master Lease is terminated as to the Subleased Premises, by either Master Landlord or Sublandlord, including, without limitation, Sublandlord's termination of the Master Lease and in the event of any damage, destruction or condemnation with respect to all or part of the Subleased Premises, this Sublease shall thereupon be terminated, and Sublandlord shall not be liable to Subtenant by reason thereof for any loss, cost or expense incurred by Subtenant in connection therewith, unless said termination shall have been effected because of the breach or default of Sublandlord under the Master Lease (and Subtenant is not in default hereunder) or voluntary surrender of the Master Lease by Sublandlord to Master Landlord as to the Subleased Premises if Sublandlord has reserved the right to exercise a termination right under the Master Lease add: except as permitted in this Sublease (which shall not be deemed to include a right of termination by reason of casualty or condemnation), provided that in no event shall Sublandlord be liable to Subtenant for any loss, cost or expense incurred by Subtenant if Master Landlord shall accept an attornment by Subtenant to Master Landlord upon substantially the same (or more favorable to Subtenant) terms as provided in this Sublease and provided further that in no event shall Sublandlord be liable for any special, consequential or punitive damage to Subtenant.

2.4.    Notwithstanding anything to the contrary contained in this Sublease, Subtenant shall not under any circumstances seek or require Sublandlord to perform or provide or to cause there to be performed or provided any work, services, signage, utilities, maintenance or repairs or make any claim against Sublandlord for any damage which may arise by reason of Master Landlord's failure to perform or provide the same pursuant to the Master Lease. Except as may be expressly provided in this Sublease, Subtenant shall be entitled to receive all of the work, services, signage, utilities, maintenance and repairs from Master Landlord to the extent that Sublandlord is entitled to receive the same under the Master Lease, unless Master Landlord is excused therefrom by reason of acts or omissions of Subtenant.

2.5.    Subtenant may, subject to the consent of Master Landlord, request directly from Master Landlord ordinary work, services, utilities, maintenance and repairs which Master Landlord is obligated to perform in the Subleased Premises pursuant to the Master Lease, but such right of Subtenant shall be conditioned on Subtenant not being in default beyond any applicable notice and/or cure periods in payment for any such work, services, utilities, maintenance and repairs previously so provided to the Subleased Premises or otherwise under this Sublease. In the event Subtenant desires any additional services from Master Landlord which are not provided in the Master Lease and require an additional charge, Subtenant may request such additional services from Master Landlord, provided such services shall not be obtained pursuant to the Master Lease and Master Landlord so agrees and further agrees that Sublandlord shall have no liability therefor.

2.6.     Sublandlord shall in no event be liable to Subtenant nor shall the obligations of Subtenant hereunder be impaired or abated or the performance hereof by Subtenant be excused because of (i) any failure or delay on Master Landlord's part in furnishing any services, signage, utilities, parking facilities or maintenance or in doing such repairs or work, including those which may be contemplated by this Sublease, (ii) any other failure of Master Landlord to observe and perform its covenants and agreements pursuant to the Master Lease, or (iii) the acts or omissions of Master Landlord, its agents, contractors, servants, employees, invitees, or licensees. If Master Landlord shall default in any of its obligations to Sublandlord with respect to the Subleased Premises, Sublandlord will use reasonable efforts to cause Master Landlord to perform and observe such obligations (except that Sublandlord shall not be obligated to commence any legal or other proceedings against Master Landlord or to make any payment of money or other consideration, or to utilize any self-help rights), but Sublandlord shall have no liability for failure to obtain the observance or performance of such obligations by Master Landlord or by reason of any default of Master Landlord under the Master Lease, of any failure of Master Landlord to act or to grant any consent or approval under the Master Lease, or from any misfeasance or nonfeasance of Master Landlord, nor shall the obligations of Subtenant hereunder be excused or abated in any manner by reason thereof, except as provided in this Sublease. If Sublandlord elects to commence legal or other proceedings against Master Landlord to enforce Sublandlord's rights under the Master Lease, Subtenant shall be responsible to reimburse Sublandlord for *to the Subleased Premises only then for all of,* the reasonable costs of such proceedings, including, without limitation, reasonable attorneys' fees incurred by Sublandlord, such reimbursement to be made by Subtenant within twenty (20) days after demand therefor.

2.7.     In the circumstances described in <u>Section 2.6</u> of this Sublease, Sublandlord may, in its sole discretion, elect to exercise any or all of its self-help rights as Tenant under the Master Lease. Subtenant agrees that if Sublandlord elects to exercise any such rights, Subtenant shall reimburse Sublandlord for [*if applicable, add: Subtenant's Proportionate Share of, or if pertaining to the Subleased Premises only then for all of,*] the cost incurred by Sublandlord therefor (including by reason of any indemnity of Master Landlord in connection therewith but excluding any reimbursement therefor which has at such time been paid by Master Landlord to Sublandlord), such reimbursement to be made by Subtenant within twenty (20) days after demand therefor, provided that if Master Landlord shall after such payment by Subtenant reimburse Sublandlord for all or any portion of such costs, and Subtenant is not in default under the provisions of this Sublease, Sublandlord will reimburse Subtenant for the amounts paid to Sublandlord by Subtenant pursuant to this sentence to the extent [*of the applicable percentage thereof (in accordance with this sentence)*] of such costs so reimbursed to Sublandlord from Master Landlord. If, however, Sublandlord elects not to exercise any of or all such self-help rights, Sublandlord shall not be liable to Subtenant for any costs, liabilities or expenses, all of which are hereby released by Subtenant.

2.8.     In the circumstances described in <u>Section 2.6</u> of this Sublease, if Sublandlord elects not to institute legal or other proceedings against Master Landlord in the name of Sublandlord to enforce Sublandlord's rights as tenant under the Master Lease but Subtenant shall nevertheless request Sublandlord to do so, Sublandlord shall, at Sublandlord's option, either (i) assign to Subtenant its causes of action or rights against Master Landlord to the extent

applicable to Subtenant, the Subleased Premises or Subtenant's rights hereunder, and shall permit Subtenant to institute such legal or other proceeding against Master Landlord in the name of Subtenant or, if necessary in order to effectuate the benefit of such assignment, in the name of Sublandlord, provided Subtenant shall use counsel reasonably approved by Sublandlord and Subtenant shall not settle such proceeding without the prior written consent of Sublandlord (which shall not be unreasonably withheld or delayed), or (ii) institute legal or other proceedings against Master Landlord at the request of Subtenant in the name of Sublandlord, provided in either of (i) or (ii) that (A) in Sublandlord's commercially reasonable judgment, such proceedings will not reduce or impair any claims Sublandlord may have against Master Landlord, (B) Subtenant shall not then be in default under this Sublease beyond any applicable notice and cure period, (C) such proceeding shall be prosecuted at the sole cost and expense of Subtenant and Subtenant shall agree to indemnify and hold harmless Sublandlord from any claims, liabilities, damages, costs and expenses, including any reasonable attorneys' fees incurred by Sublandlord as a result of Subtenant exercising its rights under this subsection, and Subtenant shall furnish to Sublandlord a cash deposit or other security in an amount, form and substance reasonably satisfactory to Sublandlord securing Sublandlord against all such liability, (D) Sublandlord shall reasonably determine that such proceeding is a bona fide attempt by Subtenant to enforce Sublandlord's rights under the Master Lease applicable to Subtenant and the Subleased Premises and is not primarily of nuisance value, and that there are no other practical bona fide methods for obtaining the performance of Master Landlord's obligations under the Master Lease, and (E) Subtenant's rights under this Sublease or use and enjoyment of the Subleased Premises are materially affected.

