# EXHIBIT C

EXHIBIT C
PAGE 53

Filing # 181653249 E-Filed 09/12/2023 04:01:28 PM

**IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA**

**BEEQB LLC,**

   **Plaintiff,**

 **CASE NO.:**

 v.

**UPTIME HOSTING LLC, UPTIME
ARMORY LLC, BIT5IVE LLC, and
ROBERT COLLAZO,**

   **Defendants.**

_____/

**COMPLAINT**

 Plaintiff BEEQB LCC ("***BEEQB***") sues Defendants UPTIME HOSTING LLC ("***Uptime Hosting"***), Uptime Armory LLC ("***Uptime Armory***"), BIT5IVE LLC ("***Bit5ive***"), and Robert Collazo ("***Collazo***"), and states:

**NATURE OF ACTION**

 1. This action is for breach of contract, negligent and fraudulent misrepresentation, conversion, unjust enrichment, and damages.

 2. Beeqb is a company engaged in the cryptocurrency mining industry.

 3. Defendants Uptime Hosting, Uptime Armory, and Bit5ive are a group of companies that offer crypto mining facilities and ancillary services to crypto mining customers.

 4. Defendant Collazo is the CEO of Defendants Uptime Hosting, Uptime Armory, and Bit5ive.

 5. Defendant Uptime Hosting breached the hosting agreement with Beeqb by not providing agreed-upon services, which has caused and continues to cause damage to Beeqb from the loss of profit, loss of Service Level Credits (as hereinafter defined in paragraph 34), loss of

1

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C
PAGE 54**

Beeqb's refundable deposit and the depreciation and damage to its cryptocurrency mining machines.

6.        Beeqb now brings this action to obtain legal and equitable relief for Defendants' breach of contract, negligent and fraudulent misrepresentation, conversion, and unjust enrichment.

## JURISDICTION AND VENUE

7.        The Court has jurisdiction over the Defendants under Fla. Stat. § 48.193(1)(a)1-2, and 7.

8.        Venue is proper in Miami-Dade County under Fla. Stat. §§ 47.011 and 47.021 because all Defendants reside or have a principal place of business in Miami-Dade County.

## PARTIES

9.        Plaintiff Beeqb is a Florida limited liability company with its principal place of business located at 1830 S Ocean Dr, Hallandale Beach, FL 33009.

10.        Defendant Uptime Hosting is a Delaware limited liability company with its principal place of business located at 12301 NW 112 Ave Suite 112, Medley, FL 33178.

11.        Defendant Uptime Armory is a Delaware limited liability company with its principal place of business located at 6951 NW 16th Street, Miami, FL 33126.

12.        Defendant Bit5ive is a Florida limited liability company with its principal place of business located at 6951 NW 16th Street, Miami, FL 33126.

13.        Defendant Robert Collazo is an individual residing at 2226 SW 57 Street, Miami, FL 33155.

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C**
**PAGE 55**

**FACTS**

**I.     Beeqb's Business**

14.     Beeqb was formed in Florida in 2018 by Maxim Eliseev, its owner.

15.     Beeqb is actively involved in the cryptocurrency mining industry, which utilizes specialized and powerful Bitcoin mining machine computers. Beeqb is reliant on the sustained use of more than 1,300 of its Application-Specific Integrated Circuit Miner machines ("*Machines*"), which is critical for its continued success as a company.

**II.     Beeqb's Contract with Defendant Uptime Hosting**

16.     In the summer of 2021, Beeqb's representatives, including Eliseev, became aware of the Bit5ive group of companies, particularly Defendants Uptime Hosting, Uptime Armory, and Bit5ive (together, the "*Group*").

17.     Defendant Collazo, acting on behalf of the Group, represented that the Group had facilities that could host thousands of Machines and that their facilities had access to abundant and reliable electrical power. At that time, Collazo stated that the Group had an extensive network of partners and contractors without explicitly mentioning that there are landlords on the facilities and that no Defendant owns any facility. However, in reality, the Group was subleasing these facilities to Beeqb without obtaining permission from the landlords.

18.     This concealment prevented Beeqb from recognizing the potential risks that could affect its business operations at these facilities.

19.     When Beeqb's representatives, including Eliseev, asked to review agreements with the Group's partners, Collazo assured Beeqb that all agreements were in place and the partners' contracts would not cause any problems for Beeqb's business. This was a false representation. In reality, the contracts between the Group and its partners contained clauses that allowed the landlord

to suspend the power supply in case of nonpayment and utilize or even sell the equipment on the premises in order to settle debts owed by the Group.

20.     Because the Group was providing access to the facilities to multiple companies, including Beeqb, failure to pay for power by one company put others at risk of losing power supply.

21.     Cryptocurrency mining operations require a continual supply of an enormous amount of electricity to produce cryptocurrency and derive profits. Uninterrupted access to a reliable power supply is a critical consideration for mining companies when entering into a contract with a counterparty.

22.     Based on these and other representations, Beeqb agreed and paid for one container[1] for the operation of its Machines and commenced working with Uptime Hosting. Initially, Uptime Hosting did not fulfill some of its responsibilities on time. Despite this, Uptime Hosting assured Beeqb that it would soon meet its contractual hosting commitments. Because of these assurances, Beeqb chose to keep working with the Group.

23.     Beeqb's assertion that the Group has its own facilities was one of the critical considerations prior to entering into an agreement with the Group because working with an intermediary such as Uptime Hosting opens Beeqb up to significant risks, many of which have materialized in this case.

24.     On October 1, 2021, Beeqb and Uptime Hosting entered into a Hosting Agreement, a copy of which is attached as **Exhibit A**. Under the Hosting Agreement, Beeqb and Uptime Hosting have clearly defined roles and responsibilities.

_____

[1] Containers or Pods are required for storing mining machines. They are typically designed with integrated cooling, power distribution, and network infrastructure to optimize the mining operations.

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C**
**PAGE 57**

25.    As per the Hosting Agreement, there were two hosting facilities, one located at 4038 Rocket Street, Pryor, Oklahoma 74361 ("***Oklahoma Facility***"), and the other at 150 Hyatt Street, Gaffney, South Carolina 29341 ("***Gaffney Facility***").

26.    Under the terms of the Hosting Agreement, Beeqb agreed to supply the Machines and pay associated electricity and hosting fees. In return, Uptime Hosting was to provide electricity, space, and other services for these Machines.

27.    In October 2021, as per the contract, Beeqb paid Uptime Hosting three payments toward Beeqb's refundable deposit in the amounts of $657,000.00, $153,300.00, and $36,272.00 ("***Refundable Deposits***"). When paying these deposits, Beeqb relied upon Collazo's representations that the deposit was fully refundable and could be used toward Beeqb's future payments for electric or other bills.

28.    In October 2021, Beeqb paid Uptime Hosting is $875,000.00 consisting of payments of $656,250.00, $131,250.00, $43,750.00, and $43,750.00 for five specifically built crypto mining containers for the Machines ("***Containers***") under the Sale and Purchase Agreement dated October 1, 2021 ("***Purchase Agreement***"). A copy of the Purchase Agreement is attached as **<u>Exhibit B</u>**. These Containers were specifically built for Beeqb's Machines and Uptime Hosting's facilities. The Containers were not compatible with any other hosting provider's facility.

29.    Under Section 1.1 of the Hosting Agreement, Beeqb was obligated to deliver the Machines precisely to Uptime Hosting. Between December 2021 and January 2023, Beeqb supplied Uptime Hosting with approximately 1,308 of its Machines and made all the necessary payments, thus satisfying Beeqb's obligations under the Hosting Agreement.

**ASSOULINE & BERLOWE, P.A**.
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C
PAGE 58**

### III.     Defendant Uptime Hosting's Breach of Contract

30.     Starting November 9, 2022, the Gaffney Facility began to experience electrical interruptions that lasted multiple days. In November, downtime was 11 days, in December – 13 days, and in January 2023 – 14 days.

31.     Uptime Hosting, represented by its Chief Customer Officer Andrea Siles, assured Beeqb multiple times that the Gaffney Facility could support the sustained operation of Machines, but this did not occur.

32.     As shown below, Uptime Hosting utterly failed to perform as promised in connection with the Hosting Agreement by failing to deliver the required amount of electricity, failing to provide Service Level Credits to Beeqb, and failing to return Beeqb's refundable deposit and Beeqb's Machines, resulting in substantial damages to Beeqb.

33.     Under Section 1.1 of the Hosting Agreement, Defendant Uptime Hosting was obligated to provide Beeqb with services for these Machines, including receiving, testing, and operating the Machines, engaging in cryptocurrency mining, providing rack space allocation for the Machines, installation services, electrical power connection, cooling infrastructure, network connectivity, security, and technical support ("*Service*s").

34.     Under Section 1.8 of the Hosting Agreement, Uptime Hosting was obligated to provide Services to Beeqb's Machines at a minimum of 90% of the time ("***Minimum Service Level***"). The contractually agreed-upon remedy for failure to meet the Minimum Service Level was for Beeqb to receive a credit ("***Service Level Credit***") equal and limited to a discount in proportion to the monthly rate for the amount of downtime beyond the Minimum Service Level.

35.     Uptime Hosting materially and substantially breached Section 1.8 of the Hosting Agreement. Uptime Hosting failed to deliver the total amount of power necessary for the operation

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C
PAGE 59**

of the Machines, and thus failed to perform at the Minimum Service Level. Uptime Hosting also failed to provide Beeqb with any Service Level Credits due as per the Hosting Agreement.

36.     By January 24, 2023, $61,560.00 in Service Level Credits were owed to Beeqb for the downtime at the Gaffney Facility. This information was communicated to Uptime Hosting and Collazo on that specific date through an email from Beeqb's representative.

37.     Since January 13, 2023, the Gaffney Facility has been without power, and this remains ongoing up to the present day.

38.     On February 2, 2023, Uptime Hosting sent invoice No. 1469 for electric bills from the Oklahoma Facility for $125,245.61. Beeqb requested Uptime Hosting to use (1) Service Level Credits and (2) Refundable Deposits toward payment of this bill. This request was reasonable since the Gaffney Facility operations had stopped providing power prior to and during that time. Given this circumstance, Beeqb had no logical justification for making further payments, especially when Uptime Hosting's breach of contract was evident. Moreover, the funds already paid as deposits could have readily covered the invoice amount.

39.     Uptime Hosting refused to cover the invoice in an email dated February 3, 2023, saying that the "deal structure for Oklahoma will not allow [Uptime Hosting] to apply [Service Level Credits] as a credit towards that power invoice, but will honor it in Gaffney [Facility] as we reactivate." This statement was false. The Hosting Agreement and its terms were binding and covered both facilities. Additionally, Uptime Hosting was not allowed to choose where Service Level Credits could be applied.

40.     Starting from February 10, 2023, Uptime Hosting halted the operation of the Machines situated in the Oklahoma Facility because Beeqb had not paid the invoice, even with the substantial amount of Refundable Deposits and Service Level Credits owed to Beeqb.

ASSOULINE & BERLOWE, P.A.
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

EXHIBIT C
PAGE 60

41.     Therefore, Defendant Uptime Hosting materially and substantially breached the Hosting Agreement by failing to provide Beeqb with its contractually owed Service Level Credits and denying services to the Machines.

42.     Considering all mutual settlements and reductions, the outstanding amount of the refundable hosting deposit is $343,421.96 ($322,545.46 and $197,100.00) for the Oklahoma and Gaffney Facilities, respectively, less the outstanding electricity bill ($176,223.50), to which Beeqb is entitled.

43.     Uptime Hosting materially and substantially breached this part of the Hosting Agreement. Uptime Hosting has refused to uphold this contractual obligation and has not refunded Beeqb's hosting deposit.

44.     Under Section 3.7 of the Hosting Agreement, Uptime Hosting was obligated to return Beeqb's Machines upon Beeqb's request. Beeqb requested the return of its Machines multiple times, yet Uptime Hosting has told Beeqb that access to both facilities is prohibited.

45.     Uptime Hosting materially and substantially breached Section 3.7 of the Hosting Agreement. Uptime Hosting refused Beeqb's request to return its Machines, in blatant violation of the contractually agreed-upon remedy.

46.     Additionally, each day of downtime amounts to $1,620.00 in Service Level Credits in the Gaffney Facility and $1,680.00 in the Oklahoma Facility. Thus, Service Level Credits owed to Beeqb amount to more than $800,000.00 for the Gaffney Facility and more than $1,000,000.00 for the Oklahoma Facility. With each day of downtime, these amounts continue to rise.

**IV.     Beeqb's Demand Letters and Uptime Hosting's Reply**

47.     After Beeqb retained counsel to represent it in this dispute in April 2023, Beeqb sent Uptime Hosting a letter informing it of liability for breach of contract. A copy of the demand letter dated April 20, 2023, is attached as **Exhibit C**.

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C**
**PAGE 61**

48.    Additionally, Beeqb has sent demand letters to the Oklahoma and Gaffney Facilities' landlords. These letters request the release of the Machines, as Uptime Hosting had misrepresented that the landlords prohibited the removal of Beeqb's lawfully owned Machines and Containers from the facilities. A copy of the demand letters to both landlords dated April 21 and April 26, 2023, are attached as **Exhibit D.**

49.    On April 24, 2023, the Gaffney Board of Public Works ("***BPW***"), the landlord of the Gaffney Facility, replied to the demand letter that all property located at the facility could not be released absent a court order since there is pending litigation against BPW in an unrelated case. A copy of the response letter is attached as **Exhibit E**. This was a significant fact that Collazo and Uptime Hosting had not previously mentioned to Beeqb.

50.    In the response letter dated April 27, 2023, Uptime Hosting informed Beeqb that there is no access to the Gaffney Facility and the Machines on site due to the lawsuit and that "Uptime Hosting is willing to reimburse [Beeqb] for the hosting deposit as it relates to the Gaffney site as soon as Uptime Hosting is able to return to the site and engage a replacement client." In regard to the Oklahoma Facility, Uptime Hosting informed Beeqb that it is not responsible for paying the electricity bill and is "willing to reimburse [Beeqb] for the hosting deposit in Oklahoma once it engages a replacement client." Uptime Hosting also mentioned that the Group is facing potential bankruptcy. A copy of the response letter is attached as **Exhibit F**.