2.9.    If, in this Sublease, Subtenant is required to obtain Sublandlord's consent or approval, Subtenant understands that Sublandlord may be required to first obtain the consent or approval of Master Landlord pursuant to the Master Lease. Sublandlord will cooperate with Subtenant in requesting any such consent or approval.   Subtenant shall reimburse Sublandlord for any costs or expenses payable under the Master Lease or otherwise reasonably incurred by Sublandlord (including, without limitation, legal fees and disbursements) in connection with requesting Master Landlord's consent or approval on behalf of Subtenant with respect to any matter as to which Master Landlord's consent or approval is required under the Master Lease or hereunder.  If Master Landlord should refuse such consent or approval, Sublandlord shall be released of any obligation to grant its consent or approval with respect to such matter whether or not Master Landlord's refusal, in Subtenant's opinion, is arbitrary or unreasonable.  In any instance in which Sublandlord is required by any provision of this Sublease or applicable law not unreasonably to withhold consent or approval, Subtenant's sole remedy shall be an action for specific performance or injunction requiring Sublandlord to grant such consent or approval, all other remedies which would otherwise be available being hereby waived by Subtenant, including any claim for monetary damages of any kind or nature.

2.10.   The rights of Subtenant hereunder are subject and subordinate to all ground and underlying leases and to all mortgages to which the Master Lease may be subject and subordinate to, or to which the Master Lease may now or hereafter be subjected or subordinated, whether now or hereafter affecting such leases or the real property of which the Subleased Premises are a part.

**2.11.** Sublandlord agrees to forward to Subtenant, upon receipt thereof by Sublandlord, a copy of each notice of default received by Sublandlord in its capacity as tenant under the Master Lease. Subtenant agrees to forward to Sublandlord, upon receipt thereof, copies of any notices received by Subtenant from Master Landlord or from any governmental authorities with respect to the Subleased Premises.

**2.12.** If Subtenant shall default under any of the provisions of this Sublease on its part to be performed, and Subtenant shall not have commenced diligently to cure such default within five (5) days after notice thereof to Subtenant (except in the case of what Sublandlord reasonably believes to be an emergency situation in which case no such notice need be given), Sublandlord may, in addition to any other remedy provided in this Sublease, by law or otherwise, cure such default and the cost thereof, together with interest thereon from the date incurred until paid at the rate provided in Article X hereof, shall be payable by Subtenant within ten (10) days following written demand therefor, and in the event Subtenant fails to pay the same, Sublandlord may recover such costs, including interest, as Additional Rent, in an action brought against Subtenant.

**2.13.** Sublandlord represents that it is the holder of the interest of the tenant under the Master Lease, and that the Master Lease is in full force and effect.

**2.14.** Subtenant agrees to indemnify Sublandlord and hold Sublandlord harmless from all losses, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Sublandlord may incur, or for which Sublandlord may be liable, to Master Landlord, arising from the acts or omissions of Subtenant, Subtenant's agents, contractors, employees, invitees, or licensees, that are the subject matter of any indemnity or hold harmless of Sublandlord to Master Landlord under the Master Lease, and all amounts payable by Subtenant to Sublandlord on account of such indemnity shall be deemed to be Additional Rent hereunder.

**2.15.** If as a result of the provisions of the Master Lease, Master Landlord has abated any of the fixed rent and/or additional rent payable by Sublandlord as tenant of the Subleased Premises under the Master Lease, Sublandlord shall, without duplication of any other provision of this Sublease, correspondingly abate the Fixed Rent and Additional Rent payable under this Sublease as to all or part of the Subleased Premises, as applicable under the Master Lease as to which rent is abated under the Master Lease and for as long as such abatement shall continue under the Master Lease.

### ARTICLE III. "AS IS".

**3.1.** Subtenant has examined the Subleased Premises, is aware of the physical condition thereof, and agrees to take the same "as is" with the understanding that there shall be no obligation on the part of Sublandlord to incur any expense whatsoever in connection with the preparation of the Subleased Premises for Subtenant's occupancy thereof. Neither Sublandlord nor Sublandlord's agents or other representatives have made, nor has Subtenant relied upon, any representations, warranties, or promises, express or implied, with respect to the Subleased Premises or the equipment and improvements therein situated or serving the same or the physical condition thereof or Master Landlord's title thereto, or compliance with laws with respect thereto or with respect to any other matter or thing relating to the Subleased Premises.

**3.2.** Subtenant agrees to indemnify Sublandlord and hold Sublandlord harmless from all losses, damages, and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Sublandlord may incur, or for which Sublandlord may be liable, with respect to any applicable sales or use tax relating to the sale of the FF&E.

### ARTICLE IV. SUBLEASE ESCALATIONS.

**4.1.**

(a) In the event any additional rent or other amounts are payable with respect to any time period falling within the term of this Sublease which are attributable to the provisions of Section [section] of the Master Lease (including estimated increases, if the Master Lease provides for estimated payments) ("**Escalation Rent**") then Subtenant shall pay such amount as Additional Rent hereunder (such additional rent payable by Subtenant hereinafter called "**Sublease Escalation Rent**"). At any time after receipt by Sublandlord of any statement for any Escalation Rent, or if Sublandlord is at any time obligated to pay any Escalation Rent, Sublandlord may deliver to Subtenant a statement prepared, at the option of Sublandlord, by Sublandlord and/or Master Landlord ("**Escalation Statement**") with respect to the payment of the Sublease Escalation Rent and, within ten (10) days after delivery of such statement, Subtenant shall pay to Sublandlord the Sublease Escalation Rent.

(b) If an annual Master Landlord's Statement is furnished by Master Landlord to Sublandlord which shows that there has been an overpayment by Subtenant of Sublease Escalation Rent or if Master Landlord shall notify Sublandlord that Sublandlord is entitled to a credit against subsequent rent due to a refund of Taxes and/or Operating Expenses (each as defined in the Master Lease) as to which Subtenant paid Sublease Escalation Rent, and if Master Landlord shall actually give Sublandlord credit therefor under the Master Lease, Sublandlord shall permit Subtenant to credit the amount of such overpayment or Subtenant's portion of such refund, as the case may be, against the next subsequent Sublease Escalation Rent payments under this Sublease. After the termination of this Sublease and the payment to Sublandlord of the balance, if any, of all Sublease Rent due hereunder, Sublandlord shall promptly pay to Subtenant the amount of any such refund or credit not previously applied by Subtenant. In the event that on or after the Sublease Expiration Date any Escalation Rent is due under the Master Lease with respect to any period during the Sublease Term and payable as Sublease Escalation Rent but not otherwise paid by Subtenant to Sublandlord, Subtenant's obligations hereunder on account of such Sublease Escalation Rent shall be appropriately prorated and Subtenant shall pay the same as Additional Rent under this Sublease. Subtenant's obligations pursuant to the preceding sentence shall survive termination or expiration of this Sublease.

(c) Subject to the provisions of Section 2.8 hereof, Subtenant shall not have the right to question the propriety of or the basis for any such Escalation Statement rendered by Master Landlord and Sublandlord shall be under no obligation to challenge, object to or contest any such statement, any allocations or determinations made by Master Landlord pursuant to such Escalation Rent, although Sublandlord may do so in its

sole and absolute discretion. In the event that overpayment of Escalation Rent is determined after contest of any statement, as to which Subtenant and Sublease Escalation Rent, Sublandlord shall promptly notify Subtenant thereof, and if Master Landlord has actually credited Sublandlord therefor under the Master Lease for the period occurring during the Sublease Term, Sublandlord shall permit Subtenant to credit Subtenant's overpayment, but less all costs and expenses incurred by Sublandlord in connection with such dispute to the extent not reimbursed by Master Landlord to Sublandlord) against the next subsequent Sublease Escalation Rent payments under this Sublease. After the termination of this Sublease and the payment to Sublandlord of the balance, if any, of all Fixed Rent, Sublease Escalation Rent and other Additional Rent due hereunder, Sublandlord shall promptly pay to Subtenant the amount described in the previous sentence to the extent not previously applied by Subtenant.