51.    Uptime Hosting has argued that the breach of contract is excused due to force majeure. This argument is unfounded because Uptime Hosting's inability to maintain sufficient funds, especially its failure to use the Refundable Deposits to cover the facility's electric bills, does not meet the stringent standard for force majeure.

52.    There can be no force majeure when an entity chooses an inherently risky strategy

**ASSOULINE & BERLOWE, P.A**.
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343
**EXHIBIT C
PAGE 62**

to deceive its customers and contractors, such as not mentioning to landlords that there are multiple equipment owners or not maintaining enough cash to cover current obligations. Force majeure is an unpredictable and unexpected circumstance the party could not have foreseen. Here, Uptime Hosting's poor decision-making and bad-faith behavior do not qualify as force majeure.

**V.    Uptime Hosting's Misrepresentations and Conversion**

53.    Uptime Hosting provided Beeqb with false information about its business situation. This deceptive act aimed to convince Beeqb to enter into agreements with Uptime Hosting and Uptime Armory. As a result of these agreements, Beeqb found itself in a situation of substantial risk and potential future losses.

54.    On August 7, 2023, Hashpower LLC ("***Hashpower***"), the landlord and owner of the Oklahoma Facility, notified Beeqb that under its settlement with Bit5ive, Hashpower now owns five of Beeqb's containers. Beeqb was not notified by any of the Defendants that its lawfully purchased property would be sold or otherwise disposed of, and Beeqb never consented to this change of ownership.

55.    Additionally, on August 8, 2023, Hashpower's CEO Robert Hefner told Beeqb that "Bit5ive has represented that some containers, I'm still uncertain as to which, at [Oklahoma Facility] were only temporary Beeqb containers and that it has new containers manufactured for Beeqb located elsewhere. Bit5ive represented that the containers at [the Oklahoma Facility] are their property, and they have warranted that their bill of sale to Hashpower is final." This clear misrepresentation contradicts the existing arrangements between Beeqb and Uptime Armory.

56.    Therefore, Defendants have converted Beeqb's Containers.

57.    Since August 17, 2023, Beeqb has found additional instances of Defendants' bad-faith behavior. Hashpower mentioned to Beeqb that Hashpower was using Beeqb's Machines to

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C
PAGE 63**

cover debts Bit5ive owes to Hashpower: "Hashpower acted upon the rights bestowed upon it by the binding hosting contract signed between Hashpower and Bit5ive and Bit5ive acquiesced to performing in accordance with the contract. This involved using the equipment to help improve a challenging situation that it found itself in, even though it wasn't responsible for the situation."

58.     Beeqb never allowed and never would have allowed any of the Defendants to use its Machines to cover for their own financial mistakes. At the same time, Uptime Hosting owed significant amounts of money to Beeqb in Service Level Credits and Refundable Deposits.

59.     Beeqb does not know when the conversion of the Machines began. The purchase price of the Machines located at the Oklahoma Facility amounts to approximately $4,170,000.00. Because this equipment works constantly, its manufacturer-predicted life expectancy is five years. The equipment loses 1.5% or $66,720.00 of value for amortization purposes each month. Since Bit5ive allowed Hashpower to use Beeqb's Machines, Bit5ive is liable for the amortization and equipment depreciation costs.

60.     On August 19, 2023, Defendants Uptime Hosting, Uptime Armory, and Bit5ive, through their attorneys, sent a letter to Beeqb trying to push the burden for the Group's hardship on Beeqb, stating that "Beeqb opted not to pay the power bills at the Oklahoma site, and that fact caused issues between the landlord and our clients, as the landlord deemed them in default." However, as was stated above, it was not Beeqb's fault that Uptime Hosting had no available cash to utilize Refundable Deposits toward the power bills. A copy of the response letter is attached as **Exhibit G.**

61.     Additionally, in that response letter, the Group's attorneys stated:

> At this juncture, the landlord is demanding Bit5ive place funds in escrow to determine ownership of three containers on its site. Our clients acknowledge that BEEQB is entitled to three containers, and they propose providing BEEQB with two brand new containers to be delivered at the

**ASSOULINE & BERLOWE, P.A**.
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C**
**PAGE 64**

location of your client's choosing. As for the third, one container is coming back, and our clients will also provide that to BEEQB.

This offer was made to hide the conversion of Beeqb's containers and obtain consent from Beeqb after the fact since it is clear to all parties that Beeqb owns the containers pursuant to the Purchase Agreement mentioned above.

62.     Beeqb now brings this action to obtain legal and equitable relief for Defendants' numerous violations of its rights.

63.     As a result of Defendants' ongoing breach of contract, negligent and fraudulent misrepresentation, and conversion, the financial resources of Beeqb are being wasted each day, necessitating urgent relief.

64.     All conditions precedent to this action have occurred, been satisfied, or have otherwise been waived.

## COUNT I
## BREACH OF CONTRACT

65.     Plaintiff restates and incorporates all allegations set forth in Paragraphs 1 through 64 as set forth above.

66.     As of October 1, 2021, Beeqb had a valid contract with Uptime Hosting, whereby the latter agreed to perform various services in connection with the Hosting Agreement as a reasonably prudent services provider.

67.     As of October 1, 2021, Beeqb had a valid contract with Uptime Armory, whereby the latter agreed to make and deliver custom-made Containers to the facility of Beeqb's choice in exchange for payment.

68.     Beeqb fulfilled its obligations under both contracts.

69.     Uptime Hosting materially breached the Hosting Agreement by failing to provide the Minimum Service Level and Service Level Credits.

**ASSOULINE & BERLOWE, P.A**.
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C
PAGE 65**

70.     Uptime Hosting also materially breached the Hosting Agreement by refusing to return Beeqb's refundable deposit and Beeqb's Machines.

71.     Beeqb could not move to another facility as its Machines became inaccessible due to Uptime Hosting's breach of contract.

72.     Beeqb has suffered and will continue to suffer damages as a result of Uptime Hosting's breach of contract, including:

     a.   Loss of Beeqb's Machines;

     b.   Loss of the refundable deposit;

     c.   Loss of substantial profits from Beeqb's Machines being offline due to Defendants' failure to provide electricity to the Machines; and

     d.   All costs related to bringing suit, and such other damages as the Court may deem just and proper.

73.     All damages were foreseeable consequences of Defendant Uptime Hosting's breach of contract.

**WHEREFORE,** Plaintiff demands judgment and payment of damages including, but not limited to, consequential damages and lost profits against and from Defendant Uptime Hosting together with attorneys' fees, court costs, interest, and such other relief as this Court finds just, fair, and equitable.

## <u>COUNT II</u>
## NEGLIGENT MISREPRESENTATION

74.     Plaintiff restates and incorporates all allegations set forth in Paragraphs 1 through 64 as set forth above.

75.     Defendants Collazo, Bit5ive, and Uptime Hosting misrepresented to Beeqb that the facilities belonged to the Group.

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 S.E. 2ⁿᵈ St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C**
**PAGE 66**

76.    Defendants knew that this was false and thus refused to show their agreements with landlords of the facilities in an attempt to hide that their rights on the premises were limited and induce Beeqb to rely on misrepresentations and agree to contracts with the Group.

77.    Beeqb relied on these misrepresentations and entered into contracts with the Group, which resulted in damages, including loss of profits and depreciation.

78.    Beeqb has suffered and will continue to suffer damages as a result of Defendants' negligent misrepresentations, including:

       a.    Loss of substantial profits from Beeqb's Machines being offline due to Defendants' failure to provide electricity to the Machines;

       b.    Loss of access to the Machines and Containers; and

       c.    All costs related to bringing suit and such other damages as the Court may deem just and proper.

WHEREFORE, Plaintiff demands judgment and payment of damages including, but not limited to, consequential damages and lost profits against and from Defendants Collazo, Bit5ive, and Uptime Hosting together with court costs, interest, and such other relief as this Court finds just, fair, and equitable.

## COUNT III
## FRAUDULENT MISREPRESENTATION

79.    Plaintiff restates and incorporates all allegations set forth in Paragraphs 1 through 64 as set forth above.

80.    Defendants Collazo and Uptime Hosting misrepresented to Beeqb that the facilities belong to the Group, which is a material fact since only the landlord can, with sufficient certainty, guarantee and provide a stable power supply essential for mining operations.

**EXHIBIT C
PAGE 67**

81.     Defendants knew that it was false and thus refused to show their agreements with the landlords of the facilities to hide the fact that their rights on the premises were limited and to induce Beeqb to rely on misrepresentations.

82.     Beeqb relied on these misrepresentations and entered into agreements with the Group, which resulted in damages, including loss of profits and depreciation.

83.     Beeqb has suffered and will continue to suffer damages as a result of Defendants' fraudulent misrepresentations, including:

    a.  Loss of substantial profits from Beeqb's Machines being offline due to Defendants' failure to provide electricity to the Machines;

    b.  Loss of access to the Machines and Containers; and

    c.  All costs related to bringing suit and such other damages as the Court may deem just and proper.

**WHEREFORE**, Plaintiff demands judgment and payment of damages including, but not limited to, consequential damages and lost profits against and from Defendants Collazo and Uptime Hosting together with court costs, interest, and such other relief as this Court finds just fair, and equitable.

<u>**COUNT IV**</u>
**CONVERSION**

84.     Plaintiff restates and incorporates all allegations set forth in Paragraphs 1 through 64 as set forth above.

85.     Beeqb retains ownership over all of the infrastructure it contributed to the facilities.

86.     By allowing Hashpower to use the Machines and Containers without Beeqb's consent and holding themselves out as having ownership of the equipment, Defendants Bit5ive,

**ASSOULINE & BERLOWE, P.A**.
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343
**EXHIBIT C**
**PAGE 68**

Collazo, and Uptime Hosting facilitated the conversion of Beeqb's property, including the Machines, containers, and other crypto mining equipment.

87.     As a result of Defendants' conduct, a third party has access to and possesses Beeqb's property without authorization.

88.     Thus, Defendants have intentionally and without authority assumed and exercised control over Beeqb's property, interfering with Beeqb's right of possession and Beeqb's ownership rights.

89.     As a direct result of Defendants' actions, Beeqb has suffered and continues to suffer harm.

**WHEREFORE**, Plaintiff demands judgment and payment of damages, including but not limited to loss profits and consequential damages, against and from Defendants Bit5ive, Collazo, and Uptime Hosting together with court costs, interest, and such other relief as this Court finds just, fair, and equitable.

<u>**COUNT V**</u>
**UNJUST ENRICHMENT**

90.     Plaintiff restates and incorporates all allegations set forth in Paragraphs 1 through 64 as set forth above.

91.     Defendants have continued, unlawfully, to use Beeqb's Machines and Containers to mine cryptocurrency, even though Beeqb did not consent to such use. Defendants have been enriched by their continued, unlawful use of the Machines and Containers in the form of cryptocurrency mining income. Under the circumstances, it would be unjust to allow Defendants to retain said proceeds because they realized the income only through the unjust exploitation of Beeqb's property.

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 S.E. 2nd St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343
**EXHIBIT C
PAGE 69**

92.    Therefore, Defendants have unjustly enriched themselves by their continued, unlawful use of Beeqb's equipment.

**WHEREFORE**, Plaintiff demands judgment and payment of damages, including but not limited to loss profits and consequential damages, against and from Defendants together with court costs, interest, and such other relief as this Court finds just, fair, and equitable.

Date:    September 12, 2023                    Respectfully submitted,

**ASSOULINE & BERLOWE, P.A.**
Miami Tower
100 SE 2ⁿᵈ Street, Suite 3105
Miami, Florida 33131
Telephone: 305-567-5576
Facsimile: 305-567-9343

By: *s/ Peter A. Koziol*
     Peter A. Koziol, Esq. (FBN 30446)
     pak@assoulineberlowe.com
     Secondary: ja@assoulineberlowe.com
     Eric N. Assouline, Esq. (FBN 106143)
     ena@assoulineberlowe.com
     Secondary: ah@assoulineberlowe.com

     **BUZKO KRASNOV**
     Evgeny Krasnov, Esq.
     evgeny.krasnov@buzko.legal
     Filipp Petkevitch
     filipp.petkevitch@buzko.legal
     228 Park Ave S
     PMB 85451
     New York, NY 10003

     *Attorneys for Plaintiff, BEEQB LLC*
     *Pro Hac Vice Motion forthcoming*

**ASSOULINE & BERLOWE, P.A.**
Miami Tower • 100 S.E. 2ⁿᵈ St., Suite 3105, Miami, Florida 33131 • Telephone: 305-567-5576 • Facsimile: 305-567-9343

**EXHIBIT C**
**PAGE 70**

# EXHIBIT A

EXHIBIT C
PAGE 71

# UPTIME HOSTING LLC
# HOSTING AGREEMENT

This Hosting Agreement ("Agreement"), made as of October 1, 2021 ("Effective Date"), is made by and between Uptime Hosting LLC ("Host"), a Florida limited liability company with its principal place of business located at 12301 NW 112 Ave Suite 112, Medley, FL 33178 and BEEQB LLC ("Client"), a Florida limited liability company with its principal place of business located at 1830 S Ocean Dr, Hallandale Beach, FL, 33009 (collectively "Parties"; individually "Party").

## Recitals

**WHEREAS,** Host primarily engages in the business of cryptocurrency mining and ancillary hosting services;

**WHEREAS,** Client engages in the business of cryptocurrency mining;

**WHEREAS,** Host seeks to provide certain cryptocurrency mining and hosting services to Client in exchange for equitable compensation; and

**WHEREAS,** Client seeks to utilize certain cryptocurrency mining and hosting services of Host;

**NOW, THEREFORE,** in consideration of the premises herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, each intending to be legally bound hereby, agree to the provisions of this Agreement as follows:

## Agreement

1. <u>Host Services.</u>

   1.1. *Services.* Client has, or shall promptly, deliver the Digital Asset mining equipment listed in **Exhibit A** attached hereto (the "**Client Equipment**") to Host. Host shall receive and test the Client Equipment, engage in cryptocurrency mining and operation of the Client Equipment, provide rack space allocation for the Client Equipment ("**Client Space**"), installation services, electrical power connection, cooling infrastructure, network connectivity, security, and technical support, as outlined in this Agreement (collectively, the "**Services**"), for the Term.