## ARTICLE V. NOTICES.

Any notice, demand or communication which, under the terms of this Sublease or under any statute or municipal regulation must or may be given or made by the parties hereto, shall be in writing and given or made by mailing the same by registered or certified mail, postage prepaid, return receipt requested, or by nationally recognized overnight courier for next business day delivery, addressed to the party for whom intended at its address as aforesaid; provided, however, from and after the Sublease Commencement Date, Subtenant's address shall be the Subleased Premises, and with a copy of such communications addressed to Sublandlord sent to [address], Attn: [name], Esq. and with a copy of such communications addressed to Subtenant sent to [address]. Either party, however, may designate such new or other address to which such notices, demands or communications thereafter shall be given, made or mailed by notice given in the manner prescribed herein. Any such notice, demand or communication shall be deemed given or served, as the case may be, on the date of receipt or if receipt is refused.

## ARTICLE VI. END OF SUBLEASE TERM; HOLDOVER.

6.1.    At the expiration or earlier termination of this Sublease for any reason, Subtenant shall thereupon restore the Subleased Premises to the condition as required by the Master Lease upon the expiration of the term, and shall surrender and deliver up the Subleased Premises in good condition and repair, including, but not limited to, free of any furniture, fixtures and equipment and any cabling, and reasonable wear and tear and damage by fire or other casualty and condemnation which Subtenant is not required to restore or repair excepted, and Subtenant shall [leave at the Subleased Premises or remove the FF&E as provided in Sections 3.2 and 3.3 hereof and] leave electrical power in electric safe off condition. If the Subleased Premises are not timely vacated and surrendered in such condition at the Sublease Expiration Date, Subtenant shall and hereby agrees to indemnify and hold Sublandlord harmless from and against any and all claims, losses, expenses or damages, including, without limitation, attorneys' fees and disbursements, arising out of or resulting from any delay by Subtenant in so surrendering the Subleased Premises, or any portion thereof, including, without limitation, any claims made by any succeeding tenant or prospective tenant founded upon such delay and the loss of the benefit of the bargain should such successive sublease be terminated by reason of such holding over and, including,

without limitation, any amounts payable by Sublandlord to Master Landlord pursuant to the Master Lease in respect of the Premises.

**6.2.** In the event Subtenant remains in possession of the Subleased Premises, or any portion thereof, after the Sublease Expiration Date, the parties recognize and agree that the damage to Sublandlord resulting therefrom will be substantial and will exceed the amount of the monthly installments of the Sublease Rent payable hereunder. Subtenant therefore agrees that in addition to any other right or remedy Sublandlord may have hereunder or at law or in equity, Subtenant, at the option of Sublandlord, shall be deemed to be occupying the Subleased Premises as a subtenant from month to month, at a monthly rental equal to two times (i) the monthly Fixed Rent and Additional Rent and other charges payable during the last month of the scheduled term hereof or (ii) the fair market value for the Subleased Premises, whichever is greater, subject to all of the other terms of this Sublease and the Master Lease insofar as the same are applicable to a month to month tenancy. The provisions of the preceding sentence shall not be construed to limit any other rights or remedies which might be available to Sublandlord as a result of Subtenant's failure to surrender possession of the Subleased Premises or any portion thereof on the Sublease Expiration Date, including, without limitation, prosecuting a holdover or summary dispossess proceeding.

### ARTICLE VII. ALTERATIONS.

Subtenant may make no changes, alterations, additions, improvements or decorations in, to or about the Subleased Premises without Sublandlord's prior written consent and, if required by the Master Lease, Master Landlord's prior written consent. All work to be performed by Subtenant, including the work necessary for Subtenant's initial fit-out and occupancy of the Subleased Premises (if any), including telecommunications wiring and cabling (**"Subtenant's Initial Construction"**), shall be performed at Subtenant's cost in accordance with and subject to the terms and provisions of the Master Lease, except as may be inconsistent with the express provisions of this Sublease, but Subtenant shall be responsible to pay all fees, costs and expenses to Master Landlord in connection therewith as and when required by the Master Lease.

### ARTICLE VIII. SECURITY.

**8.1.** Subtenant shall prior to, or simultaneously upon, execution and delivery of this Sublease to Sublandlord, deposit with Sublandlord a letter of credit complying with the provisions of Section 8.2 below (the **"Letter of Credit"**) in the face amount of $50,000.00 USD (the **"Security Deposit Amount"**), in Certified Funds via Cashier's Check payable to:

Gaffney Board Of Public Works
210 East Frederick Street
PO BOX 64
Gaffney SC 29342
Account Number: 60041001

The Letter of Credit shall be maintained as provided in Section 8.3 below (and should any Letter of Credit be drawn upon there shall have been deposited with Sublandlord from the funds of the

Issuing Bank (as hereinafter defined) a cash security deposit), all as security for the faithful performance and observance by Subtenant of all of the terms, provisions and conditions of this Sublease (including the payment of any Fixed Rent and Additional Rent (collectively referred to as **"Sublease Rents"**).  Subtenant agrees that, in the event that Subtenant defaults in respect of any of the terms, provisions and conditions of this Sublease (including the payment of any Sublease Rents), Sublandlord may make a demand for payment under said Letter of Credit and use, apply, or retain the whole or any part of the proceeds thereof, or any cash security deposited, as the case may be, to the extent required for the payment of any Sublease Rents, or any other sum as to which Subtenant is in default, or for any sum that Sublandlord may expend or may be required to expend by reason of Subtenant's default, in respect of any of the terms, provisions and conditions of this Sublease (including any damages or deficiency accrued before or after summary proceedings or other re-entry by Sublandlord).  In the event that Sublandlord applies or retains any portion or all of such proceeds of such Letter of Credit or cash security, as the case may be, Subtenant shall within ten (10) business days restore the amount so applied or retained by causing the Issuing Bank to issue an amendment thereto, or if no Letter of Credit was then outstanding by causing a new Letter of Credit to be issued so that, at all times, the amount of the Letter of Credit which may be drawn upon shall be the Security Deposit Amount [*as may be reduced pursuant to Section 8.4 hereof*].  The provisions of this Article shall not be a limitation on Sublandlord's rights and remedies under this Sublease or at law or in equity and failure of Subtenant to satisfy the obligations of the preceding sentence shall be, for notice purposes, construed as a monetary default.  In the event that Subtenant shall fully and faithfully comply with all of the terms, provisions and conditions of this Sublease, the Letter of Credit or cash security, as the case may be, shall be returned to Subtenant ninety (90) days after the later of the Sublease Expiration Date or delivery of possession of the entire Subleased Premises to Sublandlord in accordance with the terms of this Sublease.

8.2.     Subtenant shall deliver to Sublandlord and continuously maintain in full force and effect until ninety (90) days after the Sublease Expiration Date, a clean, irrevocable Letter of Credit issued by any commercial bank acceptable to Sublandlord (hereinafter referred to as the **"Issuing Bank"**) (A) (i) with offices for banking purposes in the City of [city name] and offices for presentation of letters of credit in the City of [city name], or (ii) if it is the normal and ordinary practice of such commercial bank, for presentation of letters of credit by a nationally recognized overnight delivery service (e.g. Federal Express) to another office of such commercial bank located within the continental United States, and (iii) which is insured by the Federal Deposit Insurance Corporation, and (B) whose long-term, unsecured and unsubordinated debt obligations which are rated by at least two of Fitch Ratings Ltd. (Fitch), Moody's Investors Service, Inc. (Moody's) and Standard & Poor's Ratings Services (S&P) or their respective successors at least AA by Fitch, Aa by Moody's and AA by S&P, and (C) which has a short term debt rating from at least two of the following: A1+ from Fitch, P-1 from Moody's and A-1+ from S&P (collectively, the **"Issuer Requirements"**), which Letter of Credit shall (i) name Sublandlord as beneficiary thereof, (ii) have a term of not less than one (1) year, (iii) be in the amount of the then applicable Security Deposit Amount, and (iv) otherwise be in form and content satisfactory to Sublandlord, in its sole discretion.  Sublandlord agrees that a Letter of Credit in the form of <u>Exhibit C</u> hereto shall be satisfactory and that, as of the date of this Sublease, [bank name]] is approved as the Issuing Bank.  The Letter of Credit shall, in any event, provide that:

(a)    The Issuing Bank shall pay to Sublandlord an amount up to the face amount of the Letter of Credit upon presentation of only a demand for payment in the amount to be drawn;

(b)    The Letter of Credit shall be deemed to be automatically renewed, without amendment, for consecutive periods of one year each and shall have a final expiry date of not earlier than ninety (90) days after the Sublease Expiration Date, unless the Issuing Bank sends written notice (hereinafter called the "**Non-Renewal Notice**") to Sublandlord both by Federal Express or similar courier acceptable to Sublandlord and by certified or registered mail, return receipt requested, not less than sixty (60) days next preceding the then expiration date of the Letter of Credit, that it elects not to have such Letter of Credit renewed;

(c)    Sublandlord, after receipt of the Non-Renewal Notice, or within sixty (60) days prior to the expiration date of any Letter of Credit then held by Sublandlord, shall have the right, exercisable by a demand for payment draft only, to draw upon the Letter of Credit and receive the proceeds thereof (which shall be held by Sublandlord as a cash deposit pursuant to the terms of this Article VIII pending the replacement of such Letter of Credit or applied as permitted by the terms of this Article VIII); and

(d)    Upon Sublandlord's assignment or other transfer of its interest in the Sublease, the Letter of Credit shall be transferable by Sublandlord as provided in Section 8.5 below.

If the Letter of Credit held by Sublandlord shall for any reason not have been so renewed within sixty (60) days of its then expiration date, Subtenant agrees that (a) it shall no later than sixty (60) days of the then expiration date replace such expiring Letter of Credit with a Letter of Credit as required by the terms of this Article VIII and Sublandlord agrees that, simultaneously with the delivery of such replacement Letter of Credit, it will return to the Issuing Bank the Letter of Credit being replaced and (b) in addition to any other right or remedy of Sublandlord under this Sublease, at any time prior to such replacement of such expiring Letter of Credit, Sublandlord may draw upon the Letter of Credit as provided in Section 8.3 below (and the proceeds thereof shall be held by Sublandlord as a cash deposit pursuant to the terms of this Article VIII pending the replacement of such Letter of Credit or applied as permitted by the terms of this Article VIII).

8.3.    If Sublandlord draws upon the Letter of Credit, it shall deposit the proceeds thereof into a bank (including, without limitation, an account at Sublandlord) or savings and loan association to be selected, from time to time, by Sublandlord in its sole discretion, which account shall separate from Sublandlord's funds. Sublandlord agrees to hold the said security in such an account, subject, however, to the terms of Section 8.1 hereof, with respect to the application of such security in the event of Subtenant's default hereunder and subject to Subtenant's obligation and agreement to replace the Letter of Credit so drawn upon with another Letter of Credit as required by the terms of this Article VIII whereupon Sublandlord shall return such cash security deposit to Subtenant. Sublandlord shall not be required to credit any security with interest, or pay any interest thereon to Subtenant. If interest shall be earned on such security, then to the extent permitted by law, Subtenant agrees that Sublandlord shall be entitled to receive and retain, as an administrative fee, a sum equal to one (1%) percent per annum upon the security, and Sublandlord shall have the right to withdraw such sum from time to time as Sublandlord shall determine, in its sole

discretion. The balance of the interest earned on such security, unless and until such interest shall be paid to Sublandlord as herein provided, shall be held as a part of the security deposited by Subtenant, subject to and in accordance with the terms of <u>Section 8.1</u> hereof. Sublandlord shall not be required to credit any security with interest, or pay any interest thereon to Subtenant, for any period during which Sublandlord does not receive interest thereon.

8.4.    Provided Subtenant is not and has not been in default under the Sublease, as determined by Sublandlord, at any time during the Sublease Term prior to the time of the applicable date on which the security deposit amount is to be reduced as provided herein, the Security Deposit Amount may be reduced on the [second] anniversary of the Sublease Commencement Date to $[dollar amount]. Subtenant may deliver, upon such reduction, a substitute Letter of Credit or amendment to the existing Letter of Credit consented to by Sublandlord in accordance with the requirements of this Article, it being understood that if a substitute Letter of Credit is to be delivered, Sublandlord shall not be obligated to return any Letter of Credit in its possession until Subtenant has delivered the substitute Letter of Credit.

8.5.    In the event of an assignment or other transfer of the Master Lease, or Sublandlord's interest therein, or a leasing of the entire Premises, Sublandlord shall have the right, without cost or expense, to transfer the Letter of Credit or cash security, as the case may be, deposited hereunder to the assignee or lessee, and Sublandlord shall thereupon be released by Subtenant from all liability for the return of such Letter of Credit or cash security. In such event, Subtenant agrees to look solely to the new Sublandlord for the return of said Letter of Credit or cash security. It is agreed that the provisions hereof shall apply to every transfer or assignment made of said Letter of Credit or cash security to a new Sublandlord. Subtenant shall execute such documents as may be necessary to accomplish such transfer or assignment of the Letter of Credit and shall pay any transfer or other fees of the Issuing Bank. Subtenant hereby acknowledges that Sublandlord will not agree to a letter of credit transfer form which requires that Sublandlord's signature be bank authorized or authenticated.

8.6.    Subtenant covenants that it will not assign or encumber, or attempt to assign or encumber, the Letter of Credit or cash deposited as security hereunder or any proceeds thereof, and that neither Sublandlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment, or attempted encumbrance.

8.7.    If Sublandlord determines, in its discretion, that the financial condition of the Issuing Bank has so declined as to cause concern that the Issuing Bank may not honor a draw on its Letter of Credit, or the Issuer Requirements are not met, Subtenant shall promptly obtain a replacement Letter of Credit complying with the terms hereof from another commercial bank acceptable to Sublandlord which then meets the Issuer Requirements. If the replacement Letter of Credit complying with the terms of this Sublease shall not have been received by Sublandlord within five (5) business days of Sublandlord's request therefor, Sublandlord may draw upon the Letter of Credit then held by Sublandlord and the proceeds thereof shall be held by Sublandlord as a cash deposit pursuant to the terms of this Article VIII pending the replacement of such Letter of Credit or applied as permitted by the terms of this Article VIII.

**8.8.** In the event that Subtenant fails to deliver a replacement Letter of Credit pursuant to Section 8.2 hereof (if the Letter of Credit is not automatically renewed) or pursuant to Section 8.7 hereof, as applicable, such event shall constitute a default by Subtenant hereunder and the provisions applicable to a default set forth in the Master Lease as incorporated herein shall apply to such default.

## ARTICLE IX. ASSIGNMENT AND SUBLET.

**9.1.** Subtenant shall not, whether voluntarily, involuntarily or by operation of law, in any manner or by reason of any act or omission on the part of Subtenant or any party acting by or through Subtenant (w) assign or otherwise transfer this Sublease or the term or estate hereby granted, nor (x) sublet, license or underlet all or any part of the Subleased Premises, nor (y) permit the Subleased Premises or any desk space therein to be occupied by any person(s) (collectively, an "underletting"), nor mortgage, pledge or encumber this Sublease or all or part of the Subleased Premises without first obtaining:

    (a) Master Landlord's consent and all other required consents to such assignment or subletting as set forth in and pursuant to the terms of the Master Lease, after Subtenant shall have complied with the provisions of the Master Lease as if it were an assignment or subletting by Sublandlord thereunder, and

    (b) Sublandlord's consent in accordance with the terms of the Master Lease as incorporated herein.

If Subtenant is a corporation, partnership, or limited liability entity, then the transfer in one or more transactions of 50% or more of the voting stock, membership or equity interest of Subtenant, whether accomplished by merger, operation of law or otherwise, shall constitute an assignment for purposes of this Sublease, requiring that Subtenant obtain the consent of Sublandlord.