   1.2. *Host Containers.* Host may use modified pods designed or procured by Host ("**Host Container**") for purposes of providing Services for the Client. Host may transfer the Client Equipment to Host Containers. In the event Client Equipment is delivered earlier than the date on which certain Host Containers may be deemed

**EXHIBIT C**
**PAGE 72**

ready for hosting by the Host, Host may find other facilities to host such Client Equipment before the relevant Host Containers are deemed ready for hosting by the Host. Notwithstanding any contradictory terms in this Agreement, Host shall not be liable for any delays in providing the Host Containers, and the Host Containers shall remain the property of Host at all times. Host may move the Client Equipment to other properties without the prior written consent of Client upon written notice to Client. Nothing in this Subsection shall be construed to provide Client any ownership interest in any Host Container(s).

1.3.    *Client Containers*. Host may use pods provided by the Client ("**Client Container**") for purposes of providing Services for the Client; *provided, however*, that all Client Containers must be approved in writing by the Host prior to delivery by Client. In the event Client Equipment is delivered earlier than the date on which certain Client Containers may be deemed ready for hosting by the Host, Host may find other facilities, pods, or containers to host such Client Equipment before the relevant Client Containers are deemed ready for hosting by the Host. Notwithstanding any contradictory terms in this Agreement, Client shall be solely liable for all shipping arrangements for the Client Containers, and the Host Containers shall remain the property of Client at all times. Host may move the Client Containers, including any Client Equipment, to other properties without the prior written consent of Client upon written notice to Client.

1.4.    *Installation and Testing*. Upon receipt of Client Equipment, Host shall perform commercially reasonable testing in accordance with Host's equipment testing procedures and notify Client of any malfunctioning Client Equipment within thirty (30) business days. Host shall install all properly functioning Client Equipment in the Client Space within thirty (30) business days of testing such Client Equipment. Host shall not be liable for any defects or malfunctions in Client Equipment or for failing to identify any hidden defects during installation or testing.

1.5.    *Commencement Date*. Host shall commence the provision of Services on the Commencement Date which shall be either of:

1.5.1.    Thirty (30) calendar days after Host informs Client that Host is ready to receive the Client Equipment *and* receives such Client Equipment; or

1.5.2.    A date agreed to by the Parties in writing as stated in Exhibit A; *provided, however*, that Host may extend the agreed-upon Commencement Date by up to six (6) calendar months.

2

**EXHIBIT C**
**PAGE 73**

In any event, Host shall provide Client written notice that the provision of Services has commenced no later than seven (7) business days following such commencement.

1.6.     *Maintenance*. Host shall perform such maintenance actions as Host deems necessary or desirable with respect to the buildings and facilities owned or leased by Host in which the Client Space is located ("**Data Center**") and maintain Host's network ("**Maintenance**"). Client acknowledges and agrees that the performance of Maintenance may cause the network to be temporarily inaccessible and the Services unavailable to Client. Host shall use commercially reasonable efforts to conduct such Maintenance in a manner so as to avoid or minimize the unavailability of Services to Client Equipment. If Maintenance is planned or expected to interrupt the availability of Services, Host shall provide Client notice forty-eight (48) hours prior to conducting such maintenance via email, identifying the time and anticipated duration of the Maintenance. Notwithstanding the foregoing, Host may conduct emergency Maintenance without prior notice to Client; *provided, however*, that Host shall provide Client notice during or after such emergency Maintenance within a reasonable time. Host shall take commercially reasonable efforts to ensure that the Maintenance frequency shall not exceed three (3) occurrences (excluding emergency Maintenance) each calendar month and shall not exceed eight (8) hours per occurrence.

1.7.     *Repair Work*. Host shall monitor Client Equipment daily and shall, within three (3) business days, contact Client if any Client Equipment is not fully operational. At Client's request, Host shall perform diagnostic and repair work ("**Repair Work**") on such Client Equipment. Host shall be the exclusive or top priority provider of Repair Work. Repair Work shall be billed in hourly increments, and billable services for such Repair Work shall include all time expended to diagnose problems, communicate and receive Client instructions, perform repairs, and report results. Repair Work shall be billed at the rate of fifty dollars per hour ($50.00/hr), excluding the cost of any materials or equipment supplied or purchased by Host; *provided, however*, that Host shall provide a quote to Client in advance and obtain the written consent of Client prior to the commencement of any Repair Work. Notwithstanding the foregoing, such quotes provided by Host may be subject to change. The response time for Repair Work shall be based upon the availability of resources at the time of Client's request. Subject to the aforementioned notification and consent requirement, Client hereby authorizes Host to open and modify Client Equipment for Repair Work and acknowledges that such requests may void the warranty of the affected Client Equipment. Any hardware replacement determined necessary by Host shall be as agreed by the Parties prior to making additional purchases.

3

**EXHIBIT C**
**PAGE 74**

1.8.   *Minimum Service Level*. Except in the event of Maintenance, Client Equipment failure, Repair Work, and *force majeure*, each month, Host shall provide the Services to Client ninety percent (90%) of the time ("**Minimum Service Level**"). In the event Services are not provided at the Minimum Service Level for over seventy-two (72) hours, Client shall receive a credit equal and limited to a discount in proportion to the monthly rate for the amount of downtime beyond the Minimum Service Level ("**Service Level Credit**"). The Service Level Credit shall be applied in equal installments over the Client's following two (2) calendar monthly payments. In the final two (2) calendar months of the term Host shall fully refund any Service Level Credit.

1.9.   *Service Failures*. Client accepts that Services may not be uninterrupted, error-free, or on a completely secure basis. Host shall have no obligation to credit Client any amount for any such failure in the event that Host fails to provide Service and Host determines in its reasonable judgment that such failure was the result of:

1.9.1.   *Force majeure*;

1.9.2.   Any actions or inactions of Client, including any activity under Client's control or within the obligations undertaken by Client (including, without limitation, hacking, provision of inaccurate or corrupt data, use of the Services other than in accordance with the directions of Host, failure or inability of Client to receive Digital Assets, failure of the underlying software protocols of the Digital Asset networks, and problems in Client's local environment); or

1.9.3.   Maintenance.

2.   <u>Hosting Fee and Deposit</u>.

2.1.   *Hosting Fee*.   The Hosting Fee shall be based on a price of <mark>$0.060</mark> per kilowatt and will be billed to Client according to the actual electricity consumption generated. The Hosting Fee is an all-inclusive hosting price which covers all the hosting costs incurred by Host, including, without limitation, Internet usage fees and hosting management.

2.2.   *Deposit*.   Client shall pay the first and last months' Hosting Fee within three (3) calendar days of the Effective Date. Client shall also render payment for a security deposit, calculated as the equivalent of one calendar month's Hosting Fee, within three (3) calendar days of the Effective Date. Host shall return the security deposit to Client within thirty (30) calendar days upon termination of the Agreement if not used by the Host.

**EXHIBIT C**
**PAGE 75**

3.    <u>Invoices, Rates, and Payment Terms</u>.

3.1.    *Invoice*. Host shall provide an invoice to Client stating all applicable Services rendered (including associated fees) and for any Repair Work provided under this Agreement. Host shall provide each invoice via email no later than five (5) business days following the end of each calendar month.

3.2.    *Rates*. Host shall invoice Client for all Services on a monthly basis as stated in this Agreement or as agreed to by the Parties in writing from time to time.

3.3.    *Rate Changes*. Host reserves the right to modify its rates:

3.3.1.    At the end of any Term, provided Host notifies Client at least thirty (30) calendar days in advance of the effective date of such rate change;

3.3.2.    Upon a material and substantiated increase in any of Host's operating costs, including, without limitation, power rates, facility leasing rates, tax rates, or increased regulatory compliance costs, but not within the first three (3) calendar months of any Term; or

3.3.3.    If there is sustained decrease of greater than fifty percent (50%) in the market rate of BTC following the Commencement Date for more than thirty (30) calendar days, in which event Host may consider lowering its rate.

3.4.    *Payment Term*. Client shall render full payment for all invoices within ten (10) calendar days of their receipt. The Parties agree that time shall be deemed of the essence in the payment of each invoice. If any invoice amount shall be due and unpaid on the fifteenth calendar day following such invoice's applicable deadline (subject to a Disputed Invoice), the Host may redirect and utilize the Client Equipment for the Host's benefit until such usage by the host equates to the amount owed by Client on the everyday exchange rate of Coinbase.

3.5.    *Payment Currency and Taxes*.

3.5.1.    Except for payments made in United States Dollars (or equivalent USDT), Host reserves the right to reject any payment, or require additional payment based on the conversion rate of such payment to United States Dollars (if applicable).

**EXHIBIT C**
**PAGE 76**

3.5.2.  Each Party shall be responsible for the taxes (including, without limitation, sales, use, transfer, privilege, excise, consumption, and other taxes), fees, duties, governmental assessments, impositions and levies that may be imposed or levied on it in connection with this Agreement and/or the provision of Services hereunder under applicable law.

3.6.  *Disputed invoices*. In the event Client disputes any Service or other charge listed in an invoice, Host must be notified of such dispute in writing within seven (7) calendar days of the invoice date, and Client shall render full payment for the remaining undisputed portion. Notices of disputes issued by Client more than seven (7) calendar days of the invoice date shall be paid in full first. Client waives the right to dispute an invoice amount after thirty (30) calendar days following the applicable invoice date. Host shall credit any disputed amounts resolved in favor of Client to Client's account, and any disputed amounts resolved in favor of Host shall be paid within ten (10) calendar days of such resolution.

3.7.  *Return of Client Mining Equipment*. Upon Client's request, and provided that Client is current on all amounts due to Host, Host shall return Client Equipment upon termination of the Agreement. Shipping and handling costs for such returns shall be paid by Client to Host in advance. Risk of loss during shipping shall be borne by Client. At Client's direction and expense, Host will obtain insurance on behalf of Client for return shipping of the Client Equipment.

3.8.  *Client Equipment Storage Fee*. In the event this Agreement expires or is terminated and Client either maintains a deficiency in payment for Services rendered or does not arrange for the Client Equipment's return shipping, and Client does not cure such breach within thirty (30) calendar days of the date of expiration or termination of the Agreement, Host may assess a reasonable storage fee and deny Client access to the Client Equipment until such payment is rendered by Client in full.

3.9.  *Client Equipment Forfeiture*. In the event Client fails to cure such deficiency within ninety (90) calendar days of the date of expiration or termination of the Agreement, title over such Client Equipment as is needed to offset the outstanding balance of the deficiency shall transfer to Host. In such an event, Client shall have three (3) business days to pay the outstanding balance of the deficiency, with interest, in which case title to the Client Equipment previously transferred to Host shall revert to Client.

4.     Term and Termination.

6

EXHIBIT C
PAGE 77

4.1.   *Term*. The term of the Agreement shall begin on the Commencement Date and end on the date one (1) calendar year following of the Commencement Date ("**Term**"). At the end of the Term, unless either Party issues a written notice of non-renewal, this Agreement shall automatically renew for successive one (1) calendar year terms.

4.2.   *Termination*.

4.2.1.   *Termination by Either Party*. This Agreement may be terminated by either Party, at any time, without liability to the other Party, for any one or more of the following:

i.     The non-terminating Party breaches any material term of this Agreement and fails to cure such breach (if susceptible to cure) within thirty (30) calendar days after receipt of written notice of the same;

ii.    The non-terminating Party becomes the subject of a voluntary or involuntary proceeding relating to insolvency, bankruptcy, receivership, liquidation, or reorganization for the benefit of creditors, and such petition or proceeding is not dismissed within sixty (60) calendar days of the filing thereof; or

iii.   A court or other government authority having jurisdiction over the Services prohibits Host from furnishing the Services to Client.

4.2.2.   *Termination by Host*. Host may terminate this Agreement if Client fails to pay any sum for Services when such payment is due (and such failure remains uncured for a period of thirty (30) calendar days).

5.   Representations and Warranties.

5.1.   *Host Representations*. Host represents and warrants to Client that:

1.     Host has full power and authority to enter into this Agreement and perform Host's obligations hereunder;

2.     Host's performance of its obligations hereunder will not violate any applicable laws or require the consent of any third party;

7

**EXHIBIT C**
**PAGE 78**

3.   The transaction herein meets the requirements of local laws, regulations, and industry norms of the jurisdiction of the Data Center and/or Client Space, and the content of this transaction with the Client is protected by any applicable laws.

4.   In the event Host provides any Services for Client Containers, Host shall be liable for the integrity and security of such Client Containers.

2.   *No Other Host Warranties*. The Services (including all materials supplied and used therewith) are provided "as is," "where is", and Client's use of the Services is at Client's own risk. Host does not make, and hereby disclaims, any and all representations and warranties, express or implied, whether in fact or by operation of law, statutory or otherwise, including, but not limited to, any representation or warranty regarding the price or liquidity of any Digital Asset, either now or in the future, warranties of merchantability, habitability, marketability, profitability, fitness for a particular purpose, suitability, noninfringement, title, or arising from a course of dealing, or trade practice.