**9.2.** All costs and expenses of Sublandlord incurred in connection with any actual or proposed assignment or underletting, including, without limitation, reasonable attorneys' fees and disbursements, allocable administrative costs, and any amounts payable under the Master Lease as a result of such actual or proposed assignment or underletting, shall be paid by Subtenant, as Additional Rent hereunder, within ten (10) days after demand.

**9.3.** Sublandlord shall be entitled to receive from Subtenant (as and when received by Subtenant) as an item of Additional Rent one hundred percent (100%) of all amounts received by Subtenant from any sub-subtenant or assignee in excess of the amounts payable by Subtenant to Sublandlord hereunder (the "**Transfer Premium**"), as and when paid by such assignee or undertenant. The Transfer Premium shall be reduced by the reasonable transaction costs actually paid by Subtenant in order to assign this Sublease or to sub-sublet the Subleased Premises, provided that Subtenant provides Sublandlord with a detailed breakdown of all transaction costs associated with such assignment or subletting at the time Subtenant obtains Sublandlord's consent and Sublandlord consents to such costs, which consent shall not be unreasonably withheld, conditioned or delayed. The following shall constitute transaction costs: work allowances, alteration expenses and other customary expenses reasonably incurred by Subtenant in connection with such assignment or sub-sublease. The Transfer Premium shall include all Fixed Rent, Sublease Escalation Rent, other Additional Rent or other consideration of any type whatsoever payable by the

assignee or sub-subtenant in excess of the Fixed Rent, Sublease Escalation Rent and other Additional Rent payable by Subtenant under this Sublease. Transfer Premium shall also include, but not be limited to, key money and bonus money paid by the assignee or sub-subtenant to Subtenant in connection with such assignment or sub-subletting, and any payment in excess of fair market value for services rendered by Subtenant to the assignee or sub-subtenant or for physical assets, fixtures, inventory, equipment, or furniture transferred by Subtenant to the assignee or sub-subtenant in connection with therewith. For purposes of calculating the Transfer Premium, expenses will be amortized on a straight line basis over the then remaining term of this Sublease (in the case of an assignment) or the term of the sub-sublease, as the case may be, and deducted from any assignment proceeds or the sub-sublet rents.

**9.4.**    If the Subleased Premises are sub-sublet (whether or not Sublandlord or Master Landlord shall have consented thereto), Sublandlord, after default by Subtenant in its obligations hereunder, may, without notice to Subtenant, collect rent from the sub-subtenant and Subtenant hereby authorizes Subtenant's sub-subtenant to make such payments of rent directly to Sublandlord and Sublandlord shall apply the net amount collected to the Sublease Rents herein reserved, but no such sub-subletting or collection of rent shall be deemed a waiver of the covenant set forth in this Article, or the acceptance of the sub-subtenant as a Subtenant. No such sub-subletting or any assignment of this Sublease (whether or not Sublandlord or Master Landlord shall have consented thereto) shall release Subtenant from the performance and observance by Subtenant of the covenants, obligations and agreements on the part of Subtenant to be performed or observed herein and in the case of an assignment, Subtenant and the assignee shall be jointly and severally liable for all obligations to be performed thereafter under this Sublease. The consent by Sublandlord or Master Landlord to an assignment, sale, pledge, transfer, mortgage or sub-subletting shall not in any way be construed to relieve Subtenant from obtaining the express consent in writing, to the extent required by this Sublease, to any further assignment, sale, pledge, transfer, mortgage or sub-subletting.

## ARTICLE X. LATE CHARGE.

To cover the additional expense incurred by Sublandlord in the handling of delinquent payment of Fixed Rent, Sublease Escalation Rent, other Additional Rent and other charges payable to Sublandlord by Subtenant pursuant hereto, Subtenant will pay on demand if and to the extent permitted by applicable law, (i) a "late charge" in an amount equal to the greater of any corresponding late charge under the Master Lease or four (4%) percent of such delinquent payment, to cover the administrative expenses of handling such late payment, and (ii) for each dollar of such Fixed Rent, Sublease Escalation Rent, other Additional Rent and other charges if any such amount is received after its due date, interest at the lesser of (A) an annual rate equal to the floating prime rate of Bank of America plus four (4%) percent or (B) the maximum rate permitted by law, and to accrue from the date such amounts of Fixed Rent, Sublease Escalation Rent, other Additional Rent and other charges first became due hereunder.

## ARTICLE XI. QUIET ENJOYMENT.

So long as Subtenant pays all of the Sublease Rents due under this Sublease and performs all of Subtenant's other obligations hereunder, Subtenant shall peacefully and quietly have, hold and

enjoy the Subleased Premises during the term of this Sublease, without hindrance by Sublandlord or by anyone claiming by or through Sublandlord, subject, however, to the terms, provisions and obligations of this Sublease and the Master Lease.

## ARTICLE XII. INDEMNITY AND INSURANCE.

12.1.    Subtenant hereby indemnifies and agrees to hold Sublandlord harmless from and against any and all claims (including, without limitation, claims of Master Landlord against Sublandlord), losses or damages, including, without limitation, attorneys' fees and disbursements, resulting from or arising out of (a) Subtenant's failure to perform any of the terms, covenants, conditions or agreements contained in or incorporated into this Sublease (or any consents hereto) which, by the terms of this Sublease (or such consents), Subtenant is obligated to perform, and (b) any other acts or omissions of Subtenant or Subtenant's employees, invitees, agents or other representatives, and (c) any occurrence in or about the Premises, unless due to the gross negligence or willful misconduct of Sublandlord, its employees, agents, contractors or invitees; and all amounts payable by Subtenant to Sublandlord on account of such indemnity shall be deemed to be Additional Rent hereunder and shall be payable upon demand.

12.2.    Subtenant shall, at its sole cost and expense, comply with all of the insurance provisions of the Master Lease which are binding on Sublandlord (provided that the commercial liability and property damage insurance coverage limits in Section [section' of the Master Lease shall be not less than $[3,000,000] per occurrence for purposes of this Sublease notwithstanding anything to the contrary contained in Article II hereof), and Subtenant shall name Sublandlord including its subsidiaries, [and] affiliates [and its *parent*, [parent name], ] as additional insured as well as each of those parties set forth in the Master Lease as required to be named as additional insured.  Prior to, or simultaneously with, execution and delivery of this Sublease by Sublandlord, Subtenant shall deliver an insurance certificate evidencing the foregoing, along with evidence that the insurance policy is endorsed indicating that the rights of the additional insured are conferred and rights of subrogation are waived, if an endorsement is so required to confer such rights or to waive subrogation, as required by this Article XII.  Upon request, Subtenant shall furnish Sublandlord with all certificates required to be delivered to Master Landlord pursuant to the Master Lease.

12.3.    Notwithstanding anything to the contrary contained in this Sublease, Subtenant, on behalf of itself and on behalf of anyone claiming under or through it by way of subrogation or otherwise, waives all rights and causes of action against Sublandlord and Master Landlord, and the respective directors, shareholders, officers, employees, members, agents and invitees of Sublandlord and Master Landlord, for any liability arising out of any loss or damage in or to the Subleased Premises, its contents and other property located thereon and caused by any peril normally covered under all-risk policies issued in the geographic area in which the Subleased Premises is located (whether or not such party actually carries such insurance policies).  The release and waiver shall be complete and total even if such loss or damage may have been caused by the negligence of Sublandlord or Master Landlord or their respective officers, directors, shareholders, employees, members, agents or

invitees, and shall not be affected or limited by the amount of insurance proceeds available to Subtenant, regardless of the reason for such deficiency in proceeds. Subtenant covenants that from and after the date possession of the Subleased Premises is delivered to Subtenant, its casualty insurance policies will contain waiver of subrogation endorsements, and that if such endorsements, for any reason whatsoever, are about to become unavailable, it will give Sublandlord not less than thirty (30) days prior written notice of such impending unavailability.