3.   *Client Representations*. Client represents and warrants to Host that:

3.1.   Client has full power and authority to enter into this Agreement and perform Client's obligations hereunder;

3.2.   Client will provide Client's Bitcoin address to Host in compliance with Host's Bitcoin address procedure. Client will verify that Host has correctly installed Client's Bitcoin address and will immediately notify Host if there are any inaccuracies in Client's Bitcoin address;

3.3.   Client will provide all end-user equipment, software, credentials, and/or related equipment that Client deems necessary or desirable for Client's receipt of Digital Assets. Host does not provide, and Client shall hold Host harmless from, user or access security with respect to any of Client's Equipment or the Data Center and shall be solely liable for user access security and network access to Client Equipment. Host will not provide any service to detect or identify any security breach of Client Equipment or the Data Center. Host will not provide any tests, tools, or techniques intended to gain unauthorized access to Client Equipment or Client's personal property;

8

EXHIBIT C
PAGE 79

3.4.    Client will at all times comply with the laws, regulations and rules of any applicable governmental or regulatory authority, including, without limitation, Money Service Business regulations under the Financial Crimes Enforcement Network ("**FinCen**"); state money transmission laws; laws, regulations, and rules of relevant tax authorities; applicable regulations and guidance set forth by FinCEN; the Bank Secrecy Act of 1970; the USA PATRIOT Act of 2001; AML/CTF provisions as mandated by U.S. federal law and any other rules and regulations regarding AML/CTF; issuances from the Office of Foreign Assets Control ("**OFAC**"); the National Futures Association; the Financial Industry Regulatory Authority; and the Commodity Exchange Act;

3.5.    Client will not use the Services to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third party privacy rights; use the Services to store or transmit Viruses; attempt to gain unauthorized access to any Service or its related systems or networks; permit direct or indirect access to or use of any Service in a way that circumvents a contractual usage limit; copy a Service or any part, feature, function, or user interface thereof except as permitted under this Agreement; or use the Services in relation to any act deemed unlawful. Client will use commercially reasonable efforts to prevent unauthorized access to or unauthorized use of the Services and shall notify Host promptly of any such unauthorized access of use. For purposes of this section, "Viruses" means any malicious data, code, program, or other internal component (e.g., computer worm, computer time bomb or similar component), which could damage, destroy, alter, or disrupt any computer program, firmware, or hardware, or which could, in any manner, reveal, damage, destroy, alter, or disrupt any data or other information accessed through or processed by the Service in any manner;

3.6.    Client has clear title, free and clear of all security interests or liens, to Client Equipment, including the legal right to use, operate and locate Client Equipment in the Data Center; and

3.7.    Client's performance of its obligations hereunder and receipt of the Digital Assets will not violate any applicable laws or require the consent of any third party.

2.    <u>Limitations of Liability and Indemnification</u>.

9

**EXHIBIT C**
**PAGE 80**

2.1.  *Digital Assets*. Host does not own any Digital Assets or associated equipment and does not own the underlying software protocols of Digital Asset networks which govern the operation of such Digital Assets. Host is not responsible for the operation of the underlying protocols and makes no guarantees regarding their security, functionality, or availability. In no event shall Host be liable to Client or any other entity for any decision made or action taken by Client in reliance on, or in connection with the Services. This limitation on liability includes, without limitation, any damage or interruptions caused by any computer viruses, spyware, scamware, trojan horses, worms, or other malware that may affect Client's computer or other equipment, or any phishing, spoofing, domain typosquatting or other attacks (collectively, "**Hacking**"), or *force majeure*. If this disclaimer of liability section is deemed to conflict with any other section of this Agreement, this disclaimer of liability section shall prevail and control to the extent of the conflict. For purposes of this Agreement, "**Digital Asset**" means any digital asset, cryptocurrency, virtual currency, digital currency, or digital commodity, including, without limitation, Bitcoin and Ether, which is based on the cryptographic protocol of a computer network that may be: centralized or decentralized; closed or open-source; or used as a medium of exchange and/or store of value.

2.2.  *Information Security*. Client understands and agrees that use of telecommunications and data communications networks and the Internet may not be secure and that connection to and transmission of data and information over the Internet and such facilities provides the opportunity for unauthorized access to wallets, computer systems, networks, and all data stored therein. Information and data transmitted through the Internet or stored on any equipment through which Internet information is transmitted may not remain confidential, and Host does not make any representation or warranty regarding privacy, security, authenticity, and non-corruption or destruction of any such information. Host does not warrant that the Services or Client's use will be uninterrupted, error-free, or secure. Host shall not be responsible for any adverse consequence or loss whatsoever to Client's (or its users" or subscribers") use of the Services or the Internet. Use of any information transmitted or obtained by Client from Host is at Client's own risk. Host is not responsible for the accuracy or quality of information obtained through its network, including as a result of failure of performance, error, omission, interruption, corruption, deletion, defect, delay in operation or transmission, computer virus, communication line failure, theft or destruction or unauthorized access to, alteration of, or use of information or facilities, or malfunctioning of websites. Host does not control the transmission or flow of data to or from Host's network and other portions of the Internet, including the Digital Asset networks. Such transmissions and/or flow depend in part on the performance of telecommunications and/or Internet services provided or

10

**EXHIBIT C**
**PAGE 81**

controlled by third parties. At times, actions or inactions of such third parties may impair or disrupt Host or Client's connections to the Services. Host does not represent or warrant that such events will not occur, and Host disclaims any and all liability resulting from or related to such acts or omissions. If Host suspects any security violations have occurred related to Client's account or Digital Assets, Host may suspend access to Client's account and hardware pending resolution.

2.3.    *Consequential Damages*. In no event will either Party be liable to the other for any type of incidental, special, exemplary, punitive, indirect or consequential damages, including, but not limited to, lost revenue, lost profits, replacement goods, loss of technology, rights or services, loss of data, or interruption or loss of use of service or equipment, even if such Party was advised of the possibility of such damages, and whether arising under theory of contract, tort, strict liability or otherwise.

2.4.    *Damage to Client Equipment*. Host shall not be responsible for any cosmetic damage or operation deficiency from Client Equipment, or Client Containers, not due to Host's intentional acts or omissions, and Host shall not repair or reimburse the Client for any such damage without Host's prior written consent.

6.5    *Legal Processes*. Host and its affiliates, service providers, and their respective officers, directors, agents, joint venturers, employees, and representatives may comply with any writ of attachment, execution, garnishment, tax levy, restraining order, subpoena, warrant or other legal process, which Host reasonably and in good faith believes to be valid. Host may notify Client of such process by electronic communication unless specifically ordered not to effect such notice. Host may charge Client for associated costs, in addition to any legal process fees. Client agrees to indemnify, defend, and hold Host harmless from all actions, claims, liabilities, losses, costs, attorney's fees, or damages associated with Host's compliance with any process that Host reasonably believes in good faith to be valid.

6.    *Host Indemnification*. In addition to any other applicable rights under this Agreement, Client agrees to indemnify, defend and hold harmless Host and its officers, managers, partners, members, agents, employees, affiliates, attorneys, heirs, successors and assigns (collectively "**Host Parties**") from any and all claims, demands, actions, suits, proceedings, and all damages, judgments, liabilities, losses, and expenses, including, but not limited to, reasonable attorneys" fees ("**Losses**"), arising from or relating to (a) any legal, regulatory or governmental action against or including Client, (b) the maintenance or operation of Client's Equipment, (c) any Loss by any of Client, its officers, managers, partners, members, agents, employees, affiliates, attorneys, heirs, successors or assigns (collectively "**Client Parties**"), (d) any claim by an affiliate of the Client

11

**EXHIBIT C**
**PAGE 82**

Parties, including a customer, relating to, or arising out of, this Agreement or the Services (including claims arising from or relating to interruptions, suspensions, failures, defects, delays, impairments or inadequacies in any of the aforementioned Services), (e) any breach or nonperformance by Client Parties of any provision or covenant contained in this Agreement or the Services, or (f) any claim related to Hacking.

7.    *Client Indemnification.* The Host shall indemnify, defend and hold harmless the Client and its respective Affiliates, officers, directors, employees, agents, successors and assigns from and against any and all Indemnifiable Losses resulting from or arising out of: (a) any inaccuracy in or breach or non-performance of any of the Host's representations and warranties, or other covenants or agreements in this Agreement or any other transaction document by the Host, (b) the failure of the Host to perform or observe fully any covenant, agreement or other provision to be performed or observed by it pursuant to this agreement or any other transaction document, or (c) any other matters, things or events which give rise to any Indemnified Party suffering or incurring Indemnifiable Losses with respect to its or its Affiliates' investments in the Client. If and to the extent that such indemnification is unenforceable for any reason, the Host will make the maximum contribution to the payment and satisfaction of such indemnified liabilities permissible under applicable Law.

2.    <u>Confidentiality</u>.

1.    *Disclosure and Use.* Each Party agrees that it will not use in any way, nor disclose to any third party, the other Party's Confidential Information, and will take reasonable precautions to protect the confidentiality of such information, as stringently as it takes to protect its own Confidential Information, but in no case will the degree of care be less than reasonable care. Nothing herein shall preclude disclosure by a Party to that Party's attorneys, accountants and employees who have a bona fide need to know the other Party's Confidential Information in connection with the receiving Party's performance under this Agreement. Each Party agrees to only make copies of the other's Confidential Information for purposes consistent with this Agreement, and each Party shall maintain on any such copies a proprietary legend or notice as contained on the original or as the disclosing Party may request. For purposes of this Section 9.1, "**Confidential Information**" means information which:

1.1.    Derives actual or potential economic value from not being generally known to, and not available through proper means, by other persons who could obtain economic value from receipt or use of such information;

**EXHIBIT C
PAGE 83**

1.2.    Is the subject of reasonable efforts by its owner to maintain its confidentiality or secrecy; or

1.3.    Is by its nature confidential, trade secrets or otherwise proprietary to its owner.

Confidential information includes the terms and conditions of this Agreement, software source and object code, inventions, know-how, data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, configurations, plans, processes, financial and business plans, names of actual or potential clients or suppliers, Data Center configuration, and proprietary technology developed or created by Host, including Host's operations, design, content, hardware designs, algorithms, software (in source and object forms), user interface designs, architecture, class libraries, and documentation (both printed and electronic), know-how, trade secrets and any related intellectual property rights throughout the world, and any derivative works, improvements, enhancements or extensions thereof.

2.    *Exclusions from Confidentiality Obligations*. Notwithstanding the confidentiality obligations required herein, neither Party's confidentiality obligations hereunder shall apply to information which:

2.1.    Is already known to the receiving Party (other than the terms of this Agreement); or

2.2.    Is required to be disclosed by Law, provided, however, if either Party is at any time requested or required to disclose any information supplied to it in connection with this Agreement, the Party agrees to provide the other Party with prompt notice of such request.

2.    <u>Miscellaneous Provisions</u>.

2.1.    *Amendment*. No provision of the Agreement may be amended, superseded, or otherwise modified unless the amendment or modification is agreed to in writing and signed by the Parties.

2.2.    *Relocation of Client Equipment or Client Space*. If it is necessary or desirable for Host's efficient use of the Data Center to relocate the Client Equipment or Client Space to another area of the Data Center, the Parties shall cooperate in good faith to facilitate such relocation. Host shall be solely liable for the costs incurred in connection with any such relocation. Client shall be solely liable for costs

13

**EXHIBIT C**
**PAGE 84**

incurred in connection with relocation made by Host at the request of Client. Host shall use commercially reasonable efforts to minimize and avoid any interruption in Services during such relocation.

2.3.    *Force Majeure.* In no event shall Host be responsible or liable for any failure or delay in the performance of its obligations arising out of the Agreement caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics and related health disasters, and interruptions, loss, local, state, or national government acts, delays or conflicts with shippers, or malfunctions of utilities, communications, or computer (software and hardware) services.

2.4.    *Notice.* All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and addressed to either Party as set forth in this Section. All notices shall be delivered by internationally recognized overnight courier (with all fees prepaid) or electronic mail if adequate confirmation of receipt is provided. Except as otherwise provided in this Master Agreement, a notice is effective only if (i) the receiving Party has received the notice and (ii) the Party giving the notice has complied with the requirements of this Section. Notice is deemed received: in the case of internationally recognized overnight courier, the date and time the courier confirms delivery; or in the case of electronic mail, the date and time the recipient's server receives the electronic mail. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section):

BIT5IVE LLC:                    1201 NW 112 Ave Suite 112
                                MEDLEY, FL
                                Email: andrea@bit5ive.com /
                                robert@bit5ive.com
                                Attention: Andrea Siles / Robert
                                Collazo


BEEQB LLC:                      212 NW 4th Ave
                                Hallandale Beach, FL 33009
                                Email: radmir.zaripov@gmail.com
                                Attention: Radmir Zaripov

14

**EXHIBIT C**
**PAGE 85**

2.5.    *Non-Circumvention*. Client agrees not to contact persons or entities introduced by Host without the prior written consent of Host. Furthermore, Client agrees that Client shall not utilize confidential information nor consummate any transaction, for fees or otherwise, with any entity (including such entity's affiliates and related entities) introduced by Host without providing compensation to Host in an amount deemed acceptable to Host at Host's sole discretion. The provisions of this Subsection shall apply during the term of this Agreement and for two (2) calendar years thereafter.

2.6.    *Non-Solicitation*. During the term of this Agreement, and for two (2) calendar years thereafter, Client shall not induce any employee or contractor of Host to leave Host's employ or contractual relationship or hire any such employee or contractor without Host's prior written consent. Notwithstanding, an employee or contractor shall not be deemed to have been solicited or as a result hired for employment or contract solely as a result of a general public advertisement or other such general solicitation of employment.

2.7.    *Non-Disparagement*. Each Party agrees to take no action which is intended, or would reasonably be expected, to harm the other Party or its reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to the other Party. Such actions include, without limitation, disparaging remarks, comments or statements that impugn the character, honesty, integrity, morality or business acumen or abilities in connection with any aspect of the operation of the other Party.

The provisions of this Section do not extend to statements made by either Party when compelled by an authority of law; *provided, however*, that the Party making such statement informs the other Party (unless explicitly ordered not to do so by such legal authority).

2.8.    *Assignment*. Neither the Agreement nor any of the rights, interests, or obligations hereunder may be assigned by either Party (whether by operation of law or otherwise) without the prior written consent of the non-assigning Party. Subject to the preceding sentence, Host may assign the Agreement to its affiliates, parent, subsidiaries, or successors-in-interest without Client's consent via written notice to Client. Subject to the foregoing, the Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

2.9.    *Entire Agreement*. Unless specifically provided herein, this Agreement contains all of the understandings and representations between the Parties relating to the

15

**EXHIBIT C**
**PAGE 86**

subject matter hereof and supersede all prior and contemporaneous understandings, discussions, agreements, representations, and warranties, both written and oral, regarding such subject matter.