## ARTICLE XIII. CONFIDENTIAL INFORMATION.

**13.1.** Subtenant understands that it and its officers and employees, agents or representatives in the course of entering into and performing this Sublease, may have access to and come into contact with information of Sublandlord and Sublandlord's clients including but not limited to, the Master Lease, this Sublease, Master Landlord's consent to this Sublease, materials, information, computer software systems and programs, data, operational techniques and methodology, ideas, concepts and documents (hereinafter referred to collectively as **"Corporate Property"**). All Corporate Property, unless otherwise specifically declared to Subtenant by Sublandlord, is deemed to have pecuniary value to Sublandlord and to be confidential in nature.

**13.2.** Subtenant agrees to protect and treat as confidential the Corporate Property, to not disclose any Corporate Property to third parties and to not use such Corporate Property for any purposes whatsoever other than in connection with entering into or performing its obligations under this Sublease. Subtenant will advise each of its employees, agents and representatives who have access to same, of their obligation to keep the Corporate Property confidential and will not cause or permit other persons or entities to have access to the Corporate Property without Sublandlord's prior written consent.

**13.3.** Subtenant understands that Sublandlord, in many instances, uses proprietary information of others under contractual license, and Subtenant shall treat such licensed proprietary information in the same manner as if they are the Corporate Property and further, shall do nothing which would cause Sublandlord to breach the terms of its license agreements.

**13.4.** It is agreed and understood that in the event of a breach of this Section, damages may not be an adequate remedy and Sublandlord shall be entitled to injunctive relief to restrain any such breach, threatened or actual.

**13.5.** Subtenant's restrictions under this Section shall not apply to information which (i) is received by Subtenant from any source, other than Sublandlord, that is authorized to disclose it; (ii) is or becomes generally known to the public by publication or some means other than a breach of duty of this Sublease; (iii) is required by law, regulation or court order to be disclosed, provided that the request for such disclosure is proper and the disclosure does not exceed that which is required. In the event of disclosure under clause (iii) above, Subtenant shall furnish a copy of this Section to anyone to whom it is required to make such disclosure and (a) shall promptly advise Sublandlord in writing of each such disclosure, or (b) provide Sublandlord with evidence that such information was rightfully in Subtenant's possession prior to disclosure by Sublandlord.

## ARTICLE XIV. SIGNAGE.

Subtenant may have the rights to property directory signage and suite entry signage to the extent that Sublandlord has the rights to such signage pursuant to the Master Lease, if applicable or available within the property, included but not limited to the company's logo and likeness of the parent company or any of its subsidiaries. Subtenant shall be responsible for all costs associated with signage for the Subleased Premises, which shall be included in Additional Rent hereunder.

## ARTICLE XV. MISCELLANEOUS.

**15.1.** This Sublease may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

**15.2.** This Sublease shall not be binding upon Sublandlord unless and until it is signed by Sublandlord and delivered to Subtenant. This Section 15.2 shall not be deemed to modify the provisions of Section 1.4 hereof.

**15.3.** This Sublease constitutes the entire agreement between the parties and all representations and understandings have been merged herein.

**15.4.** This Sublease is binding upon and shall inure to the benefit of all of the parties hereto, their successors and (subject to the provisions hereof) their assigns.

**15.5.** Neither this Sublease nor a memorandum thereof may be recorded by Subtenant.

**15.6.** Subtenant represents that it has had no discussions with Master Landlord with respect to the leasing of space within the Property.

**15.7.** This Sublease shall be governed by, and construed in accordance with the laws of the State of South Carolina applicable to agreements to its type, nature and kind made and to be performed wholly within said State and without giving effect to the conflict of laws principals.

**15.8.** Subtenant hereby represents and warrants to Sublandlord that it has the full right, power and authority to enter into the transactions provided for herein.

**15.9.** This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of such counterparts together shall constitute on and the same instrument. Signatures provided by facsimile or electronic transmission shall have the same force and effect as original signatures and shall be binding upon the parties.

**IN WITNESS WHEREOF**, the parties have hereunto set their hands and seals as of the day and year first above written.

**SUBLANDLORD:**                                **SUBTENANT:**

By: _Tony Tate_                                  By: _Alonzo V. Pierce_
Name: Tony Tate                                  Name: Alonzo V. Pierce
Title: CEO, President                            Title: President / Chairman

**EXHIBIT A. SUBLEASED PREMISES.**

154 HYATT STREET – GAFFNEY SC 29340

**EXHIBIT B. ANNUAL RENT (ANNUAL AMOUNTS).**

| YEAR | RENT AMOUNT (ANNUALLY) | EXPIRATION DATE |
|---|---|---|
| YEAR 1 | $36000 | First anniversary of the last day of the month preceding the month in which the Rent Commencement Date occurs |
| YEAR 2 | $36000 | |
| YEAR 3 | $36000 | |
| YEAR 4 | $36000 | |
| YEAR 5 | $36000 | |

**EXHIBIT C. LETTER OF CREDIT**

# Litchian Corp Gaffney BPW Sub-Lease Agreement

Final Audit Report                                                      2021-10-20

| | |
|---|---|
| Created: | 2021-10-18 |
| By: | Tony Tate (Secretary@LitchainCorp.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAwy1PTK53uAtq2aBKzEQR_IVYDK-IdUsS |

## "Litchian Corp Gaffney BPW Sub-Lease Agreement" History

Document created by Tony Tate (Secretary@LitchainCorp.com)
2021-10-18 - 6:53:03 PM GMT- IP address: 184.90.183.182

Document emailed to Alonzo v. Pierce (ap@iswholdings.com) for signature
2021-10-18 - 6:55:12 PM GMT

Email viewed by Alonzo v. Pierce (ap@iswholdings.com)
2021-10-18 - 6:55:52 PM GMT- IP address: 172.58.101.35

Document e-signed by Alonzo v. Pierce (ap@iswholdings.com)
Signature Date: 2021-10-18 - 9:26:46 PM GMT - Time Source: server- IP address: 73.32.122.30

Document emailed to Tony Tate (ttate@litchaincorp.com) for signature
2021-10-18 - 9:26:48 PM GMT

Email viewed by Tony Tate (ttate@litchaincorp.com)
2021-10-18 - 9:40:10 PM GMT- IP address: 104.28.94.188

Document e-signed by Tony Tate (ttate@litchaincorp.com)
Signature Date: 2021-10-20 - 8:09:17 PM GMT - Time Source: server- IP address: 184.90.183.182

Agreement completed.
2021-10-20 - 8:09:17 PM GMT

 **Adobe Sign**

## SPECIAL BENEFIT LICENSE AGREEMENT

**THIS SPECIAL BENEFIT LICENSE AGREEMENT** is made and entered into as of this 18th day of October, 2021, by and between LITCHAIN Corporation, a duly organized Florida Profit Corporation ("LICENSOR"), and ISW Holdings Inc , ("LICENSEE"), a Nevada Corporation , hereinafter, collectively (the "Parties").

### RECITALS

**WHEREAS**, the Licensor is a party to a Special Agreement with Gaffney Board of Public Works, ("BPW") to authorize Licensor to participate in BPW's Economic Development Incentive Rate ("Schedule I") and Credit for New Loads ("Schedule I Economic Development Credits") for electric service as of September 8, 2021, (hereinafter "Special Agreement for Electric Utility Service to LITCHAIN Corporation", and collectively referred to as the "Original Agreement", hereby incorporated by reference);

**WHEREAS**, the Licensor has decided to enter into an agreement with Licensee to pass-along it's benefits of the Special Agreement for Electric Utility Service Agreement to Licensee on a non-exclusive basis and Licensee has agreed to accept the terms of said Agreement as more fully described in this Agreement.

**NOW**, **THEREFORE,** in consideration of the mutual promises and covenants herein, contained, the parties agree as follows:

1.  **RECITALS**. The recitals set forth above are incorporated herein by reference.