2.10.  *Severability*. If any term or provision of the Agreement is held invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of the Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

2.11.  *Waiver*. No waiver by either Party of any breach by the other Party of any term or provision of the Agreement to be performed by the other Party shall be deemed a waiver of any similar or dissimilar term or provision at the same or any prior or subsequent time, nor shall the failure of or delay by either Party in exercising any right, power, or privilege under the Agreement operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

2.12.  *Third Party Beneficiaries*. There shall be no third-party beneficiaries to this Agreement.

2.13.  *Governing Law*. The Agreement and all related documents including all exhibits attached hereto, and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, statute, or otherwise, are governed by, and construed in accordance with the laws of the State of Florida (including its statutes of limitations and   choice of law statutes), without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Florida.

2.14.  *Alternative Dispute Resolution*. Unless the Parties agree otherwise in writing, in the event a dispute arises from, or related to, the terms or performance of the Agreement, the Parties shall engage in direct negotiation.

In the event such negotiations fail to amicably resolve any remaining dispute(s), the Parties shall proceed to binding arbitration before a single arbitrator of the American Arbitration Association ("AAA"). In the event the Parties fail to agree on the identity of the arbitrator, the arbitrator shall be assigned to the Parties by the AAA.

Any arbitration shall be conducted in accordance with the AAA's Commercial Arbitration Rules and Mediation Procedures.

**EXHIBIT C
PAGE 87**

Unless otherwise agreed to by the Parties in writing, the seat of arbitration shall be Miami, Florida.

The Parties shall bear their own dispute-related expenses.

2.15.  *Jury Trial Waiver*. To the full extent permitted by law, the Parties hereby expressly waive any and all right to a trial by jury on the issue to enforce any term or condition of the Agreement.

2.16.  *Class Action Waiver*. Any proceedings to resolve or litigate any dispute arising from the provisions of this Agreement will be conducted solely on an individual basis. Neither Party will seek to have any dispute heard as a class action, private attorney general action, or in any other proceeding in which either party acts or proposes to act in a representative capacity.

2.17.  *Construction*. The recitals and preamble are incorporated herein as if set forth at length.

2.18.  *Counterparts*. The Parties may execute this Agreement in multiple counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement via facsimile, electronic mail in portable document format (.pdf), or by any other electronic means shall have the same effect as delivery of an executed original of this Agreement.

[Signature Page Follows]

17

**EXHIBIT C**
**PAGE 88**

**IN WITNESS WHEREOF,** the Parties have executed this Hosting Agreement as of Effective Date.

The Company: **UPTIME HOSTING LLC**

By: ___Robert Colazzo___
Print Name

___[signature]___
Signature

___Founder and CEO___
Title

The Buyer: **BEEQB LLC**

By: ___Eliseev Maxim___
Print Name

___[signature]___
Signature

___MGR / OWNER___
Title

18

EXHIBIT C
PAGE 89

**EXHIBIT A**
**CLIENT EQUIPMENT**

The following items shall constitute Client Equipment:

| QTY | Description |
| --- | --- |
| 1400 | ASIC S19 Bitmain Antminer, 100 th/s |

The Commencement Date shall be April 2022.

19

**EXHIBIT C**
**PAGE 90**

# EXHIBIT B

EXHIBIT C
PAGE 91

### UPTIME ARMORY, LLC
### SALE AND PURCHASE AGREEMENT

This Sale and Purchase Agreement ("Agreement") is entered into and effective as of October 1, 2021 ("Effective Date"), by and between Uptime Armory, LLC (the "Company"), a Florida limited liability company with its principal place of business located at 12301 NW 112 Ave Suite 112, Medley, FL 33178 and BEEQB LLC (the "Buyer"), a Florida limited liability company with its principal place of business located at 1830 S Ocean Dr, Hallandale Beach, FL, 33009 (collectively "Parties"; individually "Party").

#### Recitals

**WHEREAS,** the Company primarily engages in the business of selling certain cryptocurrency mining equipment;

**WHEREAS,** the Buyer engages in the business of cryptocurrency mining;

**WHEREAS,** the Company wishes to sell to the Buyer, and the Buyer wishes to purchase from the Company, the cryptocurrency mining equipment defined herein, subject to the terms and conditions set forth herein;

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual covenants and obligations contained in this Agreement, including the payment of fees and other good and valuable consideration contained herein, the Parties agree as follows:

#### Agreement

1. <u>Sale and Purchase of Equipment</u>.

    a. The quantity and description of the cryptocurrency mining equipment subject to this Agreement ("Equipment") shall be as set out in Schedule A attached hereto.

    b. The Company reserves the right to make any changes in the specification of the Equipment which may be required to conform with any applicable laws and regulations or which do not materially affect their quality or performance.

2. <u>Purchase Price</u>.

**EXHIBIT C**
**PAGE 92**

a.    *Purchase Price.* As full consideration for the Equipment and for all obligations specified herein, the Buyer shall render payment of the sum of eight hundred and seventy five thousand U.S. dollars ($875,000.00) (the "Purchase Price").

b.    *Taxes.* The Purchase Price excludes any tax(es). If applicable, the Buyer shall render payment of any sales and/or use taxes to the Company.

c.    *Additional Costs.* All prices are exclusive of transfer, delivery, packaging, packing, shipping, carriage, insurance, and other charges and duties and importation costs. The Buyer shall be solely liable for all such costs.

3.   <u>Payment</u>.

a.    *Deposit.* The Buyer shall pay the Company a non-refundable deposit of six hundred fifty six thousand two hundred and fifty U.S. dollar ($656,250.00) representing seventy-five (75%) of the Purchase Price, as well as all applicable taxes within seven (7) business days of the Effective Date. Such deposit shall be credited towards the Purchase Price.

b.    *Remainder.* The Buyer shall pay the Company two hundred eighteen thousand seven hundred and fifty U.S. dollars ($218,750.00) (representing the final twenty-five percent (25%) of the Purchase Price), within five (5) business days after the Company renders the Buyer the Notice of Completion of the Equipment, which notice the Company shall deliver via email.

c.    *Failure to Pay.* In the event the Buyer fails to make timely payment(s) in accordance with the provisions of this Section, the entirety of the balance of the Purchase Price then outstanding shall become immediately due and payable and, without prejudice to any other right or remedy available to the Company, the Company shall have the right to:

i.    Charge interest on the amount outstanding from the applicable missed deadline (whether or not after judgment), at the monthly rate of the lesser of one percent (1%) of the Purchase Price, accruing on a daily basis and being compounded monthly until payment is made, or the highest rate permitted by law, whether before or after any judgment;



**EXHIBIT C
PAGE 93**

     ii.     Suspend all further manufacture, transfer, delivery, installation, or warranty service concerning any Equipment subject to this Agreement, or any other agreements between the Parties, until payment has been made in full;

     iii.     Apply a storage charge for any undelivered Equipment at a rate of one percent (1%) of the Purchase Price per calendar month; and

     iv.     Terminate this Agreement.

d.     *Equipment Forfeiture.* In the event the Buyer fails to render any timely payment(s) required under this Section within ninety (90) calendar days of the Commencement Date (as herein defined), the Buyer shall forfeit the Equipment, and title to the Equipment shall remain with the Company.

e.     *Deficiency Set-off.* The Company may, without prejudice to any other rights it may have, set off any liability of the Buyer to the Company against any liability of the Company to the Buyer.

4.     <u>Inspection and Transfer of Equipment.</u>

a.     *Company Inspection.* The Company shall test and inspect the Equipment prior to issuing the Notice of Completion of the Equipment to ensure the Equipment complies with the requirements of the Agreement and applicable law.

b.     *Buyer Inspection.* Following the issuance of the Notice of Completion of the Equipment, the Buyer may inspect the Equipment for thirty (30) calendar days prior to transfer; *provided, however*, that the Buyer shall provide the Company notice of no less than five (5) calendar days of its intention to inspect the Equipment.

c.     *Transfer.*

     i.     The Equipment shall be transferred from the Company to the Buyer at the Company's location as determined by the Company.

     ii.     The Buyer shall take possession of the Equipment within thirty (30) calendar days of the Company issuing the Notice of Completion of the Equipment. In the event the Buyer



EXHIBIT C
PAGE 94

notifies the Company of its intent to inspect the Equipment in accordance with Section 4(b) when fewer than five (5) calendar days remain of the thirty (30) calendar day period, the thirty (30) calendar day period shall be extended by as many days as are needed to complete the five (5) calendar day notice period. In no event shall the transfer period be more than thirty-five (35) calendar days, unless otherwise agreed to by the Parties.

iii.    The Company shall be responsible (at the Buyer's cost) for preparing the transfer location for the Equipment and for the provision of all necessary access and facilities reasonably required for the Buyer to take possession of and install the Equipment. The Buyer shall approve the transfer location prior to the commencement of the transfer, which approval the Buyer shall not unreasonably withhold.

iv.    In the event the Buyer fails to take possession over the Equipment within the transfer period stated in this Subsection, the Company shall have the right to assess a monthly storage charge of one percent (1%) of the Purchase Price.

v.    In the event the Buyer fails to take possession over the Equipment within ninety (90) calendar days of the expiration of the transfer period stated in this Subsection, the Buyer shall forfeit the Equipment.

d.    *Title*. Title over the Equipment shall transfer from the Company to the Buyer upon the transfer of the Equipment.

e.    *Risk of Loss*. Risk of damage or loss to the Equipment shall transfer from the Company to the Buyer upon the transfer of the Equipment.

f.    *Transfer via Company Delivery*. In the event the Parties agree in writing, the Company may deliver the Equipment to a location as agreed to by the Parties. In such an event, the Company shall provide the Buyer a quote for shipping rates and shall not commence delivery until such rates have been paid in full by the Buyer. In the event the Buyer does not approve such shipping rates, the Buyer may organize the shipping of the Equipment; *provided, however*, that the Buyer shall ensure delivery of the Equipment is completed within ninety (90) calendar days of the date of the applicable

4



EXHIBIT C
PAGE 95

purchase order. The Buyer shall ensure the agreed-upon location has met all technical requirements necessary to operate the Equipment and contains all required installation equipment and machinery. The Company may send up to two (2) technicians to the delivery location to install the Equipment, for a maximum of two (2) working days, at no additional cost to the Buyer. If there is a delay in installing the equipment due circumstances outside of the Company's control, then the Buyer shall reimburse the Company for any additional reasonable and documented costs associated with the installation, including travel, accommodations, meals, and salaries for any days beyond the initial two (2) days at the Buyer's Facility, within ten (10) calendar days. Failure of the Buyer to adhere to the provisions of this Subsection shall result in forfeiture of the Equipment.

5.     <u>Representations, Warranties and Acknowledgements of the Company</u>.

    a.     *Company Warranties*. The Company warrants and represents to the Buyer that the structural components of the Equipment are free from defects of workmanship and materials and that, under normal use and conditions, the Equipment will operate substantially as it is intended to perform for a period of thirty (30) calendar days following transfer. The Company undertakes (subject to the remainder of this Section), at its option, to repair the frame of the Equipment (including with refurbished parts or refurbished Equipment) which is found to be defective as a result of faulty materials or workmanship within thirty (30) calendar days of transfer. Any repaired, refurbished, or replacement Equipment shall be under warranty for the unexpired portion of the thirty (30) calendar day period. Component parts shall be under the original limited manufacturer's warranty. The Company shall furnish information concerning the original limited manufacturer's warranty to the Buyer within five (5) business days of having received a request for such information from the Buyer.

    b.     *Failure to Issue Notice of Completion of the Equipment*. In the event the Company does not issue the Notice of Completion of the Equipment within six (6) calendar months of the Estimated Completion Date (as defined in Schedule A) due to the intentional acts or omissions of the Company, the Buyer may terminate this Agreement, in whole or in part, and/or refuse to take possession of any subsequent Equipment which the Company attempts to arrange.

5



**EXHIBIT C**
**PAGE 96**

c.    *Component Warranties Waiver.* The Buyer acknowledges that all components of the Equipment are warranted only in accordance with the limited warranty provided by the manufacturers, that the Company is passing through to the Buyer only the manufacturer's warranty for the goods, and that the Buyer shall look solely to the manufacturer of the goods for all warranty claims and defects. The Buyer hereby waives, releases, and renounces all other warranties, guarantees, representations, obligations and liabilities of Company and acknowledges that THE COMPANY MAKES NO WARRANTY, EITHER EXPRESS OR IMPLIED, AND MAKES NO WARRANTIES OF MERCHANTABILITY OR ANY WARRANTY OF FITNESS FOR PARTICULAR PURPOSE.

d.    *Warranties May Be Void.* Given that component parts may not be designed to serve the end-purpose of the Equipment due to the Equipment's specialized nature, the COMPANY MAKES NO WARRANTY THAT THE COMPONENT PARTS' LIMITED WARRANTIES HAVE NOT BEEN VOIDED DUE TO THE USE OF THE COMPONENT WITHIN THE EQUIPMENT AND BUYER AGREES TO ASSUME THE RISK OF VOIDING THE COMPONENT PARTS' LIMITED WARRANTY BY USING THE EQUIPMENT.

e.    *Equipment Not Operated at Company Affiliated Location.* In the event any Equipment will not be operated at the Company's facilities, or facilities operated by the Company's affiliates or subsidiaries, the Company shall not, under any circumstances, be liable for a breach of the warranty or undertake any warranty service contained in this Section unless:

   i.    The Buyer gives written notice of the defect to the Company within seven (7) calendar days from the time the Buyer discovers or should have discovered the defect; and

   ii.   After receiving the notice, the Company is provided a reasonable opportunity to examine such Equipment for the defect or malfunction, and the Buyer follows the Company's commercially reasonable instructions in bringing the Equipment to working condition and returns such Equipment to a repair facility specified by the Company at the Company's expense for the examination and warranty service (if applicable) to take place there.

6



**EXHIBIT C**
**PAGE 97**

If the Buyer does not follow the Company's commercially reasonable instructions in bringing the Equipment to working condition, all expenses ancillary to the examination and warranty shall be assumed by the Buyer.