2.  **GRANT OF SPECIAL BENEFIT LICENSE**. The Licensor does hereby grant to the Licensee, and the Licensee does hereby accept from the Licensor, a revocable license for the use of the benefits of the Original Agreement for a term of 5 year(s) from the date of execution of this Agreement. Licensee acknowledges that, under all applicable South Carolina Law, Licensee acquires no prescriptive rights or other property rights or claims by virtue of license.

This license shall continue for 5 year(s) from the date of execution or until written notification of its revocation by the Licensor is provided to the Licensee at least sixty (60) days prior to such revocation. This license is revocable with or without cause or reasonableness at the will and at the sole discretion of the Licensor. The Licensee understands that the Original Agreement was granted by a public service agency and albeit may have entitled Licensee to certain rights or due process rights, Licensee understands that no procedural due process rights or claims arising from the procedure used or considered to revoke this license and the Licensee specifically waives any claims or rights arising from such termination. The Licensee shall further have no right

EXHIBIT C to Blockquarry Compl.
**EXHIBIT D
PAGE 178**

or claim for damages arising from the termination of this license, regardless of the amount of investment by the Licensee and the duration of use of the benefits from the Original Agreement by the Licensee. No representations or predictions made by the Licensor or any of its officers, employees, charter officials or agents shall give any right of use or any right of damages for losses sustained by the Licensee because of the revocation of this license.

In the event that this license is revoked, the Licensee shall have a period of no more than sixty (60) days from the date of notification of such revocation to immediately cease usage of all benefits from the Original Agreement and agrees that Licensee shall become liable for all outstanding obligations as it relates to utility services owed to the public works service provider.

In the event that the Licensee cease usage of all benefits received from the Original Agreement, Licensee shall be liable for the excess costs of utilities owed and shall immediately upon written demand by Licensor remit payment for all usage that may be incurred by Licensee.

3.    **PAYMENT TO LICENSOR**. At this juncture licensee will not be required to remit payment or services for the usage of this special benefit. When applicable, the payment instructions will be detailed in Schedule A, attached and incorporated in this Agreement.

4.    **CRITERIA COMPLIANCE**. The Licensor has received from the Original Agreement of the authority to quality for specialized electrical service rates from BPW. Licensee agrees to comply with all laws and regulations outlined by BPW to qualify for the Schedule I Economic Develop Credits based upon the following criteria:

  a. The Schedule I Economic Development Credits will commence when the electric load reaches 1,000 kW, on average and has an average monthly load factor of forty-five percent (45%).

  b. The Schedule I Economic Development Credits will become applicable and remain applicable only if monthly peak load is in excess of 1,000 kW on average.

  c. Loads must satisfy the Schedule I criteria by March 01, 2022 or the offer of the BPW Schedule will be withdrawn.

Licensee understands and agrees that the criteria compliance is subject to change and all material changes will be communicated in writing via the Licensor.

5.    **BENEFIT PAYMENT**. Licensee agrees to remit all special benefit payments to the appropriate public service provider accordingly to the invoices and in the event default of payment Licensee's entitlement to the benefit shall be immediately revoked.

EXHIBIT C to Blockquarry Compl.
**EXHIBIT D**
**PAGE 179**

6.     **ADDITIONAL BENEFITS**. As a result of Licensee usage of this special benefit, Licensee hereby grants to Licensor the ability to utilize upwards of 100 % of any land use where the special benefit will be utilized for the duration of the Agreement. Licensor understands that

7.     **INDEMINIFCATION**. The Licensee agreements to indemnify and hold harmless, assume legal liability for and defend Licensor, any and all of its officers, employees, agents, servants, and successors and assigns from against any and all actions, claims, liabilities, assertions of liability, losses and cost and expenses in law or equity, including but limited to attorney's fees at trial and appellate levels, reasonable investigative and discovery costs, court costs or claims of every kind and nature whatsoever, which in any manner directly or indirectly may arise or be alleged to have arisen, or resulted or alleged to have resulted from the negligent acts or omissions or other wrongful conduct of the licensee's reliance on the benefits or any other claim which arise out of or relate to any material breach of this Agreement.

8.     **ASSIGNMENT**. Neither this Agreement nor any benefit, duties or obligations under this Agreement may be assigned by Licensee without the prior written consent of Licensor. Any such assignment will be considered null and void.

9.     **NOTICES**. Any notices required to be given under this Agreement to either party shall be in writing and shall be transmitted by (i) registered mail; (ii) certified mail, return receipt requested, or (iii) overnight mail addressed to the party to be notified at the following address or to such other address (or person) as such party shall specific by the like notice hereunder:

      LICENSOR:      LITCHAIN CORP
                          Tony Tate
                          CEO, President

      LICENSEE:      ISW Holdings Inc
                          Alonzo V. Pierce, President

10.     **ATTORNEY'S FEES**. If either party incurs any legal fees associated with the enforcement of this Agreement or any rights under this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and any court, arbitration, mediation, or other litigation expense from the other party.

11.     **ARBITRATION**. Any dispute, controversy or claim arising out of or related in any to this Agreement or any services performed hereunder which cannot be amicably resolved by the Parties shall be solely and finally settled by arbitration administered by the American Arbitration Association in accordance with its commercial arbitration rules. Judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The arbitration shall take place before a panel of three (3) arbitrators sitting in the State of South Carolina. The language

EXHIBIT C to Blockquarry Compl.
**EXHIBIT D
PAGE 180**

of the arbitration shall be English. The arbitrators will be bound to adjudicate all disputes in accordance with laws of the State of South Carolina. The decision of the arbitrators shall be in writing with written findings of fact and shall be final and binding on the parties. Each party bear in own costs relating to the arbitration proceedings irrespective of its outcome. This section provides the sole recourse for the settlement of any disputes arising out of, in connection with or related to this Agreement.

12.    **GOVERNING LAW**. This Agreement will be governed by and construed in accordance with the laws of the State of South Carolina, without regard to its conflicts of laws principles.

13.    **WAIVER**. The failure of any party to insist in any one or more instances upon performance of any of the terms and conditions of this Agreement shall not be construed as a waiver or relinquishment of any right granted hereunder, or of the future performance of such provision or any other covenant or condition, but the obligations of all parties hereunder with respect hereto shall continue in full force and effect.

14.    **SEVERABILITY**. Should any reason or any part of any section of this Agreement be rendered void, invalid, or unenforceable by any court of law, for any reason, such determination shall not render void, invalid, or unenforceable any other section or any party of any section in this Agreement.

15.    **FORCE MAJEURE**. Neither Party shall be liable hereunder for any failure or delay in performance of its obligations under this Agreement, except for the payment of money, if such failure or delay is on account of causes beyond its control, including but not limited to labor disputes, civil commotion, war, fires, floods, inclement of weather, government regulations or controls, casualty, government authority, strikes, pandemics, epidemics, local disease outbreaks, public health emergencies, or acts of God, in which event the non-performing party shall be excused from its obligations for the period of the delay and for a reasonable time thereafter. Each party shall use reasonable efforts to notify the other party of the occurrence of such an event within three (3) business days of its occurrence.

16.    **ENTIRE AGREEMENT**. This Agreement supersedes any and all agreements, either oral or written, between the Parties with respect to the benefits outlined in this Agreement and contains all of the representations, covenants, and agreements between the Parties with respect to the rendering of these benefits. Each Party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any Party, or anyone acting on behalf of any Party, which are not contained in this Agreement, and that no other agreement, statement, or promise not contained in this Agreement will be valid or binding. Any modification of this Agreement will be effective only if it is in a writing signed by an authorized representative of the party to be charged.

EXHIBIT C to Blockquarry Compl.
**EXHIBIT D**
**PAGE 181**

**[SECTION INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first written above.

**LICENSOR,**
LITCHAIN CORP, a Florida Profit Corporation

By:        _Joy Saha_____
Its:        CEO, PRESIDENT


LICENSEE,

By:        _Alonzo V. Pierce_____
Its:        President
Address:   700 Louisiana St. Suite 3950
           Houston, Texas
EIN:       20-5673057

EXHIBIT C to Blockquarry Compl.
**EXHIBIT D**
**PAGE 182**

SCHEDULE "A"

LICENSEE agrees to the following payment terms and breakdown to Licensor for the usage of the special benefits provided in the Special Benefit License Agreement dated Oct 19, 2021 .