In addition, for Equipment not operated at the Company's, or Company's affiliates or subsidiaries, facilities, the warranty does not apply to:

    iii.    Damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

    iv.    Damage or loss of the product caused by undue physical or electrical stress, including but not limited to excessive moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

    v.    Damage caused by operator error or non-compliance with the Company's instructions as to the storage, installation, commissioning, electric powering, internet connectivity, use or maintenance of the product or (if there are none) good trade practice; or

    vi.    Damage or loss of functionality due to interoperability with the Buyer's software and/or hardware.

f.    *Force Majeure.* The warranties made in this Section do not apply to normal wear and tear and damage or loss of the product caused by *force majeure* events pursuant to Section 12.

g.    *Other Warranties Excluded.* All warranties, conditions, and other representations implied by statute or common law are excluded from the Agreement to the fullest extent permitted by law.

6.    <u>Representations, Warranties and Acknowledgements of the Buyer</u>. The Buyer warrants, represents, and covenants to Company that:

a.    The Buyer shall comply with all applicable laws and regulations governing:

    i.    The use of the Equipment; and

    ii.    The sale, export and re-export of the Equipment;

7

EXHIBIT C
PAGE 98

b.   The Buyer shall distribute, deploy, and utilize the Equipment solely in compliance with all applicable laws and regulations;

c.   The Buyer shall not (and shall not permit any person to) modify the Equipment, or reverse, assemble, reverse compile, or otherwise reverse engineer the Equipment for the purpose of attempting to discover any underlying proprietary information.

7.   <u>Limitation of Liability</u>.

a.   *Consequential Damages*. The Company shall not, under any circumstances, be liable, whether in tort (including without limitation for negligence or breach of statutory duty howsoever arising), contract, or otherwise for: loss of profits, loss of business, depletion of goodwill or similar losses, loss of anticipated savings, loss of goods, loss of contract, loss of use, loss or corruption of data or information, or any special, indirect, consequential or pure economic loss, costs, damages, charges or expenses.

b.   *Clerical Errors*. Any typographical, clerical, or other error or omission in any sales literature, quotation, price list, acceptance of offer, invoice or purchase order, or other document or information issued by the Company shall be subject to correction without any liability on the part of the Company.

c.   *Limitation of Damages*. Either Party's total damages in contract, tort (including without limitation negligence and breach of statutory duty howsoever arising), misrepresentation (whether innocent or negligent), restitution or otherwise, arising in connection with the performance or contemplated performance of the Agreement shall be limited to the amount paid by the Buyer for the Equipment.

d.   *Exclusions*. Nothing in this Agreement excludes or limits the liability of either Party for:

i.    Death or personal injury caused by that Party's negligence; or

ii.   Fraud or fraudulent misrepresentation, gross negligence, or willful misconduct.

8

**EXHIBIT C**
**PAGE 99**

Company's prior written consent. Notwithstanding, an employee or contractor shall not be deemed to have been solicited or as a result hired for employment or contract solely as a result of a general public advertisement or other such general solicitation of employment.

In the event of breach of this Section 10 by the Buyer, directly or indirectly, the Company shall be entitled to a legal monetary penalty equal to the maximum fee the Buyer should realize from such a transaction plus any and all expenses, including, without limitation, all legal costs and expenses incurred to recover the lost revenue.

11. <u>Enforcement</u>. The Buyer agrees that irreparable damage for which monetary damages or other legal remedies, even if available, would not be an adequate remedy, would occur in the event of a breach of Sections 9 and 10. The Buyer further acknowledge and agree that:

     a.     The Company will be entitled, in addition to any other remedy to which it is entitled at law or in equity, to an injunction, specific performance, and other equitable relief to prevent breaches (or threatened breaches) of those Sections and to enforce specifically the terms of those Sections;

     b.     The provisions of those Sections are not intended to and do not adequately compensate the Company for the harm that would result from a breach of those Sections, and will not be construed to diminish or otherwise impair in any respect the Company's right to an injunction, specific performance, and other equitable relief; and

     c.     The right of specific enforcement is an integral part of this Agreement and without that right, the Company would not have entered into this Agreement.

12. <u>Force Majeure</u>. In no event shall either Party be responsible or liable for any failure or delay in the performance of its obligations arising out of the Agreement caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics and related health disasters, and interruptions, loss, local, state, or national government acts, delays or conflicts with shippers, or malfunctions of utilities, communications, or computer (software and hardware) services.

13. <u>Intellectual Property Rights</u>.

10



**EXHIBIT C
PAGE 100**

a.   *No Transfer of Intellectual Property Rights*. The Buyer acknowledges that all Intellectual Property Rights used by or subsisting in the Equipment are and shall remain the sole property of the Company or its affiliates or (as the case may be) third party rights.   For purposes of this Section, "Intellectual Property Rights" shall mean patents, utility models, rights to inventions, copyright, trade-marks and service marks, business names and domain names, rights in get-up and trade dress, goodwill and the right to sue for passing off or unfair competition, rights in designs, database rights, rights to use, and protect the confidentiality of, confidential information (including know-how and trade secrets), and all other intellectual property rights, in each case whether registered or unregistered and including all applications and rights to apply for and be granted, renewals or extensions of, and rights to claim priority from, such rights and all similar or equivalent rights or forms of protection which subsist or will subsist now or in the future in any part of the world.

b.   *Nondisclosure of Copyright*. The Company or its affiliates shall retain the property and copyright in all documents supplied to the Buyer in connection with the Agreement and it shall be a condition of such supply that the contents of such documents shall not be communicated either directly or indirectly to any other person, firm or company, other than the Buyer's officers, employees, agents, and advisors without the prior written consent of the Company.

c.   *Distribution of Intellectual Property*. The Buyer shall not market, distribute, white-label, license, or otherwise make available any intellectual property subject to this Section to or through any person or company without:

   i.   The express prior written approval of the Company and

   ii.   First entering into a written licensing agreement with such person or company on terms and conditions that Buyer has submitted to and have been approved by the Company and designate the Company as an intended third-party beneficiary of that agreement; *provided, however*, that nothing in this Section shall limit the Buyer from freely exercising its ownership rights to re-sell, rent, or collateralize the Equipment.

14.   Term and Termination.

11

EXHIBIT C
PAGE 101

a.     *Term*. This Agreement shall commence on the date the Notice of Completion of the Equipment is issued by the Company ("Commencement Date") for a term in perpetuity unless terminated in accordance with the provisions of the Agreement.

b.     *Termination*. Any attempted termination not in accordance hereof, or as elsewhere stated in this Agreement, shall be void *ab initio* and deemed a material breach of this Agreement by the terminating Party.

      i.     *Termination for Cause*. Either Party may terminate this Agreement with immediate effect via written notice to other Party in the event of material breach of the Agreement by the non-terminating Party; *provided, however*, that the terminating Party shall first issue the non-terminating Party a written notice to cure and provide the non-terminating Party thirty (30) calendar days to effect such cure.

      ii.     *Termination via Mutual Agreement*. The Parties may terminate this Agreement with immediate effect upon having executed a written instrument stating such a termination.

15.     <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and (if issued via mail) addressed to either Party at the address set forth in this Section. All notices shall be delivered by nationally recognized overnight courier (with all fees prepaid) or electronic mail if adequate confirmation of receipt is provided. Except as otherwise provided in this Agreement, a notice is effective only if (i) the receiving Party has received the notice and (ii) the Party giving the notice has complied with the requirements of this Section. Notice is deemed received:

a.     In the case of nationally recognized overnight courier, the date and time the courier confirms delivery; or

b.     In the case of email, the date and time the recipient's server receives the email.

Bit5ive LLC:                 12301 NW 112 Ave Suite 112
                              Medley, FL 33178
                              Email: andrea@bit5ive.com



**EXHIBIT C
PAGE 102**

BEEQB LLC:                          212 NW 4th Ave,
                                   Hallandale Beach, FL 33009
                                   Email: radmir.zaripov@gmail.com
                                   Attention: Radmir Zaripov

16.  <u>Severability</u>. If any term or provision of this Agreement is held invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

17.  <u>Entire Agreement</u>. This Agreement, together with any other documents incorporated herein by reference and related schedules, constitutes the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

18.  <u>Assignment</u>. Neither the Agreement nor any of the rights, interests, or obligations hereunder may be assigned by either Party (whether by operation of law or otherwise) without the prior written consent of the non-assigning Party. Notwithstanding the preceding sentence, the Company may assign the Agreement to its affiliates, parent, subsidiaries, or successors-in-interest without the Buyer's consent via written notice to the Buyer. Furthermore, the Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

19.  <u>Third Party Rights</u>. A person who is not a party to this Agreement has no right to enforce or to enjoy the benefit of any term of this Agreement and consequently no one other than a party to this Agreement, their successors and permitted assignees, shall have any right to enforce any of its terms.

20.  <u>Waiver</u>. No failure by either Party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach of any other covenant, duty, agreement, or condition.

21.  <u>Non-Disparagement</u>. Each Party agrees to take no action which is intended, or would reasonably be expected, to harm the other Party or its reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to the other Party. Subject to the provisions of Section 8, such actions include, without limitation, disparaging remarks, comments, or statements that impugn the character, honesty,

13

EXHIBIT C
PAGE 103

integrity, morality or business acumen or abilities in connection with any aspect of the operation of the other Party.

The provisions of this Section do not extend to statements made by either Party when compelled by an authority of law; *provided, however,* that the Party making such statement informs the other Party (unless explicitly ordered not to do so by such legal authority).

22.  <u>Governing Law</u>. This Agreement and all related documents including all schedules attached hereto, and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, statute, or otherwise, are governed by, and construed in accordance with the laws of the State of Florida (including its statutes of limitations and choice of law statutes), without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Florida.

23.  <u>Dispute Resolution</u>. Unless the Parties agree otherwise in writing, in the event a dispute arises from, or related to, the terms or performance of the Agreement, the Parties shall engage in direct negotiation.

In the event such negotiations fail to amicably resolve any remaining dispute(s), the Parties shall proceed to binding arbitration before a single arbitrator of the American Arbitration Association ("AAA"). In the event the Parties fail to agree on the identity of the arbitrator, the arbitrator shall be assigned to the Parties by the AAA.

Any arbitration shall be conducted in accordance with the AAA's Commercial Arbitration Rules and Mediation Procedures.

Unless otherwise agreed to by the Parties in writing, the seat of arbitration shall be Miami, Florida.

The Parties shall bear their own dispute-related expenses.

24.  <u>Jury Trial Waiver</u>. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

25.  <u>Class Action Waiver</u>. Any proceedings to resolve or litigate any dispute arising from the provisions of this Agreement will be conducted solely on an individual basis. Neither Party will seek to have any dispute heard as a class action, private attorney general

14



**EXHIBIT C**
**PAGE 104**

action, or in any other proceeding in which either party acts or proposes to act in a representative capacity.

26.   Counterparts. The Parties may execute this Agreement in multiple counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement via facsimile, electronic mail in portable document format ("pdf"), or by any other electronic means shall have the same effect as delivery of an executed original of the Agreement.

15

EXHIBIT C
PAGE 105

**IN WITNESS WHEREOF,** the Parties have executed this Sale and Purchase Agreement as of the Effective Date.

The Company: **UPTIME ARMORY, LLC**

By: _____Robert Collazo_____
Print Name

_____(signature)_____
Signature

_____Founder and CEO_____
Title

The Buyer: **BEEQB LLC**

By: _Maxim Eliseev_
Print Name

_____(signature)_____
Signature

_____Title_____

16

EXHIBIT C
PAGE 106

**SCHEDULE A**
**DESCRIPTION OF EQUIPMENT, PURCHASE AND TRANSFER DETAILS**

Description of Equipment:

Five (5) 40' Standard shipping container, modified for use in Crypto Mining. Each container will be designed to hold and operate 280 S19 Pro Antminers manufactured by Bitmain within 5% of specifications.

The major modifications include:

Structural: Long side louvers with additional vertical supports; entry door; framing for fans at door short end.

Interior: Rubber flooring; foamboard insulation; LED lighting; environment meters; two security cameras.

Racking: Four large industrial strength racks, each rack having 10 vertical shelves and fitting 7 miners per shelf. Each Pod5ive will be outfitted with 2 racks per side with a design that permits the miners' exhaust fans to be embedded in the foamboard insulation.

Networking: Shielded Cat 5e cabling from each miner to a Secondary network switch with one Secondary switch per rack. All Secondary switches will be aggregated via Cat 5e into an aggregator Primary switch. Customer will connect its own network into a router aggregator to the Primary switch. A server computer is provided using the Pod5ive monitoring software, or the customer's own software.

Airflow: 4 direct drive fans with 10 HP motors running on an independent Variable Frequency & Adjustable Speed Drive on a 60A 3P 415V breaker, each with a maximum of 29,500 cfm each. Intake air filtration and an evaporative cooler will process the incoming air.

Electrical: The Pod5ive will be delivered ready to accept 415V 3-phase electricity up to 2000A from a transformer. The Pod5ive will have 2 main breakers of 1000A each. Customer will provide electric service to the connection bar from the transformer to the block inside each main breaker.

Each Pod5ive will have 2 breaker panels feeding 30 smart power distribution units (3 per rack). Each PDU will have sufficient capacity to power 12 S19 miners at 240V and 12A. Networking equipment, evaporative cooler, security, server computer, sensors, and lights will be 120V circuit.

The Estimated Completion Date shall be April 2022

The Equipment shall be picked up at the following transfer location: 12301 NW 112 Ave Suite 112, Medley, FL 33178

17

EXHIBIT C
PAGE 107

NOTE: Purchase of Pod5ive containers does NOT include mining hardware, except as indicated above. The foregoing shall not be intended to include all features and modifications to create a Pod5ive. Additional specifications can be found in the attached brochure.