**PAYMENT SCHEDULE AND INSTRUCTIONS:**

As required by Licensor upon receipt of notice. All payments are within 10 days or receipt per the payment instructions received via the Licensor Payment Instruction Agreement that was provided separately to Licensee.

| | |
|---|---|
| **WIRE:** | **Litchain Corp \| Routing ABA: 021000021 \| ACCT#: 502012252** |
| **SWIFT CODE/INTERNATIONAL WIRE:** | **CHASUS33 ADDRESS: 270 Park Avenue \| New York, New York \| 10017** |
| **ACH:** | **Litchain Corp \| Routing ABA: 267084131 \| ACCT#: 502012252** |

**SERVICES:**

Licensee as a result of a benefactor of the special benefits agreement has agreed to provide the following services for Licensor as outlined below:

None to speak of for this agreement only.

EXHIBIT C to Blockquarry Compl.
**EXHIBIT D
PAGE 183**

## SPECIAL AGREEMENT

## FOR ELECTRIC UTILITY SERVICE TO LITCHAIN CORPORATION

THIS AGREEMENT, effective September 8, 2021, is by and between the Gaffney Board of Public Works ("BPW'), Gaffney, South Carolina, and Litchain Corporation (LC), a prospective customer which has made application for electric utility service from the BPW in accordance with the BPW's policies, regulations and rates. LC's electrical loads are expected to grow to a level which will qualify for the applicability of BPW's Economic Development Incentive Rate ("Schedule I") and Credit for New Loads ("Schedule I Economic Development Credits") for electric service as more fully described in this Agreement.

### RECITALS

A.      The BPW has duly approved Schedule I to provide electrical service to industrial customers which meet the applicability criteria. A copy of Schedule K, Schedule I, and Schedule I Economic Development Credits is attached hereto and incorporated herein by reference.

B.      The Schedule K, Schedule I, and Schedule I Economic Development Credits, and other schedules and credits the BPW may offer from time to time, are available to LC, as an electrical customer of the BPW, upon satisfaction of certain applicability provisions described in Section 1, Section 2, and Section 3 of this Agreement.

C.      LC provided its potential electric load forecast to the BPW. Based upon these load forecasts, the BPW offered LC a proposal which includes electrical service under Schedule I, and Schedule I Economic Development Credits. During the term of this Agreement as provided in Section 4, LC also has the right and option to receive service under different schedules and credits as provided in Section 3 (1) hereof.

### Section 1:  Conditions of Applicability for Rate Schedule K

The BPW agrees to provide LC with electric service under Schedule K as temporary service upon commencement of operations until the time LC's load reaches the criteria for Schedule I.

### Section 2:  Conditions of Applicability for Rate Schedule I

The BPW will provide LC electrical service under Schedule I and the Schedule I Economic Development Credits provided that LC meets the following conditions:

1.      The Schedule I remains applicable only if LC's monthly peak load is in excess of 750 kW on average, with an average monthly load factor of not less than 45%.

2.      The Schedule I Economic Development Credits will become applicable and remain applicable only if LC's monthly peak load is in excess of 1,000 kW on average.

3.      LC loads must satisfy the Schedule I criteria by March 1, 2022, or the offer of the BPW Schedule I will be withdrawn.

Section 3:  Option for Change of Rate Schedule

1.      At any time during the term of this Agreement and any extension thereof, LC has the option to request a switch to another electric rate schedule available from the BPW; provided, however, that LC meets all of the criteria of the rate schedule to which it desires to switch, and BPW approves the change of rate. LC can request to switch rate schedules a maximum of one time a year. The rate schedules from which LC has an option to choose from will be the schedules available from the BPW at the time of the decision. If a rate switch is made BPW reserves the right to modify or establish a new special service agreement.

2.      Any decision by LC to switch to another electric rate schedule must be in the form of a written request submitted to the Board of Public Works, and the new electric rate schedule, including any applicable credits, shall take effect upon approval by the BPW.

Section 4:  Term of Contract

1.      After the completion of construction of the LC facility and at the time the facility becomes operational, this Agreement will commence and continue for a term of eight (8) years.  LC will notify the Board of Public Works in writing of the date of facility completion and commencement of operations.

2.      The Schedule I Economic Development Credits will commence when LC's load reaches 1,000 kW, on average, and has an average monthly load factor of 45%, and will terminate forty-eight (48) months from the date such Schedule I Economic Development Credits are applied in accordance with Schedule I. Credits will be applied as a straight pass through from PMPA to LC through monthly billing according to Schedule I.

3.      At the end of the initial eight (8) year term, and without either party taking action with respect to the terms of this Agreement, this Agreement is automatically renewable, and the parties will continue the application of the service, schedule, and credits then in effect unless later revised hereunder, for successive one-year terms.

Section 5: Special Terms and Conditions

1.      This Agreement and the application of Schedule I are subject to the condition that if future wholesale rates for the Economic Development Rate or successor charged by Piedmont Municipal Power Agency (PMPA) are increased and are no longer competitive with other qualified power suppliers, this contract may be canceled by LC upon ninety (90) days written notice to the BPW. Upon cancellation, LC would be required to reimburse the BPW credits received based on the PMPA participant responsibility schedule provided in the additional credits rider.

Section 6: Quality of Service

In an effort to provide the highest level of service to LC and other customers, the BPW constantly strives to keep its distribution system properly maintained and in good operating condition.  In its goal to maintain a top quality system, the BPW agrees to the following service conditions:

1.      BPW will perform tree trimming on all distribution lines on its system at least once every four (4) years.  Main feeder lines will be inspected, and trimmed if needed, once a year to insure the main lines remain free from tree growth. The BPW maintains two full-time tree trimming crews to perform this task.

2.      In the event of a problem with the electrical service to the LC facility, a BPW service employee will respond to the problem and be on the scene within 30 minutes. This employee will ascertain the problem and advise the customer, to the best of his ability, regarding the length of time to repair the problem.

3.      The BPW will maintain spare parts and equipment for repair and/or replacement of the equipment used to provide electric service to LC's facility. These parts will be located at the Central Warehouse.  LC is choosing to provide its own distribution transformers (2500 KVA, 240/416 v).

4.      The BPW currently operates three (3) bulk power delivery stations on its system. The BPW can serve LC from either station with a high level of reliability. A fourth delivery station is being designed in the vicinity of the LC site.

5.      The BPW has access to technical expertise in the field of electrical operations from which LC may benefit. This expertise will be available to LC whenever it is needed.

Section 7: Other terms; Notices

1.      Per BPW policy, LC will be required to pay a deposit that is equal to LC's expected two highest month utility bill average.

2.      The terms and conditions contained in this Agreement shall represent the final terms and conditions. In addition to this agreement, all standard BPW policies apply.

3.      Any notices required under this Agreement are to be provided to the following:

EXHIBIT D to Blockquarry Compl.

**EXHIBIT D**
**PAGE 186**

As to the BPW:  General Manager
              Board of Public Works
              210 East Frederick Street
              Post Office Box 64
              Gaffney, South Carolina 29342


As to LC:     Tony Tate
              Litchain Corporation
              President
              118 ½ Willis Plaza
              Gaffney SC 29340



IN WITNESS WHEREOF, the BPW and LC have caused this Agreement to be signed by their duly authorized representatives.


BOARD OF PUBLIC WORKS                    ATTEST

By: _____           _____

Its: _____


LITCHAIN CORPORATION                     ATTEST

By: _Antonia Tate_____       _Tony Tate_____

Its: _____
     President


EXHIBIT D to Blockquarry Compl.

**EXHIBIT D
PAGE 187**