18



**EXHIBIT C**
**PAGE 108**

# EXHIBIT C

EXHIBIT C
PAGE 109



**Buzko Krasnov**

Buzko Krasnov
228 Park Ave S #85451
New York, NY 10003•1502
info@buzko.legal

April 20, 2023

*Via email*

Andrea Siles
andrea@bit5ive.com

Robert Collazo
robert@bit5ive.com

**RE:    Hosting Agreement**

To Whom It May Concern,

Our firm represents Maxim Eliseev, the owner of BEEQB LLC, with whom your company, Uptime Hosting LLC, entered into the Hosting Agreement dated October 1, 2021 ("**Agreement**"). This letter is a demand that you refund Mr. Eliseev's deposit of $343,421.96 and the $184,680 Hosting Fee, return all 1,294 of the ASIC machines ("**Machines**"), and that you reimburse Mr. Eliseev $875,000 for purchasing your containers. Per the Agreement and Florida law, Mr. Eliseev has a right to these remedies.

Under the terms of the Agreement, Mr. Eliseev agreed to supply Machines and pay fees, and in return, your Company was to provide electricity connection, space, and other services for these Machines. Between December 2021 and January 2023, BEEQB supplied your Company with 1,294 Machines, which is confirmed by multiple freight invoices and delivery receipts.

Under Clause 1.1 Mr. Eliseev was obliged to deliver the Machines specifically to your Company. Mr. Eliseev delivered the Machines to your Company, and you confirmed the amount of 1,294 Machines during the last inventory check.

Under Clause 1.1 of the Agreement, you are obliged to provide Mr. Eliseev with services for these Machines, including receiving and testing the Machines, engaging in cryptocurrency mining and operating the Machines, providing rack space allocation for the Machines, installation services, electrical power connection, cooling infrastructure, network connectivity, security, and technical support ("**Services**"). To date, you have failed to fully provide Mr. Eliseev with the Services for the Machines, his deposit, or the return of his Machines.

**CLAIM #1 REFUNDABLE DEPOSIT**

As part of the Agreement, Mr. Eliseev sent your Company three payments of $657,000.00, $153,300.00, and $37,272.30 of refundable hosting deposits, to be used to pay the electrical costs for hosting his Machines. When paying these deposits, Mr. Eliseev relied upon your representation that the deposit was fully refundable. Taking into account all mutual settlements and deposit reductions, the current deposit is refundable. Currently, the outstanding amount of

DocuSign Envelope ID: 41EC4B88B-930A-40D5-B3E4-2783296F4714

the hosting deposit is $343,421.96 ($322,545.46 and $197,100.00 for the Oklahoma and Carolina locations respectively less outstanding electricity bill for $176,223.5), which Mr. Eliseev is entitled to.

Under Florida law, the elements of a breach of contract claim are "(1) a valid contract; (2) a material breach; and (3) damages." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949 (Fla. Dist. Ct. App. 2017).

The Agreement is a valid, binding, and enforceable contract. Mr. Eliseev paid the $343,421.96 refundable deposit in order to allow your Company to pay for electrical costs to power the Machines. Your Company's failure to return this refundable deposit breaches the Agreement.

### CLAIM #2 HOSTING FEE

Under Clause 1.8 of the Agreement, your Company is obliged to provide Services to Mr. Eliseev's Machines at a minimum of 90% of the time ("**Minimum Service Level**"). The contractually agreed upon remedy for failure to meet the Minimum Service Level is for Mr. Eliseev to receive a credit ("**Service Level Credit**") equal and limited to a discount in proportion to the monthly rate for the amount of downtime beyond the Minimum Service Level.

The Agreement is a valid, binding, and enforceable contract. The Agreement became effective in October 2021, and you have not provided Mr. Eliseev with the full amount of Services required by the Agreement. Under the Agreement, your Company was obligated to provide Services at the Minimum Service Level, or if the Minimum Service Level was not met, your Company was required to give Mr. Eliseev Service Level Credits. Your Company failed to deliver the full amount of power necessary for operation of the Machines thus, utterly failed to perform at the Minimum Service Level. Your Company did not conduct its operations as a prudent Services provider, despite its contractual obligation to do so. Your Company also failed to provide Mr. Eliseev any of the Service Level Credits he is owed per the Agreement. After almost a year and a half of failing to provide the full amount of Services, as of April 19, 2023 you owe Mr. Eliseev $184,680 in Service Level Credits. With each passing day the amount of Service Level Credits owed to Mr. Eliseev increases by $1,620. Accordingly, your Company breached the Agreement by failing to provide Mr. Eliseev with his contractually owed Service Level Credits.

### CLAIM #3 ASIC MACHINES

Your Company must return the Machines that you are unlawfully withholding from Mr. Eliseev. Your contention that the Machines cannot be returned because they have become collateral to the landlord who leases the hosting facility is unfounded. Mr. Eliseev has promptly paid all costs invoiced to him regarding the Machines.

Florida Statute section 713.31(2)(a) states that, "[a]ny lien asserted under this part in which the lienor has . . . willfully included a claim for work not performed upon or materials not furnished for the property upon which he or she seeks to impress such lien or in which the lienor has compiled his or her claim with such willful and gross negligence as to amount to a willful exaggeration shall be deemed a fraudulent lien."

The landlord's lien on the Machines is a fraudulent lien. Your Company did not provide Mr. Eliseev with the full amount of Services required by the Agreement. Your Company utterly failed to perform as it promised by failing to deliver power to the Machines required by the Agreement. The claim upon which you base your lien is unfounded as your Company has

DocuSign Envelope ID: 1EC4B88B-930A-40D5-B3E4-2783296F4714

breached the Agreement despite Mr. Eliseev delivering the Machines and paying the refundable deposit with the expectation that the Machines would receive the promised Services. Mr. Eliseev has fulfilled all of his obligations under the Agreement. Therefore, it is a fraudulent lien, and all Machines must be returned to Mr. Eliseev.

### CLAIM #4 REIMBURSEMENT

Your company must reimburse Mr. Eliseev $875,000 for purchasing your containers, plus any costs required in disposing of the containers. Mr. Eliseev had to buy specifically designed containers from your Company because these containers are custom-built, they cannot be used with other power-generating facilities or other hosting providers. The containers' key purpose is to store the Machines at your facilities. Because of your breach of the Agreement, the Machines inside the containers are facing significant depreciation due to weather conditions absent of power supply. Additionally, your Company had an obligation to monitor the containers daily and to contact Mr. Eliseev within three business days if the containers were not functioning properly. Lack of power at the Carolina and Oklahoma sites exposed the Machines to frost and moisture, which may result in prolonged damage to the Machines.

If you fail to reimburse Mr. Eliseev for the containers, he is within his right to sue for consequential damages under Florida law. Your company's actions are clear examples of gross negligence, more than enough to find any damage-limiting provision in the Agreement unconscionable. Florida Statute section 672.715(2)(a) provides that, "consequential damages resulting from the seller's breach include any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know . . . ". Your Company should have known that due to the containers being specifically designed for your facility, any breach would result in the containers becoming useless, as Mr. Eliseev couldn't use them at other facilities. Additionally, Mr. Eliseev's damages can be proven with clear, definite, and certain evidence, and the amount of damages can be reasonably calculated given that the purchase price of the containers is directly stated under Clause 2(a) of the Sale and Purchase Agreement.

Alternatively, Mr. Eliseev is offering your Company the chance to repurchase the containers for the $675,000 purchase price.

### CONCLUSION

You must immediately provide Mr. Eliseev with the relief requested in this letter. If you fail to comply with this demand by April 27, 2023, Mr. Eliseev reserves his legal and equitable rights, including bringing a lawsuit against your Company and its affiliated entities for breach of contract and other claims.

Sincerely,

*Filipp Petkevitch*

Filipp Petkevitch
Attorney
Buzko Krasnov
filipp.petkevitch@buzko.legal

# EXHIBIT D

EXHIBIT C
PAGE 113



**Buzko Krasnov**

Buzko Krasnov
228 Park Ave S #85451
New York, NY 10003-1502
info@buzko.legal

April 26, 2023

*Via email*

Hashpower LLC
info@hashpower.energy

### RE:     CONVERSION OF ASIC MACHINES

To Whom It May Concern,

Our firm represents Maxim Eliseev, the owner of BEEQB LLC, whose ASIC machines are currently on your property located at 4038 Rocket St, Pryor, Oklahoma 74361.

Mr. Eliseev communicated he wants to retake possession of his ASIC machines from Uptime Hosting LLC ("**Uptime**"). Uptime communicated to Mr. Eliseev that it cannot return the machines to him because they have become collateral to you, as landlord and owner of the site, where the ASIC machines operate. Mr. Eliseev is unsure whether you realize that you are holding property that does not belong to Uptime, and instead belongs to a separate company, BEEQB LLC. Mr. Eliseev and BEEQB LLC should not be held liable for any agreements you made with Uptime.

Mr. Eliseev demands that you return the ASIC machines that you are in unlawful possession of and allow Mr. Eliseev to retake possession of them immediately.

The ASIC machines were purchased pursuant to an agreement governed by Florida law. Florida Statute section 713.31(2)(a) states that, "[a]ny lien asserted under this part in which the lienor has . . . willfully included a claim for work not performed upon or materials not furnished for the property upon which he or she seeks to impress such lien or in which the lienor has compiled his or her claim with such willful and gross negligence as to amount to a willful exaggeration shall be deemed a fraudulent lien."

Your lien on the ASIC machines is a fraudulent lien. The claim upon which you base your lien is unfounded. Mr. Eliseev delivered the ASIC machines and paid the refundable deposit, which fulfilled all of his obligations to Uptime under the Agreement entered into by Uptime and Mr. Eliseev. Therefore, yours is a fraudulent lien, and all ASIC machines must be returned to Mr. Eliseev.

Under Oklahoma law, "conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein, . . ., or any wrongful exercise or assumption of authority personally or by procurement, over another's goods, depriving him of the possession, permanently or for an indefinite time." *Tillman v. Shofner*, 90 P.3d 582, 583 (Okla. Civ. App. 2004).

**EXHIBIT C
PAGE 114**

You must immediately return the ASIC machines to Mr. Eliseev. If you fail to comply with this demand by May 3, 2023, Mr. Eliseev reserves his legal and equitable rights, including bringing a lawsuit against you for conversion and other claims.

Sincerely,

*Filipp Petkevitch*

Filipp Petkevitch
Attorney
Buzko Krasnov
(718) 557-9582
filipp.petkevitch@buzko.legal



**Buzko Krasnov**

Buzko Krasnov
228 Park Ave S #85451
New York, NY 10003-1502
info@buzko.legal

April 21, 2023

*Via email*

Board of Public Works
customerservice@gbpw.com

RE:    CONVERSION OF ASIC MACHINES

To Whom It May Concern,

Our firm represents Maxim Eliseev, the owner of BEEQB LLC, whose ASIC machines are currently on your property located at 150 Hyatt St, Gaffney, South Carolina 29341.

Mr. Eliseev communicated he wants to retake possession of his ASIC machines from Uptime Hosting LLC ("**Uptime**"). Uptime communicated to Mr. Eliseev that **it** cannot return the machines to him because they have become collateral to you, as landlord and owner of the site, where the ASIC machines operate. Mr. Eliseev is unsure whether you realize that you are holding property that does not belong to Uptime, and instead belongs to a separate company, BEEQB LLC. Mr. Eliseev and BEEQB LLC should not be held liable for any agreements you made with Uptime.

Mr. Eliseev demands that you return the ASIC machines that you are in unlawful possession of and allow Mr. Eliseev to retake possession of them immediately.

The ASIC machines were purchased pursuant to an agreement governed by Florida law. Florida Statute section 713.31(2)(a) states that, "[a]ny lien asserted under this part in which the lienor has . . . willfully included a claim for work not performed upon or materials not furnished for the property upon which he or she seeks to impress such lien or in which the lienor has compiled his or her claim with such willful and gross negligence as to amount to a willful exaggeration shall be deemed a fraudulent lien."

Your lien on the ASIC machines is a fraudulent lien. The claim upon which you base your lien is unfounded. Mr. Eliseev delivered the ASIC machines and paid the refundable deposit, which fulfilled all of his obligations to Uptime under the Agreement entered into by Uptime and Mr. Eliseev. Therefore, yours is a fraudulent lien, and all ASIC machines must be returned to Mr. Eliseev.

Additionally, by wrongfully possessing the ASIC machines, you are liable under South Carolina law for Conversion. "Conversion" is the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of the

**EXHIBIT C
PAGE 116**

condition or the exclusion of the owner's rights. *Hawkins v. City of Greenville*, 358 S.C. 280, 594 S.E.2d 557 (Ct. App. 2004)

You must immediately return the ASIC machines to Mr. Eliseev. If you fail to comply with this demand by April 27, 2023, Mr. Eliseev reserves his legal and equitable rights, including bringing a lawsuit against you for conversion and other claims.

Sincerely,

*Filipp Petkevitch*

Filipp Petkevitch
Attorney
Buzko Krasnov
(718) 557-9582
filipp.petkevitch@buzko.legal

# EXHIBIT E

EXHIBIT C
PAGE 118



**POPE FLYNN**
GROUP

Pope Flynn, LLC
1411 Gervais Street, Suite 300
Post Office Box 11509 (29211)
Columbia, SC 29201

MAIN 803.354.4900
FAX 803.354.4899
www.popeflynn.com

April 24, 2023

**Via: Electronic-Mail and U.S. Mail**

Filipp Petkevitch, Attorney
Buzko Brasnov
228 Park Ave. S. #85451
New York, NY 10003-1502
filipp.petkevitch@buzko.legal

Re:    **Bockquarry Corp. v. Litchain Corp, et seq.**
Civil Action No. 7:23-cv-01427-TMC
PF File No. 00269.000005

Dear Mr. Petkevitch,

Our firm represents Gaffney Board of Public Works ("Gaffney BPW"). Gaffney BPW forwarded us a copy of your letter dated April 21, 2023. Please accept this letter as the response of Gaffney BPW to your demand for the return of ASIC machines located at 150 Hyatt Street, Gaffney, South Carolina 29341 by April 27, 2023. The requested property is the subject of a lawsuit filed by Blockquarry Corporation ("Blockquarry") against Gaffney BPW and Litchain Corporation ("Litchain") on April 7, 2023. A copy of the Complaint for Declaratory Judgment, Injunction, and Damages is enclosed for your reference. Please note that 150 Hyatt Street is misidentified in the Complaint as 154 Hyatt Street, but the premises is the same. This Complaint includes a demand for the return of certain deposit funds related to electric utility services, certain real property improvements to the premises, and certain personal property stored on the premises, including all servers.

At the time Blockquarry filed its Complaint, it also filed a Motion for Temporary Restraining Order and Preliminary Injunction. On April 12, 2023, the Court denied Blockquarry's motion for temporary restraining order and reserved ruling on Blockquarry's motion for preliminary injunction until all parties had been served and given the opportunity to respond. The April 12 order included the following instructions, "[t]he court admonishes all litigants that any party that engages in spoliation of evidence or waste of the personal property at issue in this action, or otherwise dissipates such personal property, tangible or intangible, pending an order of this court does so at its own peril, and the court reserves the right to sanction any such conduct." The ASIC machines referenced in your letter fall within the scope of this order and cannot be released to anyone, including your client, in the absence of a court order. Until such an order has been received, all equipment left at 150 Hyatt Street will remain securely locked onsite.

**EXHIBIT C
PAGE 119**

**P O P E   F L Y N N**
GROUP

Filipp Petkevitch, Attorney
Buzko Brasnov
April 24, 2023
Page | 2

    Despite the allegations contained in your letter, Gaffney BPW is not holding the ASIC machines as collateral or otherwise attempting to assert a right of ownership over them. Instead, they are the subject of an ongoing federal lawsuit and cannot be released to anyone in the absence of a court order. Once Gaffney BPW receives instructions from the Court as to the proper manner in which to disburse the equipment remaining onsite at 150 Hyatt Street, it will promptly comply with that order.

    Thank you for your understanding in this matter. We welcome any action for you to intervene on behalf of your client as necessary to have their stated interest in the servers protected by the Court.

                Sincerely,

                Virginia P. Bozeman

Enclosures

**EXHIBIT C**
**PAGE 120**

# EXHIBIT F

EXHIBIT C
PAGE 121

## PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
ATTORNEYS AT LAW

Reply to: Coral Gables Office
Sender's email: kpaz@pbyalaw.com

April 27, 2023

**Via E-Mail**

Filipp Petkevitch
Buzko Krasnov
228 Park Ave S
New York, New York 10003
Filipp.petkevitch@buzko.legal

**Re:     Response to Letter Regarding Hosting Agreement**

Dear Mr. Petkevitch:

Our law firm represents Uptime Hosting, LLC ("Uptime Hosting") in connection with the matters set forth in your letter dated April 20, 2023. Our law firm also represents affiliated entities Uptime Armory, LLC ("Uptime Armory") and Bit5ive LLC ("Bit5ive"). This letter will respond to each of the demands made in turn. In short, Uptime Hosting is amenable to collaborating with your client BEEQB LLC ("BEEQB") to amicably resolve these issues to the extent our respective clients are able to do so. Many of the matters complained of are outside the control of Uptime Hosting, as explained below.

To provide some context, your client provided hosting deposits for a total of five containers which are split amongst two sites: three containers in Pryor, Oklahoma and two in Gaffney, South Carolina. The Gaffney site, which is owned by the Gaffney Board of Public Works (the "Board"), is or was leased to Litchain Corp. The site is currently under lock and key due to a lawsuit not involving Uptime Hosting or any of its affiliates. BEEQB's miners were running on this site prior to the lawsuit and they have several hundred miners sitting there, unable to access.

The lawsuit is brought by Blockquarry Corp., which as we understand was the largest client on the site. Enclosed you will find a declaration related to the legal action currently pending related to the Gaffney site that describes the operative facts giving rise to that lawsuit. The declaration states how the Board stopped electrical service in January 2023, due to no fault of our clients. In fact, it seems from the declaration that the party at fault for the termination of electrical service was Litchain. As you can imagine, our clients are likewise suffering as a result of this problem.

At this time, no one can access the site for another 60-90 days. Our clients have submitted a request to the Board in order to retrieve hardware, which request the Board unfortunately denied.

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
200 SOUTH ANDREWS AVENUE, SUITE 600, FORT LAUDERDALE, FLORIDA 33301 • (954) 566-7117
283 CATALONIA AVENUE, SUITE 200, CORAL GABLES, FL 33134 • (305) 377-0086

EXHIBIT C
PAGE 122

Response to BEEQB Demand Letter
April 27, 2023
Page 2

The Hosting Agreement referenced in your letter contains a force majeure clause, which states as follows:

> 2.3.  *Force Majeure.* In no event shall Host be responsible or liable for any failure or delay in the performance of its obligations arising out of the Agreement caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics and related health disasters, and interruptions, loss, local, state, or national government acts, delays or conflicts with shippers, or malfunctions of utilities, communications, or computer (software and hardware) services.

In addition to the Hosting Agreement entered into between BEEQB and Uptime Hosting, BEEQB and Uptime Armory, LLC entered into a Hardware Agreement dated October 1, 2021, which governs the sale of the cryptocurrency mining equipment and required a deposit of $656,250, in addition to a remainder payment. The Hardware Agreement contains a force majeure clause similar to that of the Hosting Agreement, as follows:

> 12.  <u>Force Majeure.</u> In no event shall either Party be responsible or liable for any failure or delay in the performance of its obligations arising out of the Agreement caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics and related health disasters, and interruptions, loss, local, state, or national government acts, delays or conflicts with shippers, or malfunctions of utilities, communications, or computer (software and hardware) services.

With respect to the Gaffney site, the events that have unfolded at the site constitute events of force majeure. These are forces beyond the control of Uptime Hosting and Uptime Armory within the meaning of the contractual force majeure clauses. In other words, Uptime Hosting and Uptime Armory—which are also suffering as a result of the events at the Gaffney site—cannot be responsible for the interruptions in service and the inability to retrieve equipment given that the Board has restricted access for all.

As for the Pryor, Oklahoma site, we understand that your client opted not to pay those power bills.

Concerning the four claims raised in your letter, we will address each of those in turn.

**PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.**
200 South Andrews Avenue, Suite 600, Fort Lauderdale, Florida 33301 • (954) 566-7117
283 Catalonia Avenue, Suite 200, Coral Gables, FL 33134 • (305) 377-0086

**EXHIBIT C
PAGE 123**

Response to BEEQB Demand Letter
April 27, 2023
Page 3

## Claim #1 Refundable Deposit

There is no dispute among our clients that the Hosting Agreement and Hardware Agreement are valid, enforceable contracts. However, against the backdrop of our narrative above and citation to the respective contractual force majeure clauses, Uptime Hosting and Uptime Armory respectfully disagree that any breach of contract has occurred. The event of force majeure excuses performance for the duration of that event, as it is completely not within the reasonable control of our clients. Florida courts routinely uphold force majeure clauses in contracts to excuse performance for the duration of the force majeure event. *See, e.g.*, *Home Devco/Tivoli Isles Ltd. Liab. Co. v. Silver*, 26 So. 3d 718, 722 n.3 (Fla. 4th DCA 2010) (citing *St. Joe Paper Co. v. State Dep't of Envtl. Regulation*, 371 So. 2d 178, 180 (Fla. 3d DCA 1979)). Even if this clause were not in the contract—which it is—the doctrine of impossibility of performance would lead to the same result.

Having said that, Uptime Hosting is willing to reimburse your client for the hosting deposit as it relates to the Gaffney site as soon as Uptime Hosting is able to return to the site and engage a replacement client.

As for the Oklahoma site, our clients were not responsible for your client's non-payment of the electrical bill and respectfully disagree they must reimburse your client. Again, Uptime Hosting is willing to reimburse your client for the hosting deposit in Oklahoma once it engages a replacement client.

## Claim #2 Hosting Fee

We reiterate the force majeure clause here to the extent it applies to any claims raised by your client that the machines did not reach Minimum Service Level.

## Claim #3 Asic Machines

Again, we reiterate the force majeure clause. Our clients actively sought to mitigate damages and obtain access to the Gaffney site to retrieve equipment. The Board, which is a municipal governmental entity, denied access. Our clients are equally without any remedy unless and until the Board allows access to the premises.

We respectfully disagree with the assertion that any lien on the hardware is a fraudulent lien pursuant to Section 713.31(2)(a), Florida Statutes. As you know, the Gaffney site is in South Carolina, and South Carolina law would govern the imposition of any lien in the real property in its state. That said, we understand that the Board, a governmental entity, is the party restricting access. We have attempted to negotiate entry, and in addition, a lawsuit remains pending against the Board and Litchain. Our clients have every intent to return your client's miners but the force majeure situation is not allowing them to do so at this time.

Concerning the hardware in Oklahoma, your client's default on two power payments caused our clients to be in default and have caused a difficult situation with the landlord. Mr. Robert Collazo,

**PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.**
200 SOUTH ANDREWS AVENUE, SUITE 600, FORT LAUDERDALE, FLORIDA 33301 • (954) 566-7117
283 CATALONIA AVENUE, SUITE 200, CORAL GABLES, FL 33134 • (305) 377-0086

**EXHIBIT C
PAGE 124**

Response to BEEQB Demand Letter
April 27, 2023
Page 4

CEO of our clients, had a face-to-face meeting with your client in which he emphasized all the different scenarios that could take place if your client chose to default on payment. Your client mentioned it would not be paying their outstanding power bills in Oklahoma due to the issues in Gaffney. One site has nothing to do with the other. To the extent your assertion of a fraudulent lien relates to the hardware in Oklahoma, that issue would be governed under Oklahoma law. Our clients are actively working to engage a new client to replace your client's power capacity so our clients could remove the equipment. Once a new client signs, BEEQB's equipment could be removed almost immediately.

**Claim #4 Reimbursement**

As far as the claim that these containers cannot be used on other sites, we likewise respectfully disagree. Our clients have built more than 100 containers which have been deployed all over the country on sites neither owned nor operated by our clients. In fact, there are several currently active in Georgia, Texas, and Maine on sites neither owned nor operated by Uptime Hosting or Bit5ive. These containers were custom made to fit the dimensions of new Bitcoin miners, but the racks holding these miners can be retrofitted to house any size miner available in the market. The containers allocated for BEEQB are in great condition as they were custom made. The only use they have endured is from hosting the hardware.

In summary, our clients' intentions are as follows:

1. Once the problem in Gaffney is resolved and the capacity is replaced with a new client, BEEQB will have all its miners returned. The existing deposits for the amount they have claimed will be refunded as well.

2. Once the legal issues in Oklahoma are resolved with the landlord in the next few weeks, our clients will be able to ship their hardware to the location of their choice at no cost to BEEQB.

3. Our clients have no problem repurchasing the five containers for the proposed amount of $675,000. However, Mr. Eliseev is aware that our companies are facing potential bankruptcy. Mr. Collazo has communicated this to the BEEQB team. Our clients would need to find a potential buyer for these containers in order to fulfill the request.

**Reservation of Rights**

**The foregoing is without prejudice and is not intended to be a complete recitation of all applicable law and/or facts and shall not be deemed to constitute a waiver or relinquishment of RFI's rights or remedies, whether legal or equitable, all of which are expressly reserved, including RFI's right to all available remedies against your clients, including the recovery of costs and attorneys' fees.**

**PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.**
200 South Andrews Avenue, Suite 600, Fort Lauderdale, Florida 33301 • (954) 566-7117
283 Catalonia Avenue, Suite 200, Coral Gables, FL 33134 • (305) 377-0086

**EXHIBIT C
PAGE 125**

Response to BEEQB Demand Letter
April 27, 2023
Page 5

Please confirm receipt of this letter. Should you have any questions or wish to discuss this in more detail, feel free to call me on my direct line at (305) 370-3277.

Sincerely,

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.

Kristin Drecktrah Paz

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.

200 South Andrews Avenue, Suite 600, Fort Lauderdale, Florida 33301 • (954) 566-7117
283 Catalonia Avenue, Suite 200, Coral Gables, FL 33134 • (305) 377-0086

**EXHIBIT C
PAGE 126**

# EXHIBIT G

EXHIBIT C
PAGE 127

## PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.

ATTORNEYS AT LAW

Reply to:  Coral Gables office
Sender's email: kpaz@pbyalaw.com

August 18, 2023

**Via E-Mail**

Filipp Petkevitch
Buzko Krasnov
228 Park Ave S
New York, New York 10003
Filipp.petkevitch@buzko.legal

Re:     **Containers Owed to BEEQB**

Dear Mr. Petkevitch:

As you know, our law firm represents Uptime Hosting, LLC ("Uptime Hosting"), Uptime Armory, LLC ("Uptime Armory"), and Bit5ive LLC ("Bit5ive"). This letter relates to containers at the Pryor, Oklahoma site.

In our last communication to you, we mentioned our understanding that BEEQB opted not to pay the power bills at the Oklahoma site, and that fact caused issues between the landlord and our clients, as the landlord deemed them in default. At this juncture, the landlord is demanding Bit5ive place funds in escrow to determine ownership of three containers on its site.

Our clients acknowledge that BEEQB is entitled to three containers, and they propose providing BEEQB with two brand new containers to be delivered at the location of your client's choosing. As for the third, one container is coming back, and our clients will also provide that to BEEQB.

We hope this resolves any issue regarding your client's containers in the Pryor, Oklahoma site. Please confirm this arrangement is acceptable and likewise confirm the location where the containers should be delivered.

Should you have any questions or wish to discuss this in more detail, feel free to call me on my direct line at (305) 370-3277.

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
200 SOUTH ANDREWS AVENUE, SUITE 600, FORT LAUDERDALE, FLORIDA 33301 • (954) 566-7117
283 CATALONIA AVENUE, SUITE 200, CORAL GABLES, FL 33134 • (305) 377-0086

EXHIBIT C
PAGE 128

Letter to BEEQB
August 18, 2023
Page 2

Sincerely,

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.

Kristin Drecktrah Paz

PERLMAN, BAJANDAS, YEVOLI & ALBRIGHT, P.L.
200 South Andrews Avenue, Suite 600, Fort Lauderdale, Florida 33301 • (954) 566-7117
283 Catalonia Avenue, Suite 200, Coral Gables, FL 33134 • (305) 377-0086

**EXHIBIT C**
**PAGE 129**